**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 Case |
| | § | |
| VILLAGE HOMES, L.P., | § | Case No. 25-43782-mxm |
| | § | |
| Debtor. | § | |
| | § | |

**DISCLOSURE STATEMENT FOR SECOND AMENDED**
**CHAPTER 11 PLAN OF REORGANIZATION**
<u>**FOR DEBTOR VILLAGE HOMES, L.P.**</u>

J. Robert Forshey
State Bar No. 07264200
Emily S. Chou
State Bar No. 24006997
**Vartabedian Katz Hester & Haynes LLP**
301 Commerce Street, Ste. 2200
Fort Worth, Texas 76102
Telephone: 817-214-4990
Facsimile: 817-214-4988
bobby.forshey@vkhh.com
emily.chou@vkhh.com

**ATTORNEYS FOR DEBTOR AND**
**DEBTOR-IN-POSSESSION**

DATED: May 19, 2026

**TABLE OF CONTENTS**

I. NOTICE TO HOLDERS OF CLAIMS AND INTERESTS.................................................................4

    A.    GENERALLY...................................................................................................................4
    B.    SUMMARY OF TREATMENT UNDER THE PLAN ..................................................................6

II. EXPLANATION OF CHAPTER 11 ........................................................................................10

    A.    OVERVIEW OF CHAPTER 11 .........................................................................................10
    B.    PLAN OF REORGANIZATION............................................................................................10

III. BACKGROUND OF THE CHAPTER 11 CASE ........................................................................12

    A.    THE DEBTOR'S COMPANY.............................................................................................12
    B.    PREPETITION DISPUTE WITH OLERIO DEVELOPMENT, LLC..............................................12
    C.    COMMENCEMENT OF THE CHAPTER 11 CASE .................................................................13

IV. THE CHAPTER 11 CASE .................................................................................................14

    A.    ESTATE PROFESSIONALS ...............................................................................................14
    B.    PROFESSIONAL FEES AND EXPENSES...............................................................................14
    C.    SCHEDULES AND BAR DATE............................................................................................14

V. OVERVIEW OF THE PLAN ................................................................................................14

    A.    DISTRIBUTIONS TO CREDITORS AND INTEREST HOLDERS.................................................15
    B.    MEANS FOR IMPLEMENTATION OF THE PLAN..................................................................16
        1.    Continued Existence of the Debtor........................................................................16
        2.    Vesting of Assets ...................................................................................................16
        3.    Assumption of Obligations to Make Distributions .................................................16
        4.    Actions by Debtor and the Liquidating Debtor to Implement Plan .........................16
        5.    Management of the Reorganized Debtor ...............................................................17
        6.    Post-Effective Date Service List. ............................................................................17
        7.    Section 505 Powers ..............................................................................................17
        8.    Section 510(c) Powers ..........................................................................................17
        9.    Section 506(c) Powers ..........................................................................................17

VI. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.......................................................17

VII. CONFIRMATION OF THE PLAN .......................................................................................18

    A.    SOLICITATION OF VOTES; VOTING PROCEDURES.............................................................18
        1.    Ballots and Voting Deadlines ...............................................................................18
        2.    Parties-in-Interest Entitled to Vote ......................................................................18
        3.    Vote Required for Class Acceptance.......................................................................19
    B.    CONFIRMATION HEARING................................................................................................19
    C.    REQUIREMENTS FOR CONFIRMATION OF THE PLAN........................................................20
    D.    CRAMDOWN..................................................................................................................23

VIII. RISK FACTORS ...........................................................................................................25

    A.    INSUFFICIENT ACCEPTANCES .........................................................................................25
    B.    CONFIRMATION RISKS....................................................................................................25
    C.    NON-OCCURRENCE OF CONDITIONS PRECEDENT .............................................................25
    D.    ESTIMATED DISTRIBUTIONS UNDER THE PLAN.................................................................25

IX. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ...........................26

    A.    CONTINUATION OF THE CHAPTER 11 CASE .....................................................................26

B.　ALTERNATIVE PLAN OF REORGANIZATION ...................................................................................... 26

C.　CHAPTER 7 LIQUIDATION............................................................................................................ 26

**X. CONCLUSION ..............................................................................................................................26**

Village Homes, L.P. (the "<u>Debtor</u>"), the debtor and debtor-in-possession in the above-captioned chapter 11 case, hereby submits this Disclosure Statement (this "<u>Disclosure Statement</u>") for the Second Amended Chapter 11 Plan of Reorganization for Village Homes, L.P. (the "<u>Plan</u>") [Docket no. 317]. This Disclosure Statement is to be used in connection with the solicitation of votes on the Plan, a copy of which is attached hereto as **Exhibit "1"**. Unless otherwise defined herein, capitalized terms used herein have the meanings ascribed thereto in the Plan.  Parties-in-interest are urged to carefully review the Plan in conjunction with this Disclosure Statement.   The summaries and descriptions of the Plan set forth herein are qualified in all respects by the actual terms of the Plan as reflected in the attached **Exhibit "1".**

For a general summary of the proposed treatment of Claims or Interests under the Plan, please see the chart below.

## I. NOTICE TO HOLDERS OF CLAIMS AND INTERESTS

### A.       Generally

The purpose of this Disclosure Statement is to enable holders of Claims and Interests in Impaired Classes to make an informed decision in exercising their right to vote to accept or reject the Plan.

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. PLEASE READ THIS DOCUMENT WITH CARE.

On May 14, 2026, the Bankruptcy Court entered an Order (I) Conditionally Approving Disclosure Statement, (II) Scheduling Hearing to Consider Confirmation of Plan and Related Deadlines, and (III) Approving Related Matters [ECF No. 348] (the "Disclosure Statement Order"). Pursuant to section 1125 of the Bankruptcy Code and Rule 3017 of the Federal Rules of Bankruptcy Procedure, the Disclosure Statement Order (a) approved this Disclosure Statement, (b) set a hearing for confirmation of the Plan, (c) approved voting procedures, materials for solicitation of votes on the Plan, and form of notice, and (d) granted related relief, including establishment of certain deadlines relating to confirmation of the Plan. A copy of the Disclosure Statement Order is included in the materials accompanying this Disclosure Statement. APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A DETERMINATION REGARDING THE FAIRNESS OR MERITS OF THE PLAN.

The statements contained in the Disclosure Statement are made as of the date hereof unless another time is specified, and neither delivery of the Disclosure Statement nor any exchange of rights made in connection with the Plan shall, under any circumstances, create an implication that there has not been any change in the information set forth herein since the date the Disclosure Statement and the materials relied on in preparation of the Disclosure Statement were compiled.

For the convenience of Creditors and parties-in-interest, this Disclosure Statement summarizes the terms of the Plan, but the Plan itself qualifies all summaries. This Disclosure Statement is qualified in its entirety by the terms of the Plan. If any inconsistency exists between the Plan and the Disclosure Statement, the terms of the Plan are controlling. In the event of conflict between the Plan and

Confirmation Order, the Confirmation Order will control.

Each Claimant should consult the Claimant's individual attorney, accountant, and/or financial advisor as to the effect of the Plan on such Claimant.

Each holder of a Claim or Interest entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan in their entirety before voting. No solicitation of votes to accept or reject the Plan may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. Except for the Debtor's Estate and its professionals, no person has been authorized to use or promulgate any information concerning the Debtor, the Debtor's business, or the Plan, other than the information contained herein, in connection with the solicitation of votes to accept or reject the Plan. No holder of a Claim entitled to vote on the Plan should rely upon any information relating to the Debtor, the Debtor's business, or the Plan other than that contained in this Disclosure Statement and the exhibits thereto. Unless otherwise indicated, the source of all information set forth herein was the Debtor.

The Disclosure Statement may not be relied on for any purpose other than to determine whether to vote in favor of or against the Plan and related options and elections, and nothing contained herein shall constitute an offer to sell or purchase a security as defined by state or Federal securities law or an admission of any fact or liability by any party, or be admissible in any proceeding involving the Debtor or any other party, or be deemed conclusive evidence of the tax or other legal effects of the reorganization of the Debtor on holders of Claims or Interests. Certain of the information contained in the Disclosure Statement, by its nature, is forward looking, contains estimates and assumptions which may prove to be wrong, and contains forecasts which may prove to be wrong, or which may be materially different from actual results.

After carefully reviewing this Disclosure Statement, including the attached exhibits, please indicate your acceptance or rejection of the Plan by voting on the enclosed Ballot and returning the Ballot to the address, fax, or email as set forth on the Ballot, so that it will be received by no later than **5:00 p.m., Central Time, on June 12, 2026**. If you do not vote to accept the Plan, or if you are the holder of an unimpaired Claim or Interest, you may be bound by the Plan if it is accepted by the requisite holders of Claims or Interests.

TO BE SURE YOUR BALLOT IS COUNTED, YOUR BALLOT MUST BE RECEIVED NO LATER THAN **5:00 p.m., Central Time, on June 12, 2026**. For detailed voting instructions and the name, address, and phone number of the person you may contact if you have questions regarding the voting procedures, this process is explained below.

Pursuant to Rule 3017 of the Bankruptcy Rules, the Bankruptcy Court has scheduled the Confirmation Hearing to consider confirmation of the Plan on **June 26, 2026, at 9:00 a.m., Central Time**, in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served on or before **5:00 p.m. Central Time on June 12, 2026**. The hearing will be before the Honorable Mark X. Mullin, United States Bankruptcy Judge for the Northern District of Texas, Fort Worth Division, Room 128, U.S. Courthouse, 501 West Tenth Street, Fort Worth, Texas 76102.

THE DEBTOR SUPPORTS CONFIRMATION OF THE PLAN AND URGES ALL HOLDERS OF IMPAIRED CLAIMS AND INTERESTS TO VOTE TO ACCEPT THE PLAN.

### B.      Summary of Treatment Under the Plan of Classified Claims

The following is an estimate of the numbers and amounts of classified Claims and Interests to receive treatment under the Plan, and a summary of the proposed treatment of such Claims and Interests under the Plan. Reference should be made to the entire Disclosure Statement and to the Plan for a complete description of the classification and treatment of Claims and Interests.

The Bar Date for any Creditor other than a Governmental Unit to file a proof of Claim is February 8, 2026. The Bar Date for a Governmental Unit to file a proof of Claim is March 30, 2026. The tables below are drawn from the Debtor's Schedules and filed proofs of Claim. The final universe of Claims, as actually Allowed, may differ from these tables.  The amounts reflected below as to the Secured Creditors in Class 2A through 2G may not reflect all credits against the respective debts based on the sale of Lots pledged to the lender after the proofs of claim were filed.

| Class | Treatment |
|---|---|
| **Class 1 – Priority Non-Tax Claims**<br><br>Estimated Amount: $-0-<br><br>Estimated Number of Holders: -0- | **Unimpaired**<br><br>Paid in full.<br><br>**Estimated Recovery:  100%** |
| **Class 2A – Great Plains Bank Secured Claim**<br><br>Estimated Amount: $535,973.21<br><br>Estimated Number of Holders: 1 | **Impaired**<br><br>The Reorganized Debtor shall continue, in the ordinary course of business, to market and sell the holder's Collateral. Upon each sale of any part of the Collateral, the Reorganized Debtor shall pay to the holder the portion of the Sales Proceeds from such sale determined in accordance with the Release Price Schedule.<br><br>**Estimated Recovery:  100%** |
| **Class 2B –PlainsCapital Bank Secured Claim**<br><br>Estimated Amount: $556,028.76<br><br>Estimated Number of Holders: 1 | **Impaired**<br><br>The Reorganized Debtor shall continue, in the ordinary course of business, to market and sell the holder's Collateral. Upon each sale of any part of the Collateral, the Reorganized Debtor shall pay to the holder the portion of the Sales Proceeds from such sale determined in accordance with the Release Price Schedule.<br><br>**Estimated Recovery:  100%** |

| Class | Treatment |
|---|---|
| **Class 2C –Simmons Bank Secured Claim**<br><br>Estimated Amount: $930,476.49<br><br>Estimated Number of Holders: 1 | **Impaired**<br><br>The Reorganized Debtor shall continue, in the ordinary course of business, to market and sell the holder's Collateral. Upon each sale of any part of the Collateral, the Reorganized Debtor shall pay to the holder the portion of the Sales Proceeds from such sale determined in accordance with the Release Price Schedule.<br><br>**Estimated Recovery:  100%** |
| **Class 2D –TexasBank Secured Claim**<br><br>Estimated Amount: $1,948,391.31<br><br>Estimated Number of Holders: 1 | **Impaired**<br><br>The Reorganized Debtor shall continue, in the ordinary course of business, to market and sell the holder's Collateral. Upon each sale of any part of the Collateral, the Reorganized Debtor shall pay to the holder the portion of the Sales Proceeds from such sale determined in accordance with the Release Price Schedule.<br><br>**Estimated Recovery:  100%** |
| **Class 2E –Valliance Bank Secured Claim**<br><br>Estimated Amount: $1,305,132.55<br><br>Estimated Number of Holders: 1 | **Impaired**<br><br>The Reorganized Debtor shall continue, in the ordinary course of business, to market and sell the holder's Collateral. Upon each sale of any part of the Collateral, the Reorganized Debtor shall pay to the holder the portion of the Sales Proceeds from such sale determined in accordance with the Release Price Schedule.<br><br>**Estimated Recovery:  100%** |

| Class | Treatment |
|---|---|
| **Class 2F –Huntington Bank Secured Claim**<br><br>Estimated Amount: $613,417.35<br><br>Estimated Number of Holders: 1 | **Impaired**<br><br>The Huntington Bank Claim is a Contested Claim and has been objected to by the Debtor. The Huntington Bank Collateral will be sold and the sales proceeds up to the release price for each Lot will be placed in escrow and used to pay the Allowed Claim of Huntington.  If the funds in escrow are insufficient to pay the full amount of Huntington's Allowed Claim, the Reorganized Debtor will have 90 days to pay the deficiency.<br><br>**Estimated Recovery:  100% (to the extent allowed)** |
| **Class 2G –Worthington Bank Secured Claim**<br><br>Estimated Amount: $7,346,314.59<br><br>Estimated Number of Holders: 1 | **Impaired**<br><br>The Reorganized Debtor shall continue, in the ordinary course of business, to market and sell the holder's Collateral. Upon each sale of any part of the Collateral, the Reorganized Debtor shall pay to the holder the portion of the Sales Proceeds from such sale determined in accordance with the Release Price Schedule.<br><br>**Estimated Recovery:  100%** |
| **Class 3 – Other Secured Claims**<br><br>Estimated Amount: $-0-<br><br>Estimated Number of Holders: 0 | **Unimpaired**<br><br>This is likely an empty Class.<br><br>**Estimated Recovery:  100%** |

---

| Class | Treatment |
|---|---|
| **Class 4 – VilHom Claim**<br><br>Estimated Amount: $300,000[1]<br><br>Estimated Number of Holders: 1 | **Impaired**<br><br>The VilHom Claim has been estimated by the Bankruptcy Court for confirmation purposes only at $300,000.  The final Allowed Amount of the VilHom Claim will be determined through the Adversary Proceeding.  Until the Final Allowed Amount of the VilHom Claim is determined, the Reorganized Debtor will make monthly payments into escrow for the benefit of VilHom of $8,333.33 each.  Once the Final Allowed Amount, if any, of the VilHom Claim has been determined, the funds will be disbursed to either VilHom or the Reorganized Debtor.  If the funds in escrow are insufficient to pay the full VilHom Claim, then the balance will be paid in 36 monthly installments of no less than $8,333.33 each.<br><br>The VilHom Claim constitutes a Contested Claim.<br><br>**Estimated Recovery:  100%** |
| **Class 5 – Convenience Claims**<br><br>Estimated Amount: $-0-<br><br>Estimated Number of Holders: -0- | **Unimpaired**<br><br>Paid in full<br><br>**Estimated Recovery:  100%** |
| **Class 6 – General Unsecured Claims**<br><br>Estimated Amount: $287,650<br><br>Estimated Number of Holders:  4<br><br>**This includes the Scheduled Class 6 Claims plus an allowance for the disputed claim filed by Charles Walker Bush and Lora Bush of no more than $50,000.** | **Impaired**<br><br>Holder will receive Cash payments equal to the Allowed amount of the Claim in thirty-six (36) substantially equal monthly installments of principal and accrued interest at the rate computed in accordance with 28 U.S.C. § 1961(a).<br><br>**Estimated Recovery:  100%** |

---

[1]  This is the amount for which the Bankruptcy Court estimated VilHom's Claims for confirmation purposes.  The Debtor believes that this Claim will ultimately be fixed at $0.00 and at no more than $300,000.

| Class | Treatment |
|---|---|
| **Class 7 – Interests**<br><br>Estimated Number of Holders: 3 | **Unimpaired**<br><br>Holders of Interests shall retain such Interests. |

## II. EXPLANATION OF CHAPTER 11

### A.      Overview of Chapter 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Pursuant to chapter 11, a debtor-in-possession may attempt to reorganize its business or liquidate its assets for the benefit of the debtor, its creditors, and other parties-in-interest. The Debtor's Chapter 11 Case was commenced with the filing of a voluntary chapter 11 petition by the Debtor on October 1, 2025.

The commencement of a chapter 11 case creates an estate comprising all the legal and equitable interests of the debtor in property as of the date the petition is filed. Sections 1101, 1107, and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession" unless the bankruptcy court orders the appointment of a trustee.

The filing of a chapter 11 petition also triggers the automatic stay provisions of the Bankruptcy Code. Section 362 of the Bankruptcy Code provides, *inter alia,* for an automatic stay of all attempts to collect pre-petition claims from a debtor or otherwise interfere with its property or business. Except as otherwise ordered by the bankruptcy court, the automatic stay remains in full force and effect until the effective date of a confirmed plan of reorganization.

### B.      Plan of Reorganization

Although referred to as a plan of reorganization, a plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of the Debtor's assets. In the Debtor's Chapter 11 Case, the Plan proposes that the Debtor will continue its home-selling business, pay down its secured lenders with the proceeds of home sales according to the applicable loan documents, and pay unsecured claims in full over five (5) years, all in accordance with the priority standards set forth in the Bankruptcy Code.

After a plan of reorganization has been filed, the holders of impaired claims against or interests in a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the plan proponent to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. This Disclosure Statement is presented to holders of Claims against and Interests in the Debtor to satisfy the requirements of section 1125 of the Bankruptcy Code.

If all classes of claims and interests accept a plan of reorganization, the bankruptcy court may nonetheless still not confirm the plan unless the court independently determines that the requirements

of section 1129 of the Bankruptcy Code have been satisfied. Section 1129 sets forth the requirements for confirmation of a plan and, among other things, requires that a plan meet the "best interests of creditors" test and be "feasible." The "best interests of creditors" test generally requires that the value of the consideration to be distributed to the holders of claims and interests under a plan may not be less than those parties would receive if the debtor was liquidated pursuant to a hypothetical liquidation occurring under chapter 7 of the Bankruptcy Code. Under the "feasibility" requirement, unless the plan calls for liquidation or further financial reorganization, the court generally must find that there is a reasonable probability that the debtor will be able to meet its obligations under the plan without the need for such liquidation or further financial reorganization.

The Debtor believes that the Plan satisfies all the applicable requirements of section 1129(a) of the Bankruptcy Code, including, in particular, the "best interests of creditors" test and the "feasibility" test. The Debtor supports confirmation of the Plan and urge all holders of impaired Claims to accept the Plan.

Chapter 11 does not require that each holder of a claim against or interest in a debtor vote in favor of a plan of reorganization in order for the bankruptcy court to confirm the plan. At a minimum, however, the plan must be accepted by a majority in number and two-thirds in amount of those claims actually voting in at least one class of impaired claims under the plan. The Bankruptcy Code also defines acceptance of the plan by a class of interests (equity securities) as acceptance by holders of two-thirds of the number of shares actually voting. In the Chapter 11 Case, only the holders of Claims who actually vote will be counted as either accepting or rejecting the Plan.

In addition, classes of claims or interests that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan and thus are not entitled to vote. Accordingly, acceptances of a plan will generally be solicited only from those persons who hold claims or interests in an impaired class. A class is "impaired" if the legal, equitable, or contractual rights attaching to the claims or interests of that class are modified in any way under the plan. However, if holders of the claims or interests in a class do not receive or retain any property on account of such claims or interests, then each such holder is deemed to have voted to reject the plan and does not actually cast a vote to accept or reject the plan.

Under the Plan, Classes 1, 3, 5, and 7 are Unimpaired and are not entitled to vote to accept or reject the Plan. Classes 2A, 2B, 2C, 2D, 2E, 2F, 2G, 4, and 6 are Impaired. All of the Impaired Classes are entitled to vote to accept or reject the Plan.

The bankruptcy court may also confirm a plan of reorganization or liquidation even though fewer than all the classes of impaired claims and interests accept it. For a plan to be confirmed despite its rejection by a class of impaired claims or interests, the proponent of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or interests that has not accepted the plan.

Under section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a class of rejecting claims if, among other things, the plan provides: (a) with respect to secured claims, that each such holder will receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; and (b) with respect to unsecured claims

and interests, that the holder of any claim or interest that is junior to the claims or interests of such class will not receive or retain on account of such junior claim or interest any property at all unless the senior class is paid in full.

A plan does not "discriminate unfairly" against a rejecting class of claims if (a) the relative value of the recovery of such class under the plan does not differ materially from that of any class (or classes) of similarly situated claims, and (b) no senior class of claims is to receive more than 100% of the amount of the claims in such class.

The Debtor believes that the Plan has been structured so that it will satisfy these requirements as to any rejecting Class of Claims, and can therefore be confirmed, if necessary, over the objection of any Classes of Claims. The Debtor reserves the right to request confirmation of the Plan under the "cramdown" provisions of section 1129 of the Bankruptcy Code.

## III. BACKGROUND OF THE CHAPTER 11 CASE

### A.     The Debtor Company

The Debtor is engaged in the construction of single-family homes, acquisition of single-family residential lots and options to acquire lots, and in the marketing and sale of the completed. The Debtor is a Texas limited partnership formed in 1996. The Debtor's general partner is DH Management, Inc., a Texas corporation, which holds a 1% general partner interest. The Debtor has two limited partners: Michael Dike and James R. Harris. The Debtor's properties are located in various subdivisions in Tarrant and Parker Counties, Texas.

As of the Petition Date, the Debtor has in its portfolio approximately 117 single-family real property lots. Some of those lots have completed single-family homes on them, some have homes under construction, but the majority are vacant lots. A substantial portion of the Debtor's business is selling pre-sale, or pre-construction, homes with a smaller portion of business being selling completed spec homes.

To finance its homebuilding operations, the Debtor maintains various credit and borrowing facilities with several financial institutions, including Great Plains Bank, Plains Capital Bank, Simmons Bank, Texas Bank, Valliance Bank, Huntington Bank as the successor to Veritex Bank, and Worthington Bank. The lenders are granted liens in the lots for which they make advances for the acquisition thereof or for construction of homes thereon, or both. The existing credit facilities ensure that no two lenders advance funds secured by the same lots. Thus, as between the lenders, there are no concerns of competing liens on each lender's collateral.

### B.     Prepetition Dispute with Olerio Development, LLC, a/k/a VilHom FW Holdings, LLC

In October 2024, the Debtor entered into a Real Estate Sales Contract ("Olerio Contract") with

Olerio Development, LLC ("Olerio"), now known as VilHom FW Holdings, LLC ("VilHom").[2] Pursuant to the contract, the Debtor agreed to sell and Olerio agreed to purchase approximately 100 vacant lots, certain options to acquiring lots, the Debtor's name and related intellectual property, and certain furniture, fixtures, and equipment. Pursuant to the terms of the contract, Olerio was to close the transaction by the end of February 2025.

Olerio did not close the Asset Sale Transaction by the scheduled closing date. As a result, on March 7, 2025, the Debtor terminated the contract in writing and delivered to Olerio's counsel. A few days later, the Debtor received an email from Olerio's counsel disputing the effectiveness of the Debtor's termination. Olerio also threatened to sue the Debtor and file notices of lis pendens.

On March 14, 2025, the Debtor initiated a lawsuit in the District Court of Tarrant County, Texas, in the 352nd Judicial District Court, Cause No. 352-362798-25 seeking a declaratory judgment that, among other things, Olerio defaulted under the contract by failing to close the transaction pursuant to terms of the Contract, that the Debtor properly and validly terminated the Contract, that Olerio has no further rights or interest under the Contract, and that the Debtor is entitled to retain the earnest money deposit paid to the Debtor by Olerio in the amount of $300,000.

Olerio responded to the state court action with counterclaims against the Debtor for specific performance, or alternatively, for breach of the contract and seeking monetary damages, and Olerio recorded notices of lis pendens in the official real property records of Tarrant County and Parker County, Texas. The lis pendens filings cover all of the lots proposed to be sold under the contract.

### C.      Commencement of the Chapter 11 Case

Olerio's lis pendens filings created a cloud on the title of the contract lots, seriously impairing the Debtor's ability to sell the contract lots and operate its business effectively. The bankruptcy case was filed on October 1, 2025, to allow it to continue to operate and to repay its creditors.

### D.      Adversary Proceeding Against VilHom

The Debtor asserts that, based on VilHom's defaults, the Olerio Contract was validly terminated by VilHom pre-petition.  On October 8, 2025, the Debtor commenced Adversary no. 25-04130 against VilHom seeking declaratory judgment that the Olerio Contract had been validly terminated prepetition by the Debtor.  VilHom filed a motion to dismiss which was denied based on an order entered on October 19, 2025.

### E.      Rejection of the Olerio Contract

The Debtor filed a motion to reject the Olerio Contract [Docket no. 45].  After a contested evidentiary proceeding, the Bankruptcy Court entered an order [Docket no. 127] rejecting the Olerio Contract.  This order has become final for all purposes.  VilHom's deadline to file a proof of claim

---

[2] On or about August 22, 2025, Olerio filed a Certificate of Amendment with the Texas Secretary of State by which it changed its name to VilHom FW Holdings LLC ("**VilHom**").

based upon the rejection of the Olerio Contract is January 30, 2026.

### F.        Estimation of VilHom Claim

Pursuant to an *Order Estimating Claim of VilHom FW Holdings, LLC* [Docket no. 311], the Bankruptcy Court has estimated the VilHom Claim at $300,000 for confirmation purposes.  The actual Final Allowed Amount of the VilHom Claim will be determined through the Adversary Proceeding.

### G.        Objection to Huntington Bank Claim

The Debtor maintained a money market account with Huntington.  On February 11 and 12, 2026, Huntington made unauthorized wire transfers for this account in the amount of approximately $522,000.  Based on this, the Debtor has filed an Objection [Docket no. 287] to the Huntington Bank POCs.

## IV. THE CHAPTER 11 CASE

### A.        Estate Professionals

The following is a list of each of the Estate Professionals that have been employed, with a description of the role of each such Estate Professional:

| | |
|---|---|
| Vartabedian Katz Hester & Haynes LLP | Attorneys for the Debtor in the Chapter 11 Case |
| Bruner & Bruner PC | Special counsel for the Debtor in the Olerio/ VilHom litigation |

### B.        Professional Fees and Expenses

As of the date of this Disclosure Statement, no professional has filed any application for approval of compensation for services rendered or reimbursement of expenses incurred on behalf of the Debtor's estate, and the Bankruptcy Court has not approved any such compensation or reimbursement.

### C.        Schedules and Bar Date

On October 29, 2025, the Debtor filed its Schedules of Assets and Liabilities [ECF No. 50] and Statement of Financial Affairs [ECF No. 51].

The Bar Date for any Creditor other than a Governmental Unit to file a proof of Claim is February 8, 2026. The Bar Date for a Governmental Unit to file a proof of Claim is March 30, 2026.

## V. OVERVIEW OF THE PLAN

**THE FOLLOWING IS A SUMMARY OF THE MATTERS CONTEMPLATED TO OCCUR EITHER PURSUANT TO OR IN CONNECTION WITH THE CONSUMMATION OF THE PLAN. THIS SUMMARY HIGHLIGHTS THE SUBSTANTIVE PROVISIONS OF THE PLAN AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION**

**OR A SUBSTITUTE FOR A FULL AND COMPLETE REVIEW OF THE PLAN. THE FOLLOWING SUMMARY IS COMPLETELY QUALIFIED BY THE TERMS OF THE PLAN. IN THE EVENT OF ANY CONFLICT BETWEEN THE FOLLOWING SUMMARY AND THE PLAN, THE PLAN WILL CONTROL.**

### A.     Distributions to Creditors and Interest Holders

The Plan contemplates that the Debtor will continue to operate in the ordinary course of business from and after the Effective Date. The Plan provides that the proceeds from home sales will be applied to full payment of the Debtor's Secured Claims in accordance with the applicable loan documents, and in full payment of the Allowed VilHom Claim and Allowed General Unsecured Claims over a period of five (5) years with interest. The Plan organizes certain kinds of Claims into Classes, and leaves other kinds of Claims unclassified, as the Bankruptcy Code requires.

The Debtor owns a number of Lots located in Tarrant and Parker Counties.  Proofs of Claim for Priority Property Taxes secured by statutory tax liens have been filed against the Debtor totaling approximately $55,648.51.  This amount has been paid down through sales of Lots after the proofs of claim were filed.  As these Lots are sold, these Priority Tax Claims for tax years 2025 and earlier years, to the extent allowed, will be paid from the proceeds at closing.  Property Tax Claims for tax year 2026 will be paid as Ordinary Course Administrative Expenses.

After full payment of Allowed Administrative Expenses, Allowed Priority Tax Claims, Allowed Property Tax Claims, and U.S. Trustee fees, each holder of an Allowed Claim in each of the following Classes will receive the following distributions:

- **Class 1 (Priority Non-Tax Claims).** Each holder of an Allowed Claim in this Class will receive payment in full in Cash on or before the applicable Plan Distribution Date unless the holder and the Debtor agree to other treatment. The Debtor believes that there are no Class 1 Claims.

- **Class 2A, 2B, 2C, 2D, 2E, 2F, and 2G**. These are the Secured Claims held by the Secured Lenders. Each such Claim is classified separately. Upon the sale of each item of Collateral securing a Secured Lender's Claim, the Reorganized Debtor will pay to the Secured Lender a portion of the Sale Proceeds as determined by the applicable loan documents.  The Class 2F Claim by Huntington is disputed and will be paid once the Claim Objection is resolved from the proceeds of Lot sales paid into escrow.

- **Class 3 (Other Secured Claims)**. The Debtor believes that there are no Class 3 Claims and that this will be an empty Class.

- **Class 4 (VilHom Claim).** The VilHom Claim has been estimated by the Bankruptcy Court for confirmation purposes only at $300,000.  The final Allowed Amount of the VilHom Claim will be determined through the Adversary Proceeding.  Until the Final Allowed Amount of the VilHom Claim is determined, the Reorganized Debtor will make monthly payments into escrow for the benefit of VilHom of $8,333.33 each.  Once the Final Allowed Amount, if any, of the VilHom Claim has been determined, the funds will be disbursed to either VilHom or the Reorganized Debtor.  If the funds

in escrow are insufficient to pay the full VilHom Claim, then the balance will be paid in 36 monthly installments of no less than $8,333.33 each.

The VilHom Claim constitutes a Contested Claim.

- **Class 5 (Convenience Claims).** Each holder of an Allowed Claim in this Class will receive payment in full in Cash on or before the applicable Plan Distribution Date.

- **Class 6 (General Unsecured Claims).** Each holder of an Allowed General Unsecured Claim shall receive, beginning on or before the applicable Plan Distribution Date, Cash equal to the Allowed amount of such General Unsecured Claim in thirty-six (36) substantially equal monthly installments of principal and accrued interest at the rate computed in accordance with 28 U.S.C. § 1961(a).

- **Class 7 (Interests).** Holders of Interests shall retain such Interests.

### B.    Means for Implementation of the Plan

### 1.    Continued Existence of the Debtor

The Debtor shall continue to exist after the Effective Date, with all the powers available to such legal entities, in accordance with applicable law and pursuant to its constituent documents. Upon the occurrence of the Effective Date, the Debtor shall be thereafter referred to as the Reorganized Debtor.

### 2.    Vesting of Assets

As of the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all Assets, including all Cash, Estate Accounts Receivable, Estate Claims and Estate Defenses, shall vest in the Reorganized Debtor, free and clear of all rights, title, interests, claims, liens, encumbrances, and charges, except as expressly set forth in the Plan. On and after the Effective Date, the Reorganized Debtor may administer, use, acquire, or dispose of property without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, the Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for all fees, disbursements, expenses, or related support services of Professionals (including fees relating to the preparation of professional fee applications) without application to, or approval of, the Bankruptcy Court.

### 3.    Assumption of Obligations to Make Distributions

The Reorganized Debtor shall be deemed to have assumed the obligation to make all Distributions pursuant to the Plan.

### 4.    Actions by Debtor and the Liquidating Debtor to Implement Plan

The entry of the Confirmation Order shall constitute all necessary authorization for the Debtor and the Reorganized Debtor to take or cause to be taken all actions necessary or appropriate to

consummate, implement or perform all provisions of this Plan on and after the Effective Date, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule or regulation, including without limitation, (a) all transfers of Assets, including to the Reorganized Debtor, that are to occur pursuant to the Plan; (b) the performance of the terms of the Plan and the making of all Distributions required under the Plan; and (c) subject to the terms of the Plan, entering into any and all transactions, contracts, or arrangements permitted by applicable law, order, rule or regulation.

### 5.      Management of the Reorganized Debtor

On and after the Effective Date, the Plan and all property of the Reorganized Debtor shall be managed by the Reorganized Debtor. The Reorganized Debtor shall have sole responsibility for making Distributions under the Plan and pursuing the Estate Claims (including the Avoidance Actions), and the collection and pursuit of the Estate Accounts Receivables.

### 6.      Post-Effective Date Service List.

Pleadings filed by any party-in-interest with the Bankruptcy Court after the Effective Date shall be served on the following Persons (collectively the "Service List"): (a) any Person directly affected by the relief sought in the pleading, (b) the U.S. Trustee, (c) parties that have filed a Notice of Appearance in the Chapter 11 Case, and (d) the Reorganized Debtor.

### 7.      Section 505 Powers

All rights and powers pursuant to section 505 of the Bankruptcy Code are hereby reserved to the Estate and shall be transferred to, and vested in, the Reorganized Debtor as of the Effective Date.

### 8.      Section 510(c) Powers

All rights and powers to seek or exercise any right or remedy of equitable subordination are hereby reserved to the Estate and shall be transferred to, and vested in, the Reorganized Debtor as of the Effective Date as an Estate Defense.

### 9.      Section 506(c) Powers

The Estate hereby reserves all rights and powers pursuant to section 506(c) of the Bankruptcy Code, and all such rights shall be specifically transferred to, and vested in, the Reorganized Debtor.

## VI. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

THE PLAN AND ITS RELATED TAX CONSEQUENCES ARE COMPLEX. MOREOVER, MANY OF THE INTERNAL REVENUE CODE PROVISIONS DEALING WITH THE FEDERAL INCOME TAX ISSUES ARISING FROM THE PLAN HAVE BEEN THE SUBJECT OF RECENT LEGISLATION AND, AS A RESULT, MAY BE SUBJECT TO AS YET UNKNOWN ADMINISTRATIVE OR JUDICIAL INTERPRETATIONS. THE DEBTOR HAVE NOT REQUESTED A RULING FROM THE INTERNAL REVENUE SERVICE (THE "IRS") OR AN OPINION OF COUNSEL WITH RESPECT TO THESE MATTERS. ACCORDINGLY, NO

ASSURANCE CAN BE GIVEN AS TO THE INTERPRETATION THAT THE IRS WILL ADOPT. THERE ALSO MAY BE STATE, LOCAL OR OTHER TAX CONSIDERATIONS APPLICABLE TO EACH CREDITOR. CREDITORS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE CONSEQUENCES OF THE PLAN TO THEM UNDER FEDERAL AND APPLICABLE STATE, LOCAL AND OTHER TAX LAWS.

## VII. CONFIRMATION OF THE PLAN

### A.    Solicitation of Votes; Voting Procedures

### 1.    Ballots and Voting Deadlines

A Ballot to be used for voting to accept or reject the Plan, together with a postage-paid return envelope, is enclosed with all copies of this Disclosure Statement mailed to all holders of Claims and Interests entitled to vote. BEFORE COMPLETING YOUR BALLOT, PLEASE READ CAREFULLY THE INSTRUCTION SHEET THAT ACCOMPANIES THE BALLOT.

The Bankruptcy Court has directed that, in order to be counted for voting purposes, Ballots for the acceptance or rejection of the Plan must be received no later than **5:00 p.m., Central Time, on June 12, 2026,** at the following address, fax, or email:

Vartabedian Katz Hester & Haynes LLP
Attention: Kristina Hartogh
301 Commerce Street, Suite 2200
Fort Worth, Texas 76102
Fax: (817) 214-4988
Email: kristina.hartogh@vkhh.com

YOUR BALLOT MAY NOT BE COUNTED IF IT IS RECEIVED AT THE ABOVE ADDRESS, FAX, OR EMAIL AFTER **5:00 P.M., CENTRAL TIME, ON JUNE 12, 2026.**

### 2.    Parties-in-Interest Entitled to Vote

The holder of a Claim or Interest may vote to accept or reject the Plan only if the Plan impairs the Class in which such Claim or Interest is classified. Under the Plan, Classes 2A, 2B, 2C, 2D, 2E, 2F, 2G, 4, and 6 are Impaired. Therefore, any holder of a Claim in Class 2A, 2B, 2C, 2D, 2E, 2F, 2G, 4, or 6 may vote to accept or reject the Plan.

Notwithstanding the foregoing, any Claim or Interest as to which an Objection has been filed is not entitled to vote unless the Bankruptcy Court, upon application of the holder to whose Claim or Interest an Objection has been made, temporarily allows such Claim or Interest in an amount that it deems proper for the purpose of accepting or rejecting the Plan. Any such application must be heard and determined by the Bankruptcy Court on or before commencement of the Confirmation Hearing. A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

IF YOU HAVE ANY QUESTIONS REGARDING THE PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT COUNSEL FOR THE DEBTOR AT THE FOLLOWING ADDRESS:

> J. Robert Forshey
> Emily S. Chou
> **Vartabedian Katz Hester & Haynes LLP**
> 301 Commerce Street, Ste. 2200
> Fort Worth, Texas 76102
> Telephone: 817-214-4990
> Facsimile: 817-214-4988
> bobby.forshey@vkhh.com
> emily.chou@vkhh.com

### 3. Vote Required for Class Acceptance

The Bankruptcy Code defines acceptance of a plan by a class of claims as acceptance by holders of at least two-thirds in dollar amount, and more than one-half in number, of the claims of that class which actually cast ballots for acceptance or rejection of the plan. Thus, class acceptance takes place only if at least two-thirds in amount and a majority in number of the holders of claims voting cast their ballots in favor of acceptance.

The Bankruptcy Code defines acceptance of a plan by a class of interests as acceptance by holders of at least two-thirds in amount of the interests of that class that actually cast ballots for acceptance or rejection of the plan. Thus, class acceptance takes place only if at least two-thirds in the amount of the holders of interests voting cast their ballots in favor of acceptance.

### B. Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on the final approval of this Disclosure Statement and the confirmation of the Plan. Pursuant to the Disclosure Statement Order, the Confirmation Hearing has been scheduled for **June 26, 2026 at 9:00 a.m. Central Time**, in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division. In addition to considering confirmation of the Plan, the Bankruptcy Court will consider final approval of this Disclosure Statement at such hearing. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing or any adjournment thereof.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to confirmation of the Plan and/or final approval of this Disclosure Statement must be made in writing and filed with the Bankruptcy Court on or before **5:00 p.m. Central Time on June 12, 2026,** at the following address:

> Office of the Clerk
> United States Bankruptcy Court
> Eldon B. Mahon U.S. Courthouse
> 501 W. 10th St.

Fort Worth, TX 76102-3643

In addition, any such objection must be served, together with proof of service, (a) on any parties who have filed notices of appearance and requests for notice in the Chapter 11 Case and (b) upon the following parties on or before **5:00 p.m. Central Time on June 12, 2026**:

J. Robert Forshey
Emily S. Chou
**Vartabedian Katz Hester & Haynes LLP**
301 Commerce Street, Ste. 2200
Fort Worth, TX 76102
Telephone: 817-214-4990
Facsimile: 817-214-4988
Bobby.Forshey@vkhh.com
Emily.chou@vkhh.com

United States Trustee
Attn: Erin Schmidt
1100 Commerce Street, Room 976
Dallas, TX 75242

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, THE BANKRUPTCY COURT WILL NOT CONSIDERED IT.

The hearing to consider final approval of the Disclosure Statement and confirmation of the Plan will commence at **9:00 a.m. Central Time on June 26, 2026** before the Honorable Mark X. Mullin, United States Bankruptcy Judge for the Northern District of Texas, Fort Worth Division, Room 128, U.S. Courthouse, 501 West Tenth Street, Fort Worth, Texas 76102

### C. Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court must determine whether the Bankruptcy Code's requirements for confirmation of the Plan have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan. As set forth in section 1129 of the Bankruptcy Code, these requirements are as follows:

1.      The Plan complies with the applicable provisions of the Bankruptcy Code.

2.      The proponent of the Plan complied with the applicable provisions of the Bankruptcy Code.

3.      The Plan has been proposed in good faith and not by any means forbidden by law.

4.      Any payment made or promised by the Debtor, by the Plan proponent, or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in, or in connection with, the case, or in connection with the Plan and incident to the case, has been approved by, or is subject to the approval of the Bankruptcy Court as reasonable.

5.      (a)      (i)      The proponent of the Plan has disclosed the identity and affiliations of

any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtor, an affiliate of the Debtor participating in a joint plan with the Debtor, or a successor to the Debtor under the Plan; and

(ii)     the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and

(b)     the proponent of the Plan has disclosed the identity of any insider that will be employed or retained by the Liquidating Debtor, and the nature of any compensation for such insider.

6.     Any governmental regulatory commission with jurisdiction, after confirmation of the Plan, over the rates of the Debtor have approved any rate change provided for in the Plan, or such rate change is expressly conditioned on such approval.

7.     With respect to each Impaired Class of Claims or Interests:

(a)     each holder of a Claim or Interest of such Class has accepted the Plan or will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code on such date; or

(b)     if section 1111(b)(2) of the Bankruptcy Code applies to the Claims of such Class, the holder of a Claim of such Class will receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date of the Plan, that is not less than the value of such holder's Interest in the Estate's Interest in the property that secures such Claim.

8.     With respect to each Class of Claims or Interests:

(a)     such Class has accepted the Plan; or

(b)     such Class is not Impaired under the Plan.

9.     Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that:

(a)     with respect to a Claim of a kind specified in section 507(a)(2) or 507(a)(3) of the Bankruptcy Code, on the Effective Date of the Plan, the holder of such Claim will receive on account of such Claim cash equal to the Allowed amount of such Claim;

(b)     with respect to a Class of Claims of a kind specified in section 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6) or 507(a)(7) of the Bankruptcy Code, each holder of a Claim of such Class will receive:

(i)     if such Class has accepted the Plan, deferred cash payments of a value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim; or

(ii)     if such Class has not accepted the Plan, Cash on the Effective Date of

the Plan equal to the Allowed amount of such Claim; and

(c)     with respect to a Claim of a kind specified in section 507(a)(8) of the Bankruptcy Code, the holder of such Claim will receive on account of such Claim regular installment payments in Cash:

(i)     of a total value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim;

(ii)     over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303; and

(iii)     in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the Plan (other than Cash payments made to a Class of Creditors under section 1122(b) of the Bankruptcy Code); and

(d)     with respect to a Secured Claim which would otherwise meet the description of an unsecured Claim of a Governmental Unit under section 507(a)(8) of the Bankruptcy Code, but for the secured status of that Claim, the holder of that Claim will receive on account of that Claim, Cash payments, in the same manner and over the same period, as prescribed in 9(c) above.

10.     If a Class of Claims is Impaired under the Plan, at least one Class of Claims that is Impaired has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of such Class.

11.     Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

12.     All fees payable under 28 U.S.C. section 1930, as determined by the Bankruptcy Court at the hearing on confirmation of the Plan, have been paid or the Plan provides for the payments of all such fees on the Effective Date of the Plan.

13.     The Plan provides for the continuation after its Effective Date of payment of all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114, at any time prior to confirmation of the Plan, for the duration of the period the Debtor have obligated themselves to provide such benefits.

14.     If the Debtor are required by a judicial or administrative order, or by statute, to pay a domestic support obligation, the Debtor have paid all amounts payable under such order or such statute for such obligation that first become payable after the date of the filing of the petition.

15.     In a case in which a Debtor is an individual and in which the holder of an Allowed unsecured Claim objects to the confirmation of the Plan:

(a)     the value, as of the Effective Date of the Plan, of the property to be distributed under the Plan on account of such Claim is not less than the amount of such Claim; or

(b)     the value of the property to be distributed under the Plan is not less than the projected disposable income of such Debtor (as defined in section 1325(b)(2) of the Bankruptcy Code) to be received during the five-year period beginning on the date that the first payment is due under the Plan, or during the period for which the Plan provides payments, whichever is longer.

16.     All transfers of property under the Plan shall be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.

The Debtor believes that the Plan satisfies all the statutory requirements of chapter 11 of the Bankruptcy Code, that the Debtor have complied or will have complied with all the requirements of chapter 11, and that the Plan is proposed in good faith.

The Debtor believes that holders of all Allowed Claims and Interests Impaired under the Plan will receive payments under the Plan having a present value, as of the Effective Date, not less than the amounts likely to be received if the Debtor were liquidated in a case under chapter 7 of the Bankruptcy Code. At the Confirmation Hearing, the Bankruptcy Court will determine whether holders of Allowed Claims or Allowed Interests would receive greater Distributions under the Plan than they would receive in a liquidation under chapter 7.

These facts and others demonstrating the confirmability of the Plan will be shown at the Confirmation Hearing.

Pursuant to Section 1129(a)(11), the Plan must be feasible.  The Debtor's projections in support of the Plan are attached as **Exhibit "2"**.  To provide additional information related to the Plan Projections under Exhibit "2", the Debtor further provides as follows:

 **Exhibit "3"** - list of the Debtor's current inventory that are pledged to prepetition lenders and the Release Price for each property;

**Exhibit "4"** – list of the properties that are subject to a pending sale contract as of May 12, 2026; and,

**Exhibit "5"** - list of current inventory (including those under contract) showing Cost Basis and Estimated Sale Price.

### D.     Cramdown

In the event that any Impaired Class of Claims or Interests does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Plan proponent if, as to each impaired Class which has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to that Class. A plan of reorganization "does not discriminate unfairly" within the meaning of the Bankruptcy Code if no class receives more than it is legally entitled to receive for their claims or interests.

"Fair and equitable" has different meanings with respect to the treatment of secured and unsecured claims. As set forth in section 1129(b)(2) of the Bankruptcy Code, those meanings are as

follows:

1.  With respect to a class of secured claims, the plan provides:

(a)    (i)    that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(ii)    that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(b)    for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (a) and (b) of this subparagraph; or

(c)    the realization by such holders of the "indubitable equivalent" of such claims.

2.  With respect to a class of unsecured claims, the plan provides:

(a)    that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(b)    the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115 of the Bankruptcy Code, subject to the requirements of section 1129(a)(14) of the Bankruptcy Code.

3.  With respect to a class of interests, the plan provides:

(a)    that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such interest; or

(b)    that the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

In the event that one or more Classes of impaired Claims or Interests reject the Plan, the Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and equitable with respect to, and does not discriminate unfairly against, any rejecting impaired Class of Claims or Interests. For the reasons set forth above, the Debtor believes the Plan does not discriminate unfairly against, and is fair and equitable with respect to, each impaired Class of Claims or Interests.

## VIII. RISK FACTORS

The following is intended as a summary of certain risks associated with the Plan, but it is not exhaustive and must be supplemented by the analysis and evaluation made by each holder of a Claim or Interest of the Plan and this Disclosure Statement as a whole with such holder's own advisors.

### A.      Insufficient Acceptances

For the Plan to be, each impaired Class of Claims is given the opportunity to vote to accept or reject the Plan. With regard to such Impaired voting Classes, the Plan will be deemed accepted by a Class of Impaired Claims if the Plan is accepted by Claimants of such Class actually voting on the Plan who hold at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the total Allowed Claims of the Class voted. Only those members of a Class who vote to accept or reject the Plan will be counted for voting purposes. The Debtor reserve the right to request confirmation pursuant to the cramdown provisions in section 1129(b) of the Bankruptcy Code, which will allow confirmation of the Plan regardless of the fact that a particular Class of Claims has not accepted the Plan. However, there can be no assurance that any Impaired Class of Claims under the Plan will accept the Plan or that the Plan proponent would be able to use the cramdown provisions of the Bankruptcy Code for confirmation of the Plan.

### B.      Confirmation Risks

The following specific risks exist with respect to confirmation of the Plan:

1.    Any objection to confirmation of the Plan can either prevent confirmation of the Plan or delay such confirmation for a significant period of time.

2.    Since the Plan proponent may be seeking to obtain approval of the Plan over the rejection of one or more Impaired Classes of Claims, the cramdown process could delay confirmation.

### C.      Non-Occurrence of Conditions Precedent

Confirmation of the Plan and the occurrence of the Effective Date are subject to certain conditions precedent that may not occur.

### D.      Estimated Distributions under the Plan

In preparing the estimate of distributions under the Plan, the Estate's financial advisors have made certain estimates regarding projected cash on hand at confirmation. The accuracy of such estimates is dependent upon several variables that are partially or wholly outside the Debtor's control or ability to predict with certainty, including (i) the aggregate amount of Allowed Claims, (ii) the amount, if any, for which certain Administrative Expenses are Allowed, (iii) the collectability of the Estate Accounts Receivable, and (iv) the costs of administering the Plan subsequent to its confirmation. Accordingly, while such estimations were prepared in good faith and with the best information available, actual distributions received by holders of Allowed Claims under the Plan may vary significantly from estimated distributions.

## IX. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### A.    Continuation of the Chapter 11 Case

The Debtor have sold substantially all of its assets and have ceased doing business. Accordingly, the Debtor believes that continuation of the Chapter 11 Case is not a viable option.

### B.    Alternative Plan of Reorganization

Other parties-in-interest will be free to file an alternative plan of reorganization after the expiration of the period of exclusivity set forth in section 1121 of the Bankruptcy Code. At this time, the Plan is the only plan that has been proposed and filed in the Chapter 11 Case. If the Plan is not confirmed, an alternative plan filed by another party-in-interest, or an amended Plan filed by the Debtor, might ultimately be confirmed by the Bankruptcy Court. However, the Debtor thinks it highly unlikely that an alternative plan could be proposed and confirmed that would compensate creditors for the increased costs of administration and delay that awaiting such a plan would create.

### C.    Chapter 7 Liquidation

If the Plan is not confirmed, the Chapter 11 Case may potentially be converted to a case under chapter 7 of the Bankruptcy Code at a later date if such a request is made and granted by the Bankruptcy Court. The Debtor believes that liquidation of the Estates under chapter 7 would diminish the value to be realized by holders of Allowed Claims because of additional administrative expenses involved in the appointment of a chapter 7 trustee, attorneys, accountants, and other professionals to assist such trustee in the case of chapter 7 proceedings. The Debtor also believes that liquidation under chapter 7 could result in a significant delay of distributions to holders of Allowed Claims as compared to the liquidation of the Estate proposed under the terms and provisions of the Plan.

Attached to this Disclosure Statement as **Exhibit "6"** is a Liquidation Analysis comparing estimated distributions under the Plan to estimated distributions if the Chapter 11 Case were converted to a case under chapter 7.

## X. CONCLUSION

The Debtor urges holders of Claims in Impaired Classes to vote to **ACCEPT** the Plan and to evidence such acceptance by returning their Ballots so that they will be received on or before **5:00 p.m., Central Time, on June 12, 2026**.

*[Remainder of page intentionally left blank.]*

Dated:  May 19, 2026

Respectfully submitted,

VILLAGE HOMES, L.P.

By:   DH Management, Inc.
Its:   General Partner


By:   */s/ Mike Dike*        
      Michael Dike
      President

J. Robert Forshey
State Bar No. 07264200
Emily S. Chou
State Bar No. 24006997
**Vartabedian Katz Hester & Haynes LLP**
301 Commerce Street, Ste. 2200
Fort Worth, TX 76102
Telephone: 817-214-4990
Facsimile: 817-214-4988
bobby.forshey@vkhh.com
emily.chou@vkhh.com

**ATTORNEYS FOR DEBTOR
AND DEBTOR-IN-POSSESSION**

# EXHIBIT 1

# SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR VILLAGE HOMES, L.P.

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 Case |
| | § | |
| VILLAGE HOMES, L.P., | § | Case No. 25-43782-mxm |
| | § | |
| Debtor. | § | |
| | § | |

## SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION
## FOR DEBTOR VILLAGE HOMES, L.P.

J. Robert Forshey
State Bar No. 07264200
Emily S. Chou
State Bar No. 24006997
**Vartabedian Katz Hester & Haynes LLP**
301 Commerce Street, Ste. 2200
Fort Worth, Texas 76102
Telephone: 817-214-4990
Facsimile: 817-214-4988
bobby.forshey@vkhh.com
emily.chou@vkhh.com

**ATTORNEYS FOR DEBTOR AND
DEBTOR-IN-POSSESSION**

DATED:  April 27, 2026

## ARTICLE I.
## DEFINITIONS AND RULES OF CONSTRUCTION

A.    <u>Defined Terms</u>. In addition to such other terms as are defined in other sections of the Plan, the following terms shall have the meanings set forth below (such meanings to be equally applicable to both the singular and plural, masculine and feminine forms of the terms defined).

1.01.    "<u>Administrative Bar Date</u>" means the deadline to file Claims for Allowance as an Administrative Expense set forth in subsection 3.01(c) of the Plan.

1.02.    "<u>Administrative Expense</u>" means any cost or expense of administration of the Chapter 11 Case allowed under subsections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation, any actual and necessary expenses of preserving the Estate of the Debtor, any actual and necessary expenses of operating the business of the Debtor, all compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under section 330 or 503 of the Bankruptcy Code, all Allowed fees and expenses of Estate Professionals, and any fees or charges assessed against the estates of the Debtor under section 1930, chapter 123 of title 28 of the United States Code.

1.03.    "<u>Administrative Expense Claim</u>" means any Claim based on an Administrative Expense.

1.04.    "<u>Affiliate</u>" has the meaning ascribed to such term in section 101(2) of the Bankruptcy Code.

1.05.    "<u>Allowed</u>," when used with respect to a Claim (other than an Administrative Expense), means a Claim (a) to the extent it is not Contested; or (b) a Contested Claim, proof of which was filed timely with the Bankruptcy Court, and (i) as to which no Objection was filed by the Objection Deadline, or (ii) as to which an Objection was filed by the Objection Deadline, to the extent, if any, such Claim is ultimately allowed by a Final Order; *provided, however*, that if a Claim is to be determined in a forum other than the Bankruptcy Court, such Claim shall not become Allowed until determined by Final Order of such other forum and allowed by Final Order of the Bankruptcy Court. "<u>Allowed</u>," when used with respect to an Administrative Expense, means an Administrative Expense approved by an application to the Bankruptcy Court or which constitutes an undisputed Ordinary Course Claim.

1.06.    "<u>Assets</u>" includes all right, title, and interest in and to all property of every type or nature owned or claimed by the Debtor as of the Petition Date, together with all such property of every type or nature subsequently acquired by the Debtor through the Effective Date, whether real or personal, tangible or intangible, and wherever located, and including, but not limited to, property as defined in section 541 of the Bankruptcy Code.

1.07.    "<u>Avoidance Action</u>" means a cause of action assertable by the Debtor pursuant to Chapter 5 of the Bankruptcy Code, including without limitation, actions brought or which may be brought under sections 542, 543, 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code. Such causes of action may be asserted to recover, among other things, the transfers listed in the Debtor's respective Schedules, including in response to Question 3 of the Statements of Financial Affairs.

1.08. "Ballot" means the form of the ballot for voting to accept or to reject the Plan, which accompanies the Plan and the Disclosure Statement delivered to holders of Claims in Impaired Classes.

1.09. "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as amended and codified at title 11 of the United States Code.

1.10. "Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division, or such other court having jurisdiction over all or any part of the Chapter 11 Case.

1.11. "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Chapter 11 Case, including applicable local rules of the Bankruptcy Court.

1.12. "Bar Date" means the date established by the Bankruptcy Court, including through any standing order, for filing a proof of Claim or proof of Interest; *provided, however*, that if the Bankruptcy Court has ordered an extension of the time by which a particular Creditor may file a proof of Claim or proof of Interest, the date set with respect to such Creditor shall be the Bar Date with respect to such Creditor, but only as to such Creditor.

1.13. "Bush Claim" shall include all Claims by Charles Walker Bush and Lora Benoit Bush, including all Claims by either of such persons in the following lawsuit ("Bush Lawsuit"):

> *Charles Walker Bush and Lora Benoit Bush v. Village Homes, L.P. and L & S Mechanical, LLC*, Cause no. CV-25-0783 in the 43rrd District Court of Parker County, Texas.

1.14. "Business Day" means any day other than Saturday, Sunday, a legal holiday, or a day on which national banking institutions in Texas are authorized or obligated by law or executive order to close.

1.15. "Cash" means legal tender of the United States of America, cash equivalents and other readily marketable securities or instruments, including, but not limited to, readily marketable direct obligations of the United States of America, certificates of deposit issued by banks or commercial paper.

1.16. "Chapter 11 Case" refers to Case No. 25-43782-mxm pending in the Bankruptcy Court.

1.17. "Claim" means (a) a right to payment against the Debtor, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured (including potential and unmatured tort and contract claims), disputed, undisputed, legal, equitable, secured or unsecured, or (b) a right to an equitable remedy against the Debtor for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured (including potential and unmatured tort and contract claims), disputed, undisputed, secured or unsecured.

1.18. "Claimant" means the holder of a Claim.

---

1.19.    "Class" means a class of Claims or Interests as described in the Plan.

1.20.    "Classified Claim" shall mean a Claim included in Class 2A, 2B, 2C, 2D, 2E, 2F, 2G, 3, 4, 5, or 6.

1.21.    "Collateral" means any Asset subject to a valid and enforceable Lien to secure payment of a Claim, including any right of offset asserted against any Asset.

1.22.    "Confirmation Date" means the date of entry of the Confirmation Order.

1.23.    "Confirmation Hearing" means the hearing conducted by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code and Bankruptcy Rule 3020(b) to consider confirmation of the Plan, as such hearing may be continued from time to time.

1.24.    "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

1.25.    "Contested," when used with respect to a Claim, means any Claim that (a) is listed in the Debtor's Schedules as disputed, contingent, or unliquidated; (b) that is not listed in the Debtor's Schedules as undisputed, liquidated, contingent and as to which a proof of Claim has been filed with the Bankruptcy Court, to the extent the proof of Claim amount exceeds the scheduled amount of such Claim; (c) that is not listed in the Debtor's Schedules, but as to which a proof of Claim has been filed with the Bankruptcy Court; or (d) as to which an Objection has been, or may be, timely filed and which Objection has not been denied by Final Order.

1.26.    "Convenience Claim" means any Unsecured Claim that is Allowed in the amount of $500 or less, or for which the holder of an Unsecured Claim with an Allowed Claim in excess of $500 agrees to the Allowance of such Claim in the amount of $500.

1.27.    "Creditor" means a "creditor," as defined in section 101(10) of the Bankruptcy Code.

1.28.    "Cure Claim" means the payment or other performance required to cure any existing default under an Executory Contract.

1.29.    "Debtor" means Village Homes, L.P., the debtor in the Chapter 11 Case.

1.30.    "Disallowed," when used with respect to all or any part of a Claim or Interest, means that portion of a Claim or Interest to which an Objection or motion to disallow has been sustained by a Final Order.

1.31.    "Disclosure Statement" means the Disclosure Statement filed with respect to the Plan, as it may be amended, modified, or supplemented from time to time.

1.32.    "Distribution" means any payment or other disbursement of property pursuant to the Plan.

1.33.    "Effective Date" shall mean the first Business Day which is fourteen (14) days after the Confirmation Date if the Confirmation Order is not stayed or, if the Confirmation Order is stayed, the first Business Day following the lifting, dissolution, or removal of such stay which is at least fourteen (14) Business Days after the Confirmation Date, and upon which all conditions to the effectiveness of the Plan set forth in Article XI below are satisfied.

1.34.    "Estate" means the bankruptcy estate of the Debtor in the Chapter 11 Case.

1.35.    "Estate Claims" shall include any and all Claims or causes of action or rights of action held by the Estate against any Person, whether based on a contract, applicable tort or common law, or any law, statute or regulation of any governmental body or entity, including without limitation all Avoidance Actions, causes of action, rights of action or any right to recover money or property from any Person, as well as all legal and equitable rights and remedies incident to any of the forgoing. Estate Claims shall also include all applicable privileges in relation thereto, including the attorney-client privilege and the work product privilege.  Estate Claims shall include all rights or Claims asserted or which could be asserted by the Debtor in or through either the State Court Lawsuit or Adversary Proceeding, including all VilHom Adversary Claims.

1.36.    "Estate Defenses" means all defenses, affirmative defenses, counterclaims, or offsets by the Debtor's Estate against any Person, including but not limited to any Estate Defenses applicable to any Creditor, and including all defenses vested in the Estate pursuant to section 558.  Estate Defenses shall include all rights, Claims, defenses, or affirmative defenses which are or could be asserted by the Debtor in or through either the State Court Lawsuit or Adversary Proceeding, including all VilHom Defenses.

1.37.    "Estate Payment Rights" shall include all rights of the Estate to receive any payment from any Person, including from all sums payable to the Debtor on account of goods or services provided by the Debtor, including all construction costs payable to the Estate.

1.38.    "Estate Professionals" means those Persons employed pursuant to an order of the Bankruptcy Court in accordance with sections 327, 328, and 1103 of the Bankruptcy Code or who are entitled to compensation or reimbursement pursuant to sections 503(b)(3)(D) or 506(b) of the Bankruptcy Code.

1.39.    "Estimated VilHom Claim" shall mean the VilHom Claim, estimated at $300,000 for confirmation purposes, as set forth in the Court's *Order Estimating VilHom FW Holdings, LLC's Claim* entered at Docket no. 311.

1.40.    "Executory Contract" means any executory contract or unexpired lease to which the Debtor is a party, and which is subject to section 365 of the Bankruptcy.

1.41.    "Final Allowed Amount" shall mean that a Claim has been allowed or disallowed in a Final Order, and the Final Order is no longer subject to any further proceedings for the further direct appeal or review thereof, including any certiori proceeding or any request for reconsideration or rehearing.  For the avoidance of doubt, the Final Allowed Amount shall also include fixing a Claim at $0.00.

1.42.    "Final Order" means an order or judgment of the Bankruptcy Court or any other court or adjudicative body, and which is subject to appeal as a matter of right, and including without limitation an Order of the Bankruptcy Court allowing or disallowing a Claim.

1.43.    "General Unsecured Claim" means any Claim that is not an Administrative Expense Claim, a Priority Tax Claim, a Priority Non-Tax Claim, a Property Tax Claim, a Secured Claim, the VilHom Claim, or a Convenience Claim, but includes any Rejection Claim.

1.44.    "Governmental Unit" means a "governmental unit" as such term is defined in section 101(27) of the Bankruptcy Code.

1.45.    "Great Plains Bank" shall mean Great Plains National Bank.

1.46.    "Great Plains Bank Collateral" means any Collateral securing payment of the Great Plains Bank Secured Claim.

1.47.    "Great Plains Bank Secured Claim" means, collectively, any and all Secured Claims held by Great Plains Bank.

1.48.    "Huntington" shall mean The Huntington National Bank, including as a successor to Veritex.

1.49.    "Huntington Bank Claim" shall include any Claim by Huntington against the Debtor, including pursuant to the Huntington POCs.

1.50.    "Huntington Bank Collateral" shall refer to the Lots reflected in the attached **Exhibit "C"**, which includes the release prices as to Lots which are included in the Huntington Bank Collateral.

1.51.    "Huntington Objection" shall mean the Objection [Docket no. 287] filed by the Debtor to the Huntington POCs.

1.52.    "Huntington POCs" shall mean proofs of claim 27 and 28 filed by Huntington against the Debtor.

1.53.    "Huntington Sale Order" shall mean any order entered by the Bankruptcy Court approving the sale of any Lot or Lots included in Huntington Bank Collateral and placing any portion of the resulting sale proceeds into escrow for the benefit of Huntington.

1.54.    "Impaired" means, when used with reference to a Class of Claims or Interests, a Class that is impaired as such term is defined in section 1124 of the Bankruptcy Code.

1.55.    "Initial Plan Distribution Date" has the meaning ascribed to the term in section 7.02 of the Plan.

1.56.    "Interests" means any equity ownership interest in the Debtor.

1.57. "Lien" means any mortgage, lien, charge, security interest, encumbrance, or other security device of any kind affecting any asset or property of the Debtor contemplated by section 101(37) of the Bankruptcy Code.

1.58. "Lis Pendens" shall mean any notice of lis pendens filed by VilHom based upon the State Court Lawsuit.

1.59. "Lot" shall mean each separate tract or parcel of real estate pledged as collateral in any of the Secured Lenders.

1.60. "Objection" means (a) an objection to the allowance of a Claim interposed by any party entitled to do so within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, and (b) as to any Taxing Authority, a proceeding commenced under section 505 of the Bankruptcy Code to determine the legality or amount of any tax.

1.61. "Objection Deadline" shall mean the later of (a) ninety (90) days following the Effective Date, unless otherwise extended by order of the Bankruptcy Court, or (b) as to any Rejection Claim filed after the Effective Date, ninety (90) days after the date on which the proof of Claim reflecting the Rejection Claim is filed.

1.62. "Olerio Contract" shall mean the Real Estate Sales Contract dated October 17, 2024, among Olerio, now known as VilHom, and the Debtor.

1.63. "Olerio Contract Deposit" shall mean the $300,000 in earnest money paid by VilHom pursuant to the Olerio Contract.

1.64. "Olerio Contract Property" shall mean and include all real property or other property subject to the Olerio Contract.

1.65. "Other Secured Claim" means any Secured Claim that is not a Property Tax Claim, or a Secured Claim held by any of the Secured Lenders.

1.66. "Person" means any individual, corporation, general partnership, limited partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, government, or any political subdivision thereof or other entity.

1.67. "Petition Date" means October 1, 2025.

1.68. "PlainsCapital Bank Collateral" means any Collateral securing payment of the Plains Capital Bank Secured Claim.

1.69. "PlainsCapital Bank Secured Claim" means, collectively, any and all Secured Claims held by Plains Capital Bank.

1.70. "Plan" means this chapter 11 joint plan of liquidation, either in its present form or as it may be altered, amended, or modified from time to time.

1.71.    "Plan Documents" means the documents that aid in effectuating the Plan as specifically identified as such herein and filed with the Bankruptcy Court.

1.72.    "Plan Rate" shall mean that rate of interest, calculated as of the Effective Date, computed in accordance with 28 U.S.C., section 1961(a).

1.73.    "Priority Non-Tax Claim" shall mean a Claim that is entitled to priority of payment under sections 507(a)(4) through (7) of the Bankruptcy Code.

1.74.    "Priority Tax Claim" shall mean a Claim entitled to priority of payment pursuant to section 507(a)(8) of the Bankruptcy Code, other than any Property Tax Claims.

1.75.    "Property Tax Claim" shall mean a Claim for Property Taxes.

1.76.    "Property Taxes" shall mean such taxes assessed by any Taxing Authority against any property of the Debtor based on the value thereof, as allowed by applicable state and local law.

1.77.    "Rejection Claim" means a Claim arising under section 502(g) of the Bankruptcy Code as a consequence of the rejection of any Executory Contract.

1.78.    "Release Price Schedule" shall refer to the **Exhibit "B"** to this Plan which reflects the release price for each Lot which constitutes the collateral of any one of the Secured Lenders other than Huntington.  The release price for each Lot shall be the principal balance for each such Lot reflected on **Exhibit "B"** plus interest thereon through the date of payment calculated at the non-default contract rate.  The release prices for Huntington as successor to Veritex in relation to the Huntington Bank Collateral are set forth in **Exhibit "C"**, which supercedes the portion of **Exhibit "B"** relating to Veritex, and the Release Price Schedule set forth in **Exhibit "B"** shall not apply the to Huntington Bank Collateral.

1.79.    "Reorganized Debtor" means the Debtor from and after the Effective Date.

1.80.    "Sales Proceeds" shall mean the net proceeds arising from the sale, disposition, or exchange of any Asset by the Reorganized Debtor, after payment of any sales commissions and other costs of sale.

1.81.    "Schedules" means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtor as required by section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules or statements have been or may be subsequently amended.

1.82.    "Secured Claim" means (a) a Claim secured by a Lien against an Asset, to the extent such Lien is valid, perfected and enforceable under applicable non-bankruptcy law and is not subject to avoidance under the Bankruptcy Code or other applicable non-bankruptcy law, and which is duly Allowed, but only to the extent that such Claim does not exceed the value of the Assets which the Bankruptcy Court finds are valid security for such Claim (except, if the holder of such Claim makes the election provided for in section 1111(b)(2) of the Bankruptcy Code, the entire amount of the Claim shall be a Secured Claim), and (b) any valid and enforceable right of offset asserted against a Debtor or any Asset.

---

SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION

1.83. "Secured Lenders" means Great Plains Bank, PlainsCapital Bank, Simmons Bank, Texas Bank, Valliance Bank, Huntington, and Worthington Bank.

1.84. "Secured Tax Claim" means any ad valorem tax Claim that arises or is deemed to have arisen on or before the Petition Date, irrespective of the date on which such Claim is assessed or due.

1.85. "Simmons Bank Collateral" means any Collateral securing payment of the Simmons Bank Secured Claim.

1.86. "Simmons Bank Secured Claim" means, collectively, any and all Secured Claims held by Simmons Bank.

1.87. "State Court Lawsuit" shall mean the following lawsuit:

*Village Homes, LP. v. Olerio Development, LLC*, Cause No. 352-362798-25 in the 352nd District Court of Tarrant County, Texas.

1.88. "Substantial Consummation" means the day on which a Creditor first receives a Distribution of any kind under the terms and provisions of the Plan.

1.89. "Taxing Authority" shall include the State of Texas or any subdivision thereof, including without limitation any political subdivision of the State of Texas assessing ad valorem taxes against any of the Assets.

1.90. "Texas Bank" shall mean Texas Bank, a Texas state banking association.

1.91. "Texas Bank Collateral" means any Collateral securing payment of the Texas Bank Secured Claim.

1.92. "Texas Bank Secured Claim" means, collectively, any and all Secured Claims held by Texas Bank.

1.93. "Unclaimed Property" shall mean any Cash, Distribution, payment, or any other property unclaimed for a period of one hundred twenty (120) days after the date of the applicable Distribution, or such longer period which the Reorganized Debtor may fix in the exercise of its good faith business judgment.

1.94. "Unimpaired" means, when used with reference to a Class of Claims or Interests, a Class that is not Impaired.

1.95. "U.S. Trustee" shall mean the office of the United States Trustee for Region 6.

1.96. "Valliance Bank Collateral" means any Collateral securing payment of the Valliance Bank Secured Claim.

1.97. "Valliance Bank Secured Claim" means, collectively, any and all Secured Claims held by Valliance Bank.

1.98.    "Veritex Bank" shall mean Veritex Community Bank, a Texas state banking association.

1.99.    "VilHom" shall mean VilHom FW Holdings, LLC, formerly known as Olerio Development, LLC ("Olerio").

1.100.    "VilHom Adversary" shall mean the following adversary proceeding:

*Village Homes, L.P., v. VilHom FW Holdings LLC, F/K/A Olerio Development, LLC*, Case no. 25-04130 in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division

1.101.    "VilHom Adversary Claims" shall mean and include all Claims, causes of action, rights, and remedies asserted or claimed by the Debtor or VilHom in the VilHom Adversary, or which could be asserted or claimed in the VilHom Adversary, and including without limitation all rights, Claims, causes of action, and remedies pursuant to or relating to the contract which is the subject matter of the VilHom Adversary.

1.102.    "VilHom Claim" means, collectively, any and all Claims held by VilHom FW Holdings, LLC, f/k/a Olerio Development, LLC, including all VilHom Adversary Claims.

1.103.    "VilHom Defenses" shall mean and include, collectively, all defenses, affirmative defenses, offsets, and defensive counterclaims or other matters which the Debtor may have or claim as to any VilHom Claim, including without limitation any such defense, affirmative defense, offset, or defensive counterclaim, which is asserted or may be asserted, in the VilHom Adversary.

1.104.    "VilHom Escrow Account" shall mean a federally insured interest-bearing account at a bank located within Tarrant County, Texas.  The bank at which the VilHom Escrow Account will be maintained shall be reflected in the Confirmation Order.

1.105.    "Warranty Claims" shall mean any Claim against the Debtor based on, or arising out of, any warranty relating to any residence constructed or sold by the Debtor as the general contractor before the Effective Date, and which is asserted by the purchaser or owner thereof.  Warranty Claims do not include the Bush Claims or any Claim by any subcontractor or any provider of labor or services to construct a residence.

1.106.    "Worthington Bank Collateral" means any Collateral securing payment of the Worthington Bank Secured Claim.

1.107.    "Worthington Bank Secured Claim" means, collectively, any and all Secured Claims held by Worthington Bank.

B.    Rules of Interpretation and Construction of Terms

1.108.    Unless otherwise specified, all section, Article and exhibit references in this Plan are to the respective section in, Article of, or exhibit to, the Plan as the same may be amended,

SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION

supplemented, or otherwise modified from time to time. The headings in the Plan are for convenience and reference only and shall not limit or otherwise affect the provisions or the interpretation hereof.

1.109.   The words "herein," hereof," and "hereunder" or other words of similar import shall refer to the Plan as a whole and not to any particular article, section, subsection, or clause contained in the Plan, unless the context requires otherwise.

1.110.   Whenever from the context it appears appropriate, each term stated in either the singular or plural includes both singular and plural, and pronouns stated in masculine, feminine, or neuter form shall include all of the masculine, feminine, or neuter form.

1.111.   The rules of construction set forth in section 102 of the Bankruptcy Code shall apply to this Plan, the Confirmation Order, and all Plan Documents.

1.112.   References herein to "after notice and hearing" or other similar language shall have the same meaning as in section 102(1) of the Bankruptcy Code. Otherwise, terms used herein that are not specifically defined herein shall have the meaning ascribed to those terms, if any, in the Bankruptcy Code.

1.113.   All Exhibits to the Plan and all Plan Documents are incorporated into the Plan by this reference and are a part of the Plan as set forth in full herein. Certain Plan Documents may be filed with the Clerk of the Bankruptcy Court prior to the commencement of the Confirmation Hearing. Holders of Claims and Interests may obtain a copy of the Plan Documents, once filed, by a written request sent to the following address: Vartabedian Katz Hester & Haynes LLP, 301 Commerce Street, Suite 2200, Fort Worth, Texas 76102, Attention: Julie Gonzalez; email: julie.gonzalez@vkhh.com.

1.114.   Any reference herein to any agreement, contract, instrument, or other document in this Plan shall refer to such agreement, contract, instrument, or document as amended, supplemented, or modified.

## ARTICLE II.
## CLASSIFICATION OF CLAIMS AND INTERESTS

2.01.   The following is a designation of the Classes of Claims and Interests under the Plan. Administrative Expenses, Priority Claims of the kinds specified in sections 507(a)(2) and 507(a)(3) of the Bankruptcy Code and Priority Tax Claims have not been classified, are excluded from the following Classes in accordance with section 1123(a)(1) of the Bankruptcy Code, and the treatment of such Claims is set forth in Article III of the Plan. A Claim shall be deemed classified in a particular Class only to the extent that the Claim qualifies within the description of that Class. A Claim is included in a particular Class only to the extent that the Claim is an Allowed Claim in that Class.

> Class 1 – Priority Non-Tax Claims
> Class 2A – Great Plains Bank Secured Claim
> Class 2B – PlainsCapital Bank Secured Claim
> Class 2C – Simmons Bank Secured Claim
> Class 2D – Texas Bank Secured Claim
> Class 2E – Valliance Bank Secured Claim

Class 2F – Veritex Bank Secured Claim
Class 2G – Worthington Bank Secured Claim
Class 3 – Other Secured Claims
Class 4 – VilHom Claim
Class 5 – Convenience Claims
Class 6 – General Unsecured Claims
Class 7 – Interests

2.02. <u>Impaired Classes of Claims and Interests</u>. Classes 1, 3, 5, and 7 are Unimpaired and are not entitled to vote to accept or reject the Plan. Classes 2A, 2B, 2C, 2D, 2E, 2F, 2G, 4, and 6 are Impaired. All of the Impaired Classes are entitled to vote to accept or reject the Plan.

2.03. <u>Impairment or Classification Controversies</u>. If a controversy arises as to the classification of any Claim or Interest, or as to whether any Class of Claims or Interests is Impaired under the Plan, the Bankruptcy Court shall determine such controversy as a part of the confirmation process.

## ARTICLE III.
## TREATMENT OF UNCLASSIFIED CLAIMS

3.01. <u>Administrative Expenses</u>

(a) The Reorganized Debtor shall pay, in accordance with the ordinary business terms applicable to such expense or cost, the reasonable and ordinary expenses incurred in operating the Debtor's business or administering the Estate after the Petition Date but before the Effective Date ("<u>Ordinary Course Claims</u>"). The remaining provisions of this section 3.01 shall not apply to the Ordinary Course Claims, except that if there is a dispute relating to any such Ordinary Course Claim, the Reorganized Debtor may move the Bankruptcy Court to apply the provisions of Article IX below relating to Contested Claims to such Ordinary Course Claim and require the holder of the Contested Ordinary Course Claim to assert such Claim through this Bankruptcy Case in such manner as the Bankruptcy Court may order.

(b) Each holder of an Allowed Administrative Expense (other than Ordinary Course Claims and Administrative Expense Claims by Estate Professionals), shall receive (i) the amount of such holder's Allowed Administrative Expense in one Cash payment on the later of the Effective Date or the tenth (10th) Business Day after such Administrative Expense becomes an Allowed Administrative Expense, or (ii) such other treatment as may be agreed to in writing by such Administrative Expense Creditor and the Reorganized Debtor, or as otherwise ordered by the Bankruptcy Court.

(c) Unless the Bankruptcy Court orders to the contrary or the Reorganized Debtor agrees to the contrary in writing, the holder of a Claim for an Administrative Expense, other than such a Claim by an Estate Professional, an Ordinary Course Claim, or an Administrative Expense which is already Allowed, shall file with the Bankruptcy Court and serve upon the Reorganized Debtor and its counsel a written notice of such Claim for an Administrative Expense within thirty (30) days after the Effective Date. This deadline is the Administrative Bar Date. Such notice shall include at a minimum: (i) the name, address, telephone number and fax number (if applicable) or email address of the holder

of such Claim, (ii) the amount of such Claim, and (iii) the basis of such Claim. Failure to timely and properly file and serve such notice by or on the Administrative Bar Date shall result in such Claim for an Administrative Expense being forever barred from receiving any Distribution.

(d)     A Claim for an Administrative Expense, for which a proper notice was filed and served under subsection 3.01(c) above, shall become an Allowed Administrative Expense if no Objection is filed within thirty (30) days of the filing and service of such notice. If a timely Objection is filed, the Claim shall become an Allowed Administrative Expense only to the extent allowed by a Final Order.

(e)     The procedures contained in subsections 3.01(a), (b), (c) and (d) above shall not apply to Administrative Expense Claims asserted by Estate Professionals, who shall each file and submit an appropriate final fee application to the Bankruptcy Court no later than sixty (60) days after the Effective Date. A Claim for an Administrative Expense by an Estate Professional in respect of which a final fee application has been properly filed and served shall become an Allowed Administrative Expense only to the extent allowed by Final Order and, if so Allowed, shall be paid as set forth herein.

(f)     Professional fees and expenses to any Estate Professional incurred on or after the Effective Date may be paid by the Reorganized Debtor without necessity of any application to, or order by, the Bankruptcy Court.

(g)     If the Reorganized Debtor asserts any Estate Claims as counterclaims or defenses to a Claim for an Administrative Expense, the Administrative Expense Claim shall be determined before the Bankruptcy Court either as a contested proceeding or an adversary proceeding. The Bankruptcy Court shall have exclusive jurisdiction to adjudicate and Allow all Claims for any Administrative Expense.

(h)     The Debtor has obtained post-petition debtor-in-possession financing from Worthington Bank and Texas Bank as approved or to be approved in the following:

i.      An Order Granting Motion for Entry of an Order Authorizing the Debtor to Obtain Secured Post-Petition Construction Financing and Granting Related Relief (Related to 2129 Sandlin) [Docket no. 252] authorizing the Debtor to obtain post-petition secured financing from Worthington Bank; and

ii.     A Motion for Entry of Order Authorizing the Debtor to Obtain Secured Post-Petition Financing and Granting Related Relief (Related to 316 Scissor Trail) [Docket No. 264] seeking post-petition secured financing from Texas Bank.

The above post-petition DIP loans shall be payable and secured in accordance with their respective terms as reflected in the loan documents. While post-petition obligations, these shall not be due and payable on the Effective Date.

    3.02.    Priority Tax Claims and Property Tax Claims.

(a)     In relation to any Allowed Property Tax Claim secured by a Lien against any tract of real property sold pursuant to this Plan, upon the sale of any such tract, such Property Tax Claims shall be paid at closing from the Sales Proceeds arising from the sale of any such tract.

(b)     In relation to any Allowed Property Tax Claim secured by a Lien against any tract of real property which is a part of the Estate, if any such tract has not been sold and the sale closed within two (2) years after the Effective Date, the Allowed Property Tax Claim shall be paid in full by the Reorganized Debtor in one Cash payment no later than six (6) months after the second anniversary of the Effective Date.

(c)     Each holder of an Allowed Priority Tax Claim (including any secured Allowed Property Tax Claims) not covered by subsection (a) or (b) above shall receive, at the Debtor's option, (i) the amount of such holder's Allowed Claim in one Cash payment on the Initial Distribution Date; (ii) the amount of such holder's Allowed Claim, in substantially equal monthly Cash payments, beginning on ninetieth (90th) day after the Effective Date and continuing monthly thereafter until the sixtieth (60th) month after the Petition Date, or (ii) such other treatment as may be agreed to in writing by the holder of the Priority Tax Claim and the Reorganized Debtor.

(d)     Property Tax Claims against the Estate or secured by a Lien against any of the Assets for the tax year beginning on January 1, 2026, shall constitute one of the Ordinary Course Expenses and shall be paid by the Reorganized Debtor on a timely basis as allowed by applicable law.

3.03.   U.S. Trustee's Fees. The Reorganized Debtor shall pay the U.S. Trustee's quarterly fees incurred pursuant to 28 U.S.C. § 1930(a)(6) which are due as of the Confirmation Date in full on the Effective Date or as soon thereafter as is practicable. After the Confirmation Date, the Reorganized Debtor shall continue to pay quarterly fees as they accrue until a final decree is entered and the Chapter 11 Case is closed. The Reorganized Debtor shall file with the Bankruptcy Court and serve on the U.S. Trustee quarterly financial reports for each quarter, or portion thereof, that the Chapter 11 Case remains open.

## ARTICLE IV.
## TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

4.01.   Class 1 – Priority Non-Tax Claims. Each holder of an Allowed Priority Non-Tax Claim shall receive, (a) on or before the applicable Plan Distribution Date, one Cash payment in an amount equal to the amount of such Allowed Priority Non-Tax Claim or (b) such other treatment as may be agreed to in writing by the holder of such Allowed Priority Non-Tax Claim and the Reorganized Debtor.

Class 1 is Unimpaired. Holders of Class 1 Claims are conclusively presumed to have accepted the Plan and, accordingly, are not entitled to vote to accept or reject the Plan. At present, the Debtor believes that there are no Class 1 Claims.  Consequently, this Class may ultimately be an empty disregarded Class.

4.02.   Class 2A – Great Plains Bank Secured Claim. From and after the Effective Date, the Reorganized Debtor shall continue, in the ordinary course of business, to market and sell the Great Plains Bank Collateral.  Interest shall accrue on the Allowed Class 2A Secured Claim from and after the Effective Date at the non-default contract rate applicable to such loans.  Interest shall be paid on the

Great Plains Bank Secured Claim on a monthly basis. Upon each sale of each Lot which is a part of the Great Plains Bank Collateral, the Reorganized Debtor shall pay to the holder of the Great Plains Bank Secured Claim the portion of the Sales Proceeds from such sale based upon the release price for such Lot reflected in the Release Price Schedule.  The debt to Great Plains Bank shall mature on the second anniversary of the Effective Date.  The Lots which constitute the Great Plains Bank Collateral are reflected in the Release Price Schedule.  To the extent that any loan on any Lot included in the Great Plains Bank Collateral has not been paid in full by the first anniversary of the Effective Date, the Reorganized Debtor shall pay to Great Plains Bank, as a principal pay-down, a sum equal to 5% of the outstanding balance of each such loan on the first anniversary of the Effective Date.

Class 2A is Impaired. The holder of the Class 2A Claim is entitled to vote to accept or reject the Plan.

4.03.    Class 2B – PlainsCapital Bank Secured Claim. From and after the Effective Date, the Reorganized Debtor shall continue, in the ordinary course of business, to market and sell the PlainsCapital Bank Collateral.  Interest shall accrue on the Allowed Class 2B Secured Claim from and after the Effective Date at the non-default contract rate applicable to such loans.  Interest shall be paid on the PlainsCapital Bank Secured Claim on a monthly basis. Upon each sale of each Lot which is a part of the PlainsCapital Bank Secured Claim, the Reorganized Debtor shall pay to the holder of the PlainsCapital Bank Secured Claim the portion of the Sales Proceeds from such sale based upon the release price for such Lot reflected in the Release Price Schedule.  The debt to PlainsCapital Bank shall mature on the second anniversary of the Effective Date.  The Lots which constitute the PlainsCapital Bank Collateral are reflected in the Release Price Schedule.  To the extent that any loan on any Lot included in the PlainsCapital Bank Collateral has not been paid in full by the first anniversary of the Effective Date, the Reorganized Debtor shall pay to PlainsCapital Bank, as a principal pay-down, a sum equal to 5% of the outstanding balance of each such loan on the first anniversary of the Effective Date.

Class 2B is Impaired. The holder of the Class 2B Claim is entitled to vote to accept or reject the Plan.

4.04.    Class 2C – Simmons Bank Secured Claim. From and after the Effective Date, the Reorganized Debtor shall continue, in the ordinary course of business, to market and sell the Simmons Bank Collateral.  Interest shall accrue on the Allowed Class 2C Secured Claim from and after the Effective Date at the non-default contract rate applicable to such loans.  Interest shall be paid on the Simmons Bank Secured Claim on a monthly basis. Upon each sale of each Lot which is a part of the Simmons Bank Collateral, the Reorganized Debtor shall pay to the holder of the Simmons Bank Secured Claim the portion of the Sales Proceeds from such sale based upon the release price for such Lot reflected in the Release Price Schedule.  The debt to Simmons Bank shall mature on the second anniversary of the Effective Date.  The Lots which constitute the Simmons Bank Collateral are reflected in the Release Price Schedule.  To the extent that any loan on any Lot included in the Simmons Bank Collateral has not been paid in full by the first anniversary of the Effective Date, the Reorganized Debtor shall pay to Simmons Bank, as a principal pay-down, a sum equal to 5% of the outstanding balance of each such loan on the first anniversary of the Effective Date.

Class 2C is Impaired. The holder of the Class 2C Claim is entitled to vote to accept or reject the Plan.

4.05.    Class 2D – Texas Bank Secured Claim. From and after the Effective Date, the Reorganized Debtor shall continue, in the ordinary course of business, to market and sell the Texas Bank Collateral. Interest shall accrue on the Allowed Class 2D Secured Claim from and after the Effective Date at the non-default contract rate applicable to such loans.  Interest shall be paid on the Texas Bank Secured Claim on a monthly basis.  Upon each sale of each Lot which is a part of the Texas Bank Collateral, the Reorganized Debtor shall pay to the holder of the Texas Bank Secured Claim the portion of the Sales Proceeds from such sale based upon the release price for such Lot reflected in the Release Price Schedule.  The debt to Texas Bank shall mature on the second anniversary of the Effective Date.  The Lots which constitute the Texas Bank Collateral are reflected in the Release Price Schedule. To the extent that any loan on any Lot included in the Texas Bank Collateral has not been paid in full by the first anniversary of the Effective Date, the Reorganized Debtor shall pay to Texas Bank, as a principal pay-down, a sum equal to 5% of the outstanding balance of each such loan on the first anniversary of the Effective Date.

Class 2D is Impaired. The holder of the Class 2D Claim is entitled to vote to accept or reject the Plan.

4.06.    Class 2E – Valliance Bank Secured Claim. From and after the Effective Date, the Reorganized Debtor shall continue, in the ordinary course of business, to market and sell the Valliance Bank Collateral. Interest shall accrue on the Allowed Class 2E Secured Claim from and after the Effective Date at the non-default contract rate applicable to such loans.  Interest shall be paid on the Valiance Bank Secured Claim on a monthly basis.  Upon each sale of each Lot which is a part of the Valliance Bank Collateral, the Reorganized Debtor shall pay to the holder of the Valliance Bank Secured Claim the portion of the Sales Proceeds from such sale based upon the release price for such Lot reflected in the Release Price Schedule.  The debt to Valliance Bank shall mature on the second anniversary of the Effective Date.  The Lots which constitute the Valliance Bank Collateral are reflected in the Release Price Schedule.  To the extent that any loan on any Lot included in the Valliance Bank Collateral has not been paid in full by the first anniversary of the Effective Date, the Reorganized Debtor shall pay to Valliance Bank, as a principal pay-down, a sum equal to 5% of the outstanding balance of each such loan on the first anniversary of the Effective Date.

Class 2E is Impaired. The holder of the Class 2E Claim is entitled to vote to accept or reject the Plan.

4.07.    Class 2F – Huntington Bank Secured Claim

a)    The holder of the Huntington Bank Claim shall be treated through this Class 2F as set forth below and shall be subject to the Huntington Objection and all Estate Claims and all Estate Defenses relating to Huntington.  The Huntington Bank Claim shall constitute a Contested Claim for all purposes and the Objection Deadline in section 9.04 below shall not apply to the Huntington Bank Claim.

b)    The Huntington Bank Claim, to the extent (if any) Allowed, shall bear interest from and after the Effective Date at the non-default contract rate applicable to such loans.

SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION

c)        Huntington purports to act as the alleged successor by merger to Veritex.  From and after the Effective Date, the Reorganized Debtor shall continue, in the ordinary course of business, to market and sell the Huntington Bank Collateral.  The release price as to each Lot included in the Huntington Bank Collateral is reflected in the **Exhibit "C"** to this Plan.  The sales proceeds from the sale of the Lots included in the Huntington Bank Collateral, net of the payment of property taxes secured by a Lien against the Lot so sold, tax prorations, and costs of sale, shall be allocated and paid as follows:

    i.        The amount of the release price on any Lot so sold as provided in **Exhibit "C"**, as well as interest on such amount through the date of the closing of the sale, such sum being collectively referred as the "Huntington Escrow Proceeds", shall be paid into the Huntington Escrow Account as defined below; and

    ii.        The remaining net sales proceeds from the sale of a Lot included in the portion of the net sales proceeds representing the Huntington Bank Collateral, other than the Huntington Escrow Funds, shall be paid to and retained by the Reorganized Debtor free and clear of any Lien, Claim, or interest of Huntington.

d)        Upon the closing of a sale of a Lot included in the Huntington Bank Collateral after the Effective Date, the Huntington Escrow Proceeds shall be paid into a segregated interest-bearing account held in the name of the Reorganized Debtor at a Tarrant County bank to be named in the Confirmation Order (the "Huntington Escrow Account").

e)        To the extent that any Lot included in the Huntington Bank Collateral has been sold prior to the Effective Date, and any proceeds from the sale of any such Lot are held in escrow pursuant to a Huntington Sale Order, as soon as practicable after the Effective Date, such funds shall be paid into the Huntington Escrow Account on the Effective Date, and the Reorganized Debtor shall continue after the Effective Date to make any payment required by any Huntington Sale Order into the Huntington Escrow Account.

f)        The Bankruptcy Court shall determine the Final Allowed Amount of the Huntington Bank Claim, including through the Huntington Objection, which shall be the amount thereof net of all offsets, credits, and counterclaims to which the Reorganized Debtor is due, including any Estate Claims or Estate Defenses which relate to Huntington or the Huntington Bank Collateral.

g)        Upon the determination of the Final Allowed Amount of the Huntington Bank Claim, the funds held in the Huntington Escrow Account shall be paid and distributed as follows:

    (i)        A sum equal to the Final Allowed Amount of the Huntington Bank Claim, including interest thereon calculated at the non-default contract rate through the date of payment, shall be paid to Huntington; and

    (ii)        The balance of the Huntington Escrow Account shall be paid to the Reorganized Debtor free and clear of all Liens, Claims, and interests of Huntington.

h)        In the unlikely event that the amount disbursed to Huntington from the Huntington Escrow Account is insufficient to fully satisfy the Final Allowed Amount of the Huntington Bank

---

Claim, net of all offsets and credits in favor of the Reorganized Debtor, then the Reorganized Debtor shall have 90 days in which to pay to Huntington the remainder of the Final Allowed Amount of the Huntington Bank Claim.

i)        Class 2 F is impaired.  The holder of the Class 2F is entitled to vote to accept or reject the Plan.

4.08.    Class 2G – Worthington Bank Secured Claim. From and after the Effective Date, the Reorganized Debtor shall continue, in the ordinary course of business, to market and sell the Worthington Bank Collateral. Interest shall accrue on the Allowed Class 2G Secured Claim from and after the Effective Date at the non-default contract rate applicable to such loans.  Interest shall be paid on the Worthington Bank Secured Claim on a monthly basis.  Upon each sale of each Lot which is a part of the Worthington Bank Collateral, the Reorganized Debtor shall pay to the holder of the Worthington Bank Secured Claim the portion of the Sales Proceeds from such sale based upon the release price for such Lot reflected in the Release Price Schedule.  The debt to Worthington Bank shall mature on the second anniversary of the Effective Date.  The Lots which constitute the Worthington Bank Collateral are reflected in the Release Price Schedule.  To the extent that any loan on any Lot included in the Worthington Bank Collateral has not been paid in full by the first anniversary of the Effective Date, the Reorganized Debtor shall pay to Worthington Bank, as a principal pay-down, a sum equal to 5% of the outstanding balance of each such loan on the first anniversary of the Effective Date.

Class 2G is Impaired. The holder of the Class 2G Claim is entitled to vote to accept or reject the Plan.

4.09.    Class 3 – Other Secured Claims. On the applicable Plan Distribution Date, each holder of an Allowed Secured Claim shall, at the option of the Reorganized Debtor, receive (a) Cash in an amount equal to such Allowed Other Secured Claim, (b) the Collateral securing its Allowed Other Secured Claim, or (c) such other treatment as may be agreed to in writing by the Holder of an Allowed Other Secured Claim and the Reorganized Debtor.

Class 3 is Impaired. Holders of Class 3 Claims are entitled to vote to accept or reject the Plan. At present, the Debtor believes that there are no Class 3 Claims.  Consequently, this Class may ultimately be an empty disregarded Class.

4.10.    Class 4 – VilHom Claim.

a)        The holder of the VilHom Claim shall be treated through Class 4 as set forth below.

b)        The Allowed VilHom Claim shall bear interest from and after the Effective Date at the Plan Rate.  The VilHom Claim shall be adjudicated and determined through the Adversary Proceeding.  The VilHom Claim is a Contested Claim for all purposes and the Objection Deadline in section 9.04 below shall not apply to the VilHom Claim.

c)        Beginning on the tenth (10th) day of the first full calendar month following the Effective Date, and thereafter on the tenth day of each successive calendar month, the Reorganized Debtor shall make a monthly payment into the VilHom Escrow Account equal to $8,333.33 (which is approximately 1/36th of the Estimated VilHom Claim) (collectively, the "Principal Payments") plus interest on the Estimated VilHom Claim calculated using the Plan Rate.  Such monthly payments

SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION

shall continue until the first to occur of (a) the Principal Payments aggregate to an amount equal to the amount of the Estimated VilHom Claim, or (b) the Final Allowed Amount of the VilHom Claim has been fixed and determined through the Adversary Proceeding.

d) Once the Final Allowed Amount of the VilHom Claim has been fixed and determined through the Adversary Proceeding, if the Final Allowed Amount of the VilHom Claim, plus interest thereon at the Plan Rate, is less than the amount then held in the VilHom Escrow Account, then (i) a sum sufficient to satisfy the Final Allowed Amount of the VilHom Claim, plus accrued interest at the Plan Rate, shall be paid to VilHom from the VilHom Escrow Account, plus the interest accrued on the funds so paid to VilHom while held in the VilHom Escrow Account, and (ii) the remaining balance of the VilHom Escrow Account shall be paid to the Reorganized Debtor free and clear of any Lien, Claim, or interest of VilHom.

e) Once the Final Allowed Amount of the VilHom Claim has been fixed and determined through the Adversary Proceeding, if the Final Allowed Amount of the VilHom Claim plus interest thereon at the Plan Rate is greater than the amount held in the VilHom Escrow Account, then the funds held in the VilHom Escrow Account (plus all interest accruing thereon while held in the VilHom Escrow Account) shall be paid to VilHom and credited first to accrued interest on the Final Allowed Amount of the VilHom Claim calculated using the Plan Rate, with the remaining balance of the funds held in the VilHom Escrow Account to be applied to the principal balance of the Final Allowed Amount of the VilHom Claim. The remaining principal balance of the Final Allowed Amount of the VilHom Claim ("VilHom Balance"), meaning the portion of the Final Allowed Amount of the VilHom Claim which was not satisfied by Distributions from the VilHom Escrow Account, shall continue to bear interest at the Plan Rate and shall be payable in substantially equal monthly payments sufficient to fully amortize and pay the VilHom Balance, bearing interest at the Plan Rate, in 36 substantially equal monthly payments of principal and interest, with the first such payment being due on the 10th day of the first full calendar month after the distribution of the VilHom Escrow Account, and with a like payment being due and payable on the 10th day of each consecutive calendar month thereafter; provided, however, the principal amount of such monthly payments on account of the VilHom Balance shall not be less than $8,333.33 per month plus accrued interest at the Plan Rate.

Class 4 is Impaired. The holder of the Class 4 Claim is entitled to vote to accept or reject the Plan.

4.11.    Class 5 – Convenience Claims. Each holder of an Allowed Convenience Claim shall receive, as soon as practicable after the Effective Date, Cash equal to one hundred percent (100%) of the Allowed amount of such Convenience Claim.

Class 5 is Unimpaired. Holders of Class 5 Claims are not entitled to vote to accept or reject the Plan.

4.12.    Class 6 – General Unsecured Claims. The holder of each Allowed General Unsecured Claim shall receive, beginning on or before the applicable Plan Distribution Date, Cash equal to the amount of such Allowed General Unsecured Claim in thirty-six (36) substantially equal monthly installments of principal and accrued interest calculated using the Plan Rate. For the avoidance of doubt, the Bush Claim is treated as part of Class 6 and shall constitute a Contested Claim for all purposes and shall not be subject to the Objection Deadline in section 9.04 below.

---

SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION

Class 6 is Impaired. Each holder of a Class 6 Claim is entitled to vote to accept or reject the Plan.

4.13.    Class 7 – Interests. Holders of Class 7 Interests shall retain their Interests. Class 7 is Unimpaired. Class 7 is deemed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

## ARTICLE V.
## ACCEPTANCE OR REJECTION OF THE PLAN

5.01.    Classes Entitled to Vote. Creditors in the Unimpaired Classes—Classes 1, 5, and 7—are deemed to have accepted the Plan and entitled to vote to accept or reject the Plan. Creditors in the Impaired Classes—Classes 2A, 2B, 2C, 2D, 2E, 2F, 2G, 4, and 6—are entitled to vote and shall vote separately to accept or reject the Plan.  Class 3 is believed to be an empty Class.

5.02.    Class Acceptance Requirement. A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have voted on the Plan.

5.03.    Cramdown. This section shall constitute the request by the Debtor, pursuant to section 1129(b) of the Bankruptcy Code, that the Bankruptcy Court confirm the Plan notwithstanding the fact that the requirements of section 1129(a)(8) of the Bankruptcy Code have not been met.

## ARTICLE VI.
## MEANS FOR IMPLEMENTATION OF THE PLAN

6.01.    Continued Existence of the Debtor. The Debtor shall continue to exist after the Effective Date, with all the powers available to such legal entities, in accordance with applicable law and pursuant to its constituent documents. Upon the occurrence of the Effective Date, the Debtor shall be thereafter referred to as the Reorganized Debtor.

6.02.    Vesting of Assets. As of the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all Assets, including all Cash, Estate Payment Rights, Estate Claims and Estate Defenses, shall vest in the Reorganized Debtor, free and clear of all rights, title, interests, claims, Liens, encumbrances, and charges, except as expressly set forth in this Plan.  All Assets shall vest in the Reorganized Debtor free and clear of, and unburdened and unencumbered by, any right, Claim, charge, Lien, or encumbrance in favor of VilHom other than VilHom's rights to Distributions as the Class 4 Creditor.  On and after the Effective Date, the Reorganized Debtor may administer, use, acquire, or dispose of property vested in it pursuant to this Plan without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, the Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for all fees, disbursements, expenses, or related support services of Professionals (including fees relating to the preparation of professional fee applications) without application to, or approval of, the Bankruptcy Court.

---

6.03.   <u>Lis Pendens Ineffective</u>.  The Olerio Contract has been rejected pursuant to an Order [Docket no. 127] entered on December 22, 2025.  As a consequence, VilHom is no longer entitled to specific performance of the Olerio Contract against either the Estate or the Reorganized Debtor. The Lis Pendens are not themselves either Liens or encumbrances against the Olerio Contract Property. Instead, the Lis Pendens constitute constructive notice to the world of VilHom's Claims pursuant to the Olerio Contract as asserted by VilHom in the State Court Lawsuit and/or the VilHom Adversary.  As a consequence, pursuant to this Plan, all Olerio Contract Property may be sold free and clear of, and without any reference to, any restrictions or limitations based upon any Claims or rights asserted by VilHom in or pursuant to the Olerio Contract, the State Court Lawsuit, or Adversary Proceeding and VilHom shall have no rights against any Sale Proceeds resulting from the sale, disposition, or exchange of any Asset except as expressly provided in this Plan.  VilHom's sole right to any Distribution pursuant to this Plan shall be on account of any Allowed Class 4 Claim which shall be payable in accordance with the terms of this Plan.

6.04.   <u>Sale Free and Clear: Olerio Contract Property</u>.  To the extent, if any, that the Lis Pendens have any force or effect, or in any manner are enforceable against, or create any rights or charge against, any of the Olerio Contract Property, or to the extent that VilHom may have any right (legal or equitable) to assert any charge, Claim, encumbrance, or Lien against any of the Olerio Contract Property, such property may be sold by the Reorganized Debtor pursuant to this Plan free and clear of any right, charge, Claim, encumbrance, or Lien in favor of VilHom, including any right, charge, Claim, encumbrance or Lien pursuant to or arising out of the Olerio Contract.  No other or further authorization or order by the Bankruptcy Court shall be necessary to implement or give effect to this provision as against VilHom and the Olerio Contract Property other than the terms of the Confirmation Order.

6.05.   <u>Sale of Collateral of Secured Lenders</u>.  Pursuant to this Plan, the Reorganized Debtor may sell any Lot which constitutes a part of the Collateral for any Secured Claim of any of the Secured Lenders (Classes 2A, 2B, 2C, 2D, 2E, 2F, and 2G) free and clear of each such Secured Lender's Lien against the Collateral so sold.  The Secured Lender's Lien shall attach to the resulting Sale Proceeds and, except as to the Huntington Bank Claim, the Secured Lender shall be paid from the Sales Proceeds based on the applicable release price set forth in the Release Price Schedule.  No other or further authorization or order shall be necessary to implement or give effect to this provision against each of the Secured Lenders and the Collateral for their respective Secured Claims other than the terms of the Confirmation Order.  The proceeds from the sale of any Lot included in the Huntington Bank Collateral shall be treated in accordance with the treatment of Class 2F.

6.06.   <u>Additional Sale Orders</u>.  With respect to any sale of either any portion of the Olerio Contract Property or any of the Lots subject to either section 6.04 or section 6.05 above, the Reorganized Debtor may, in the exercise of its sole good faith business judgment, move the Bankruptcy Court for an order specifically approving any such proposed sale of any portion of the Olerio Contract Property or any of the Lots, including the sale by the Reorganized Debtor free and clear of any of the Lots or any portion of the Olerio Contract Property free and clear pursuant to sections 6.04 or 6.05 above.

6.07.   <u>Additional Loan Documents</u>.  The Reorganized Debtor may execute and deliver to each of the Secured Lenders all such additional documents as may be required, in the Reorganized

Debtor's good faith business judgment, to evidence and/or renew each such secured obligation to any of the Secured Lenders consistent with and in accordance with this Plan.

6.08.    Secured Lenders' Expenses and Post-Petition Interest.

a)    This section 6.08 shall not apply to the Huntington Bank Claim.  References to the Secured Lenders in subsections b) and c) below shall not include or be applicable to Huntington.

b)    Each of the Secured Lenders is oversecured and is entitled to recover their legal fees and expenses through the Effective Date pursuant to section 506(b).  No later than the 14th day after the Effective Date, each of the Secured Lender's shall provide to the Reorganized Debtor a statement reflecting the fees and expenses which each such lender asserts it is entitled to recover pursuant to section 506(b).  The Reorganized Debtor shall then serve on each of the Secured Lenders, no later than 28 days after the Effective Date, any objection which the Reorganized Debtor has to the fees and expenses as proposed by each such lender.  Within 60 days after the Effective Date, or as may be otherwise agreed, the Reorganized Debtor shall reimburse each of the Secured Lenders for such fees and expenses to the extent accepted and agreed to by the Reorganized Debtor.  If any of the Secured Lenders and the Reorganized Debtor cannot agree on the amount of such fees and expenses, either the Secured Lender or the Reorganized Debtor may move the Bankruptcy Court to determine the amount of such lender's Allowed Claim for such fees and expenses through a contested proceeding under Bankr. R. Pr. 9014.

c)    Likewise, each of the Secured Lenders shall be entitled to post-petition interest through the Effective Date at the non-default contract rate applicable to such loans.

6.09.    Assumption of Obligations to Make Distributions. The Reorganized Debtor shall be deemed to have assumed the obligations to make all Distributions pursuant to this Plan.  However, the Reorganized Debtor may prepay, at any time, in whole or in part, any Allowed Claim on such terms as the Reorganized Debtor may determine in its sole discretion based on the exercise of its good faith business judgment.

6.10.    Actions by Debtor and the Reorganized Debtor to Implement Plan. The entry of the Confirmation Order shall constitute all necessary authorization for the Debtor and the Reorganized Debtor to take or cause to be taken all actions necessary or appropriate to consummate, implement or perform all provisions of this Plan on and after the Effective Date, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule or regulation, including without limitation, (a) all transfers of Assets, including to the Reorganized Debtor, that are to occur pursuant to the Plan; (b) the performance of the terms of the Plan and the making of all Distributions required under the Plan; and (c) subject to the terms of the Plan, entering into any and all transactions, contracts, or arrangements permitted by applicable law, order, rule or regulation.

6.11.    Warranty Claims.  All Warranty Claims shall be and remain unaffected by this Plan, including both the discharge granted in section 12.01 below and the Plan Injunction in section 12.03 below.  However, nothing in this Plan shall act to impair, waive, or lessen any counterclaim, defense or affirmative defense by the Reorganized Debtor in relation to any of the Warranty Claims, and all defenses, affirmative defenses, offsets, credits, and counterclaims in relation to any Warranty Claim

SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION

shall be fully vested in and transferred to the Reorganized Debtor.  For the avoidance of any doubt, the Bush Claim is not one of the Warranty Claims and is treated as a part of Class 6.

6.12.    Management of the Reorganized Debtor

(a)    On and after the Effective Date, the Plan and all property of the Reorganized Debtor shall be managed by the Reorganized Debtor.  DH Management, Inc., shall continue to act as the sole general partner of the Reorganized Debtor.

(b)    The Reorganized Debtor shall have sole responsibility for making Distributions under the Plan and pursuing the Estate Claims (including the Avoidance Actions), and the collection and pursuit of the Estate Payments Rights.

6.13.    Post-Effective Date Service List. Pleadings filed by any party-in-interest with the Bankruptcy Court after the Effective Date shall be served on the following Persons (collectively the "Service List"): (a) any Person directly affected by the relief sought in the pleading, (b) the U.S. Trustee, (c) parties that have filed a Notice of Appearance in the Chapter 11 Case, and (d) the Reorganized Debtor.

6.14.    Section 505 Powers. All rights and powers pursuant to section 505 of the Bankruptcy Code are hereby reserved to the Estate and shall be transferred to, and vested in, the Reorganized Debtor as of the Effective Date.

6.15.    Section 510(c) Powers. All rights and powers to seek or exercise any right or remedy of equitable subordination are hereby reserved to the Estate and shall be transferred to, and vested in, the Reorganized Debtor as of the Effective Date as an Estate Defense.

6.16.    Section 506(c) Powers. The Estate hereby reserves all rights and powers pursuant to section 506(c) of the Bankruptcy Code, and all such rights shall be specifically transferred to, and vested in, the Reorganized Debtor.

6.17.    Prepayment of Allowed Claims.  The Reorganized Debtor may prepay, in whole or in part, any Allowed Claim on such terms and at such time as the Reorganized Debtor may determine is its sole discretion.

## ARTICLE VII.
## PROVISIONS GOVERNING DISTRIBUTIONS

7.01.    Source of Distributions. All Distributions required to be made by the Reorganized Debtor under this Plan shall be made by the Reorganized Debtor in the manner provided in this Plan and the Confirmation Order.

7.02.    Initial Plan Distribution Date. All Distributions to holders of Allowed Classified Claims shall commence on the "Initial Plan Distribution Date" applicable to each such Allowed Claim. The Initial Plan Distribution Date shall occur (a) with respect each Claim that is an Allowed Claim on the Effective Date, as soon as reasonably practicable after the Effective Date in accordance with this Plan; and (b) with respect to each Claim that is not Allowed on the Effective Date, as set forth in the

remainder of this section.  If a Final Order is entered allowing any Contested Claim other than the VilHom Claim or the Huntington Bank Claim, and the Debtor or Reorganized Debtor asserts any appeal or request for rehearing or reconsideration of the Final Order allowing the Contested Claim (including any request for reconsideration under section 502(j)), the Initial Plan Distribution Date shall be the first day of the first calendar month commencing at least 10 days after the Final Allowed Amount of such Claim has been finally determined.  This provision shall not apply to the VilHom Claim or the Huntington Bank Claim.  Any Distributions on account of the VilHom Claim shall be made pursuant to section 4.10 above, and any Distributions on account of the Huntington Bank Claim shall be made pursuant to paragraph 4.07 above.

7.03.    Timing and Amount of Distributions. No Distribution shall be made on account of any Claim until such Claim is Allowed and in accordance with the Initial Plan Distribution Date, except as otherwise set forth in this Plan or otherwise ordered by the Bankruptcy Court. No Distribution shall be made on account of any Contested Claim until such Claim is Allowed and the Initial Plan Distribution Date has occurred. The Reorganized Debtor may, but shall not be required to, seek approval of, or any other appropriate relief from, the Bankruptcy Court with respect to any of such Distributions. Any Unclaimed Property may be paid into the registry of the Bankruptcy Court or otherwise distributed in accordance with the orders of the Bankruptcy Court.  However, from and after the Effective Date, the Reorganized Debtor may pre-pay any Allowed Claim in such amounts and at such times as the Reorganized Debtor may determine in the exercise of its good faith discretion.

7.04.    Means of Cash Payment. Cash payments pursuant to this Plan shall be made by check drawn on, or by wire transfer from, a domestic bank, or by other means agreed to by the payor and payee.

7.05.    Record Date for Distributions. As of the close of business on the Effective Date (the "Distribution Record Date"), the register for Claims will be closed, and there shall be no further changes in the holders of record of any Claims. Although there is no prohibition against the transfer of any Claim by any Creditor, the Reorganized Debtor shall have no obligation to recognize any transfer of a Claim occurring after the Distribution Record Date, and the Reorganized Debtor shall instead be authorized and entitled to recognize and deal for all purposes under this Plan, including for the purpose of making all Distributions, with only those holders of Claims so reflected as of the Distribution Record Date. However, the Reorganized Debtor may, in the exercise of its good faith business judgment, agree to recognize transfers of Claims after the Distribution Record Date, but shall have no obligation to do so.

7.06.    Delivery of Distributions. All Distributions, deliveries and payments to the holders of any Allowed Claims shall be made to the addresses set forth on the respective proofs of Claim filed in the Chapter 11 Case by such Claimants or, if the Distribution is to be made based on a Claim reflected as Allowed in the Schedules, at the address reflected in the Schedules. Any such Distribution, delivery or payment shall be deemed as made for all purposes relating to this Plan when deposited in the United States Mail, postage prepaid, addressed as required in the preceding sentence. If any Distribution is returned as undeliverable, no further Distribution shall be made on account of such Allowed Claim unless and until the Reorganized Debtor is notified of such holder's then current address, at which time all missed Distributions shall be made to the holder of such Allowed Claim. However, all notices to the Reorganized Debtor reflecting new or updated addresses for undeliverable Distributions shall be made

on or before one hundred twenty (120) days after the date of the attempted Distribution or such longer period as the Reorganized Debtor may fix in the exercise of its sole discretion. After such date, all Unclaimed Property shall revert to the Reorganized Debtor and the Claim of any holder with respect to such property shall be discharged and forever barred.

7.07.   <u>W-9 Forms</u>. Each holder of an Allowed Claim must provide a W-9 form or other such necessary information to comply with any withholding requirements of any Governmental Unit (collectively the "<u>W-9 Form</u>") to the Reorganized Debtor prior to receiving any Distribution from the Reorganized Debtor. In the event a holder of an Allowed Claim does not provide a W-9 Form to the Reorganized Debtor within thirty (30) days of the Effective Date, the Reorganized Debtor shall, at an appropriate time, issue a written request to each holder of an Allowed Claim that has not previously provided a W-9 Form to the Reorganized Debtor. The request shall be in writing and shall be delivered to the last address known to the Debtor, as appropriate. The request shall conspicuously advise and disclose that failure to provide a W-9 Form to the Reorganized Debtor within thirty (30) days shall result in a waiver of any right or rights to a Distribution. In the event any holder of an Allowed Claim fails to provide the Reorganized Debtor with a W-9 Form within thirty (30) days after the date of written request described herein, then the Reorganized Debtor may suspend Distributions to such Claimant until an appropriate W-9 Form is received or move the Bankruptcy Court to determine that the holder of such Allowed Claim shall be deemed to have waived the right to receive any Distribution.

7.08.   <u>Time Bar to Cash Payments</u>. Checks issued in respect of Allowed Claims shall be null and void if not cashed within ninety (90) days of the date of issuance thereof. Requests for reissuance of any check shall be made directly to the issuer of the check by the holder of the Allowed Claim with respect to which such check originally was issued. Any request for reissuance in respect of such a voided check shall be made on or before one hundred twenty (120) days after the date of issuance of such check or such longer period as the Reorganized Debtor may fix. After such date, all Claims in respect of void checks shall be discharged and forever barred.

7.09.   <u>Cure Period</u>. Except as otherwise set forth herein, the failure by the Reorganized Debtor to timely perform any term, provision or covenant contained in this Plan, or to make any payment or Distribution required by this Plan to any Creditor, or the failure to make any payment or perform any covenant on any note, instrument or document issued pursuant to this Plan, shall not constitute an event of default unless and until the Reorganized Debtor have been given thirty (30) days written notice of such alleged default in the manner provided in this Plan, and provided an opportunity to cure any such alleged default. Until the expiration of such thirty (30) day cure period, the Reorganized Debtor shall not be in default, and performance during such thirty (30) day cure period shall be deemed as timely for all purposes. Such written notice and passage of the thirty (30) day cure period shall constitute conditions precedent to declaring or claiming any default under this Plan or bringing any action or legal proceeding by any Person to enforce any right granted under this Plan.

7.10.   <u>Distributions after Substantial Consummation</u>. All Distributions of any kind made to any Creditor after Substantial Consummation and any and all other actions taken under this Plan after Substantial Consummation shall not be subject to relief, reversal, or modification by any court unless the implementation of the Confirmation Order is stayed by an order granted under Bankruptcy Rule 8005.

## ARTICLE VIII.
## RETENTION OF ESTATE CLAIMS AND ESTATE DEFENSES

8.01.    Retention of Estate Claims. Except as otherwise specifically provided in this Plan, pursuant to section 1123(b)(3) of the Bankruptcy Code, all Estate Claims shall be transferred to, and vested in, the Reorganized Debtor, both for purposes of seeking an affirmative recovery against any Person and for the purposes of offset, recoupment or defense against any Claim asserted against the Estate or the Reorganized Debtor.  Without limiting the generality of the foregoing, all VilHom Claims and all Estate Claims and Estate Defenses relating to Huntington shall be transferred to, and vested in, the Reorganized Debtor through this Plan.

**Without limiting the effectiveness or generality of the foregoing reservation, out of an abundance of caution, the Reorganized Debtor hereby specifically reserves, retains, and preserves (a) the Estate Claims, including the VilHom Adversary Claims, including those reflected in the attached Exhibit "A" hereto, and (b) all Estate Claims and Defenses relating to Huntington including those reflected in the attached Exhibit "A" hereto.  Reference is here made to Exhibit "A" hereto, which constitutes an integral part of this Plan. The provisions of this Article of the Plan, as well as the descriptions and disclosures relating to the Estate Claims in the Disclosure Statement, are provided in the interest of providing maximum disclosure of the Estate Claims of which the Debtor is presently aware and shall not act as a limitation on the potential Estate Claims that may exist. It is the specific intention of this Plan that all Avoidance Actions and all associated remedies, all Estate Payment Rights, and all other Estate Claims, whether arising before or after the Petition Date, and whether arising under the Bankruptcy Code or applicable state or federal non-bankruptcy laws, shall all be reserved, retained, and preserved under this Plan to be transferred to, and vested in, the Reorganized Debtor. All Estate Claims are reserved, retained, and preserved both as causes of action for an affirmative recovery and as counterclaims and for the purposes of offset or recoupment against any Claims asserted against the Estate.**

8.02.    Retention of Estate Defenses. Except as otherwise specifically provided in this Plan, pursuant to section 1123(b)(3) of the Bankruptcy Code, all Estate Defenses shall be transferred to, and vested in, the Reorganized Debtor. For this purpose, all Estate Defenses are hereby reserved, retained, and preserved by the Debtor and the Estate, including without limitation all such Estate Defenses available to the Estate pursuant to section 558 of the Bankruptcy Code, as of the Effective Date based on the entry of the Confirmation Order.  Without limiting the generality of the foregoing, this shall include all VilHom Defenses, as well as all Estate Claims and Estate Defenses in relation to Huntington, including all offsets and credits against all Claims asserted by Huntington.

8.03.    Retention of Claims and Defenses Against VilHom.  Without limiting the generality of the provisions in sections 8.01 and 8.02 above, the Reorganized Debtor shall be vested with, and retain, all rights, Claims, Estate Claims, and Estate Defenses pursuant to section 558, including the VilHom Defenses and all defenses, affirmative defenses, offsets, and counterclaims, as against or in relation to VilHom.  Without limiting the generality of the foregoing, the Reorganized Debtor shall be vested with and retain, all rights, Claims, Estate Defenses (including all defenses, affirmative defenses, offsets, and counterclaims) which are asserted in, or could be asserted in, either the State Court Lawsuit or VilHom Adversary, including both the VilHom Adversary Claims, and the VilHom Defenses.

8.04.    Retention of Claims and Defenses Against Huntington. Without limiting the generality of the provisions in sections 8.01 and 8.02 above, the Reorganized Debtor shall be vested with, and retain, all rights, claims, Estate Claims, and Estate Defenses pursuant to section 558, including all Estate Claims and Estate Defenses (including all defenses, affirmative defenses, offsets, credits, and counterclaims) in relation to Huntington or which is asserted in, or could be asserted in, the Huntington Objection.

8.05.    Assertion of Estate Claims and Estate Defenses. The Reorganized Debtor shall have, and be vested with, the exclusive right, authority and standing to assert all Estate Claims and Estate Defenses for the benefit of the Reorganized Debtor.

## ARTICLE IX.
## PROCEDURES FOR RESOLVING AND TREATING
## CONTESTED AND CONTINGENT CLAIMS

9.01.    Contested Claims.  VilHom's Class 4 Claim is a Contested Claim and shall be fixed, liquidated, and determined through the VilHom Adversary.  Section 9.03 shall not apply to the VilHom Claim, the Huntington Bank Claim, or the Bush Claim, and there is no Objection Deadline as to such Claims.

9.02.    Claims Listed in Schedules as Disputed. Any General Unsecured Claim which is listed in the Schedules as unliquidated, contingent, or disputed, and for which no proof of Claim has been timely filed, shall be considered as Disallowed as of the Effective Date without the necessity of any further action by the Reorganized Debtor or further order of the Bankruptcy Court other than the entry of the Confirmation Order.

9.03.    Responsibility for Objecting to Claims and Settlement of Claims. The Reorganized Debtor shall have exclusive standing and authority to either object to any Claim or settle and compromise any Objection to any Claim, including as follows:

(a)    From and after the Effective Date, the Reorganized Debtor has the sole and exclusive right to (i) file, settle, or litigate to Final Order any Objections to any Claims; and (ii) seek to subordinate any Claim. Any Contested Claim may be litigated to Final Order by the Reorganized Debtor; and

(b)    From and after the Effective Date, the Reorganized Debtor shall have the sole and exclusive right to settle, compromise, or otherwise resolve any Contested Claim without the necessity of any further notice or approval of the Bankruptcy Court. Bankruptcy Rule 9019 shall not apply to any settlement or compromise of a Contested Claim after the Effective Date.

9.04.    Objection Deadline. All Objections to Claims shall be served and filed by the Objection Deadline; *provided, however*, that the Objection Deadline shall not apply to Claims which are not reflected in the claims register, including any alleged informal proofs of Claim. The Reorganized Debtor may seek to extend the Objection Deadline pursuant to a motion filed on or before the then applicable Objection Deadline with respect to any Claim. Any such motion may be granted without notice or a hearing. In the event that the Reorganized Debtor files such a motion and the Bankruptcy Court denies such motion, the Objection Deadline shall nevertheless be automatically extended to that

date which is ten (10) Business Days after the date of entry of the Bankruptcy Court's order denying such motion. Any proof of Claim other than one based upon a Rejection Claim and which is filed more than thirty (30) days after the Effective Date shall be of no force and effect and need not be objected to by the Reorganized Debtor. Nothing contained herein shall limit the right of the Reorganized Debtor to object to Claims, if any, filed or amended after the Objection Deadline.

9.05.    Response to Claim Objection. If the Reorganized Debtor files an Objection to any Claim, then the holder of such Claim shall file a written response to such Objection within twenty-four (24) days after the filing and service of the Objection upon the holder of the Contested Claim. Each such Objection shall contain appropriate negative notice advising the Creditor whose Claim is subject to the Objection of the requirement and time period to file a response to such Objection and that, if no response is timely filed to the Objection, the Bankruptcy Court may enter an order that such Claim is Disallowed without further notice or hearing. The negative notice language in the Objection shall satisfy the notice requirement in section 3007(a) of the Bankruptcy Rules, and the Reorganized Debtor shall not be required to send a separate notice of the Objection to the Creditor whose Claim is subject to the Objection.

9.06.    Distributions on Account of Contested Claims. If a Claim is Contested, then the dates for any Distributions as to such Contested Claim shall be determined based upon its date of Allowance, and thereafter Distribution shall be made on account of such Allowed Claim pursuant to the provisions of the Plan. No Distribution shall be made on account of a Contested Claim until Allowed. Until such time as a contingent Claim becomes fixed and absolute by a Final Order Allowing such Claim, such Claim shall be treated as a Contested Claim for purposes of estimates, allocations, and Distributions under the Plan. Any contingent right to contribution or reimbursement shall continue to be subject to section 502(e) of the Bankruptcy Code.

9.07.    No Waiver of Right to Object. Except as expressly provided in this Plan, nothing contained in the Disclosure Statement, this Plan, or the Confirmation Order shall waive, relinquish, release, or impair the Reorganized Debtor's right to object to any Claim.

9.08.    Offsets and Defenses. The Reorganized Debtor shall be vested with and retain all Estate Claims and Estate Defenses, including without limitation all rights of offset or recoupment and all counterclaims against any Claimant holding a Claim. Assertion of counterclaims by the Reorganized Debtor against any Claim asserted against the Estate or Reorganized Debtor shall constitute "core" proceedings.

9.09.    Claims Paid or Reduced Prior to Effective Date. Notwithstanding the contents of the Schedules, Claims listed therein as undisputed, liquidated and not contingent shall be reduced by the amount, if any, that was paid by the Debtor prior to the Effective Date, including pursuant to orders of the Bankruptcy Court. To the extent such payments are not reflected in the Schedules, such Schedules will be deemed amended and reduced to reflect that such payments were made. Nothing in the Plan shall preclude the Debtor or the Reorganized Debtor from paying Claims that the Debtor was authorized to pay pursuant to any Final Order entered by the Bankruptcy Court prior to the Confirmation Date.

---

SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION

## ARTICLE X.
## EXECUTORY CONTRACTS

10.01.  Assumption and Rejection of Executory Contracts. All Executory Contracts shall be deemed assumed by the Debtor upon the Effective Date unless an Executory Contract (a) has been previously assumed or rejected pursuant to an order of the Bankruptcy Court or (b) is the subject of a motion to reject filed on or before the Confirmation Date. The Plan shall constitute a motion to assume all Executory Contracts except as stated in this paragraph. However, the Debtor may file a separate motion for the assumption or rejection of any Executory Contract at any time through the Confirmation Date.

10.02.  Cure Payments. All payments that may be required by section 365(b)(1) of the Bankruptcy Code to satisfy any Cure Claim shall be made by the Reorganized Debtor as soon as reasonably practical after the Effective Date or upon such terms as may be otherwise agreed between the Reorganized Debtor and the holder of such Cure Claim; *provided, however*, that in the event of a dispute regarding the amount of any Cure Claim, the cure of any other defaults, or any other matter pertaining to assumption or assignment of an Executory Contract, the Reorganized Debtor shall make such cure payments and cure such other defaults, all as may be required by section 365(b)(1) of the Bankruptcy Code, following the entry of a Final Order by the Bankruptcy Court resolving such dispute.

10.03.  Bar to Rejection Claims. Except as otherwise ordered by the Bankruptcy Court, any Rejection Claim based on the rejection of an Executory Contract shall be forever barred and shall not be enforceable against the Reorganized Debtor or the Reorganized Debtor's assets unless a proof of Claim is filed with the Bankruptcy Court and served upon the Reorganized Debtor and its counsel by the earlier of thirty (30) days after the Effective Date or thirty (30) days after entry of the Final Order approving rejection of such Executory Contract.

10.04.  Rejection Claims. Any Rejection Claim not barred by section 10.03 of the Plan shall be classified as a Class 6 General Unsecured Claim subject to the provisions of sections 502(b)(6) and 502(g) of the Bankruptcy Code; *provided, however*, that any Rejection Claim by a lessor based upon the rejection of an unexpired lease of real property, either prior to the Confirmation Date, upon the entry of the Confirmation Order, or upon the Effective Date, shall be limited in accordance with section 502(b)(6) of the Bankruptcy Code and state law mitigation requirements. All Rejection Claims shall be deemed as Contested Claims until Allowed. Nothing contained herein shall be deemed an admission by the Debtor or the Reorganized Debtor that such rejection gives rise to or results in a Claim or shall be deemed a waiver by the Debtor or the Reorganized Debtor of any objections or defenses to any such Rejection Claim if asserted.

10.05.  Reservation of Rights. Nothing contained in the Plan shall constitute an admission by the Debtor that any contract or lease is in fact an Executory Contract or that the Debtor or the Reorganized Debtor have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Reorganized Debtor shall have thirty (30) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease.

## ARTICLE XI.
## EFFECTIVENESS OF THE PLAN

11.01.   <u>Effectiveness of the Plan</u>. The Plan shall become effective on the Effective Date.

11.02.   <u>Notice of the Effective Date</u>. On or as soon as reasonably practical after the occurrence of the Effective Date, the Reorganized Debtor shall cause a notice of the Effective Date to be filed with the Bankruptcy Court and served on all Creditors and parties-in-interest.

11.03.   <u>Revocation of Plan</u>. The Debtor may revoke and withdraw the Plan at any time before the Effective Date. If the Debtor revoke or withdraw the Plan, or if confirmation of the Plan does not occur, then this Plan shall be deemed null and void and nothing contained in the Plan shall be deemed to constitute a waiver or release of any Claims by or against the Debtor, as the case may be, or any other Person, or to prejudice in any manner the rights of the Debtor or any other Person in any further proceedings involving the Debtor.

## ARTICLE XII.
## EFFECT OF THE PLAN ON CLAIMS AND INTERESTS

12.01.   <u>Discharge of Claims</u>. Pursuant to Section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Distributions, rights, and treatments provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of all Claims which arose or accrued on or before the Effective Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtor or any of the Assets, including  all Claims of the kind specified in Sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim based upon such debt or right is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the holder of such a Claim has accepted the Plan. Any default or "event of default" by the Debtor with respect to any Claim that existed immediately before or on account of the Filing of the Bankruptcy Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims subject to the Effective Date occurring.  Without limiting the generality of the foregoing, this section and the discharge shall apply to the VilHom Adversary Claims and all Claims, rights, or remedies which were or could be asserted by VilHom in the State Court Lawsuit.  However, any other term of this section notwithstanding, the discharge granted herein shall not apply to Warranty Claims, but shall apply to the Bush Claim.

12.02.   <u>Compromise and Settlement</u>

(a)      Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration of the classification, potential Distributions and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests and controversies subject to, or dealt with, under this Plan, including, without limitation, all Claims against the Debtor or Estate arising prior to the Effective Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, fixed or contingent, arising out of, relating to or in connection with the business or affairs of, or transactions with, the Debtor or the Estate. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing

---

SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION

compromises or settlements embodied in this Plan, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interest of the Debtor, the Estate, Creditors and other parties-in-interest, and are fair, equitable and within the range of reasonableness. The rights afforded in the Plan and the treatment of all Claims and Interests herein shall be in exchange for, and in complete satisfaction and release of, all Claims and Interests of any nature whatsoever against and in the Debtor, the Estate, and the Assets.

(b)     It is not the intent of this Plan that confirmation of the Plan shall in any manner alter or amend any settlement and compromise (including those contained in agreed orders) between the Debtor and any Person that has been previously approved by the Bankruptcy Court (each, a "Prior Settlement"). To the extent of any conflict between the terms of the Plan and the terms of any Prior Settlement, the terms of the Prior Settlement shall control, and such Prior Settlement shall be enforceable according to its terms.

12.03.    **Plan Injunction.  This section is referred to herein and in the Confirmation Order as the "Plan Injunction."  As used in this Plan Injunction provision, the following terms shall have the following meanings: (i) the term "Claim" shall mean and include any Claim by any Claimant against the Debtor, including any Claim against, right to payment from, or any interest in, or any assertion of any right, charge, encumbrance, or Lien against, any of the Assets, based on or arising out of any Claim that arose or accrued in whole or in part on or before the Effective Date, including without limitation all VilHom Adversary Claims, and (ii) the term "Claimant" shall include all holders of a Claim, including without limitation VilHom, (iii) the term "Protected Persons" shall include both the Debtor and the Reorganized Debtor, and (iv) the term the "Protected Assets" shall include all Assets (including the proceeds or products thereof) transferred to or vested in the Reorganized Debtor pursuant to this Plan, as well as the proceeds and products thereof.**

**From and after the Effective Date, all Claimants are hereby permanently enjoined and prohibited, directly or indirectly, from and against all of the following:  (a) the commencement or continuation in any manner of any action, Claim, lawsuit, or other proceeding of any type or nature against or in relation to any of the Protected Persons or Protected Assets, including any act to collect or enforce any Claim, right or Lien against any of the Protected Persons or Protected Assets, other than through the terms of the Plan, (b) the creation, perfection, or enforcement of any Lien, Claim, right, burden, change, encumbrances, or interest against any of the Protected Persons or Protected Assets other than through the terms of the Plan, and (c) taking any action in relation to any Protected Person or any of the Protected Assets which violates or which does not conform to the terms of this Plan; provided, however, that the enforcement of rights granted to any Claimant pursuant to this Plan to any Claimant shall not violate this Plan Injunction; provided, further, however, the Plan Injunction shall not apply to the Warranty Claims but shall apply to the Bush Claim.  The Plan Injunction shall inure to the benefit of, and may be enforced by, the Reorganized Debtor.**

12.04.    Setoffs. Except as otherwise expressly provided for in the Plan, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable nonbankruptcy law, or as may be agreed to by the holder of a Claim, the Reorganized Debtor may set off against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Allowed Claim (before such Distribution is made), any Claims, rights, Estate Claims and Estate Defenses of any nature that

the Debtor may hold against the holder of such Allowed Claim, to the extent such Claims, rights, Estate Claims and Estate Defenses against such holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided, however*, that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release of any such Claims, rights, Estate Claims and Estate Defenses that the Estate may possess against such Claimant. In no event shall any Claimant or Interest holder be entitled to setoff any Claim or Interest against any Claim, right, or Estate Claim of the Debtor without the consent of the Debtor or the Reorganized Debtor unless such holder files a motion with the Bankruptcy Court requesting the authority to perform such setoff notwithstanding any indication in any proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

12.05.   Recoupment. Except as otherwise expressly provided for in the Plan, in no event shall any holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, account receivable, or Estate Claim of the Debtor or the Reorganized Debtor unless (a) such holder actually provides notice thereof in writing to the Debtor or the Reorganized Debtor of its intent to perform a recoupment; (b) such notice includes the amount to be recouped by the holder of the Claim or Interest and a specific description of the basis for the recoupment, and (c) the Debtor or the Reorganized Debtor have provided a written response to such Claim or Interest holder, stating unequivocally that the Debtor or the Reorganized Debtor consents to the requested recoupment. The Debtor and the Reorganized Debtor shall have the right, but not the obligation, to seek an order of the Bankruptcy Court allowing any or all of the proposed recoupment. In the absence of a written response from the Debtor or the Reorganized Debtor consenting to a recoupment or an order of the Bankruptcy Court authorizing a recoupment, no recoupment by the holder of a Claim or Interest shall be allowed.

12.06.   Turnover. On the Effective Date, any rights of the Estate to compel turnover of Assets under applicable nonbankruptcy law and pursuant to section 542 or 543 of the Bankruptcy Code shall be deemed transferred to and vested in the Reorganized Debtor.

12.07.   Exculpation.  The Debtor and its representatives are hereby exculpated from any and all Claim as of the Effective Date relating to the proposal, solicitation, or confirmation of this Plan.

12.08.   Automatic Stay. The automatic stay pursuant to section 362 of the Bankruptcy Code, except as previously modified by the Bankruptcy Court, shall remain in effect until the Effective Date of the Plan as to the Debtor, the Estate, and all Assets.

## ARTICLE XIII.
## JURISDICTION OF COURTS AND MODIFICATIONS TO THE PLAN

13.01.   Retention of Jurisdiction. Pursuant to sections 1334 and 157 of title 28 of the United States Code, the Bankruptcy Court shall retain exclusive jurisdiction of all matters arising in, arising under, and related to the Chapter 11 Case and the Plan, to the full extent allowed or permitted by applicable law, including without limitation for the purposes of invoking sections 105(a) and 1142 of the Bankruptcy Code, and for, among other things, the following purposes:

(a)      To hear and determine any and all objections to, or applications or motions concerning, the allowance of Claims or the allowance, classification, priority, compromise, estimation, or payment of any Administrative Expense;

(b)      To hear and determine any and all applications for payment of fees and expenses pursuant to this Plan to any Estate Professional pursuant to sections 330 or 503 of the Bankruptcy Code, or for payment of any other fees or expenses authorized to be paid or reimbursed under this Plan, and any and all objections thereto;

(c)      To hear and determine pending applications for the rejection, assumption, or assumption and assignment of Executory Contracts and the allowance of Claims resulting therefrom, and to determine the rights of any party in respect to the assumption or rejection of any Executory Contract;

(d)      To hear and determine any and all adversary proceedings, applications, or contested matters, including relating to the allowance of any Claim;

(e)      To hear and determine all controversies, disputes, and suits which may arise in connection with the execution, interpretation, implementation, consummation, or enforcement of the Plan or in connection with the enforcement of any remedies made available under the Plan, including without limitation, (i) adjudication of all rights, interests or disputes relating to any of the Assets, (ii) the valuation of all Collateral, (iii) the determination of the validity of any Lien or claimed right of offset or recoupment; and (iv) determinations of Objections to Contested Claims;

(f)      To liquidate and administer any disputed, contingent, or unliquidated Claims, including the Allowance of all Contested Claims;

(g)      To administer Distributions to holders of Allowed Claims as provided herein;

(h)      To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(i)      To enable the Reorganized Debtor to prosecute any and all proceedings which may be brought to set aside transfers, Liens or encumbrances and to recover any transfers, Assets, properties or damages to which the Reorganized Debtor may be entitled under applicable provisions of the Bankruptcy Code or any other federal, state or local laws, including causes of action, controversies, disputes and conflicts between the Reorganized Debtor and any other party, including but not limited to, any causes of action or Objections to Claims, preferences or fraudulent transfers and obligations or equitable subordination;

(j)      To consider any modification of the Plan pursuant to section 1127 of the Bankruptcy Code, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation the Confirmation Order;

(k)      To enter and implement all such orders as may be necessary or appropriate to execute, interpret, construe, implement, consummate, or enforce the terms and conditions of this Plan and the transactions required or contemplated pursuant thereto;

SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION

(l)     To hear and determine any motion or application which the Reorganized Debtor is required or allowed to commence before the Bankruptcy Court pursuant to this Plan;

(m)     To hear and determine any other matter not inconsistent with the Bankruptcy Code and title 28 of the United States Code that may arise in connection with or related to the Plan;

(n)     To determine proceedings pursuant to section 505 of the Bankruptcy Code;

(o)     To enter a final decree closing the Chapter 11 Case;

(p)     To approve the sale, exchange, or transfer of any Asset pursuant to this Plan, including the sale of any Lot or any portion of the Olerio Contract Property free and clear or the rights, claims, and Liens of any Secured Lender or VilHom; and

(q)     To determine any other matter or dispute relating to the Estate, the Estate Claims, the Estate Defenses, the Assets, or the Distributions by the Reorganized Debtor.

13.02.   <u>Abstention and Other Courts</u>. If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of or relating to the Chapter 11 Case, this Article of the Plan shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

13.03.   <u>Non-Material Modifications</u>. The Reorganized Debtor may, with the approval of the Bankruptcy Court and without notice to all holders of Claims and Interests, correct any defect, omission, or inconsistency in the Plan in such manner and to such extent as may be necessary or desirable. The Reorganized Debtor may undertake such nonmaterial modification pursuant to this section insofar as it does not adversely change the treatment of the Claim of any Creditor or the Interest of any Interest holder who has not accepted in writing the modification.

13.04.   <u>Material Modifications</u>. Modifications of this Plan may be proposed in writing by the Debtor at any time before confirmation, provided that this Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Debtor shall have complied with section 1125 of the Bankruptcy Code. This Plan may be modified at any time after confirmation and before its Substantial Consummation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as modified, under section 1129 of the Bankruptcy Code, and the circumstances warrant such modification. A holder of a Claim or Interest that has accepted or rejected this Plan shall be deemed to have accepted or rejected, as the case may be, such Plan as modified, unless, within the time fixed by the Bankruptcy Court, such holder changes its previous acceptance or rejection.

## ARTICLE XIV.
## MISCELLANEOUS PROVISIONS

14.01.   <u>Severability</u>. Should the Bankruptcy Court determine if any provision of the Plan is unenforceable either on its face or as applied to any Claim or Interest or transaction, the Reorganized Debtor may modify the Plan so that any such provision shall not be applicable to the holder of any

Claim or Interest. Such a determination of unenforceability shall not (a) limit or affect the enforceability and operative effect of any other provision of the Plan or (b) require the re-solicitation of any acceptance or rejection of the Plan.

14.02.   Oral Agreements; Modification of Plan; Oral Representations or Inducements. The terms of the Plan, Disclosure Statement and Confirmation Order may only be amended in writing and may not be changed, contradicted, or varied by any oral statement, agreement, warranty, or representation. None of the Debtor, any representative of the Estate, nor their attorneys have made any representation, warranty, promise or inducement relating to the Plan or its confirmation except as expressly set forth in this Plan, the Disclosure Statement, or the Confirmation Order or other order of the Bankruptcy Court.

14.03.   Waiver. The Reorganized Debtor shall not be deemed to have waived any right, power, or privilege pursuant to the Plan unless the waiver is in writing and signed by the Reorganized Debtor. There shall be no waiver by implication, course of conduct or dealing, or through any delay or inaction by the Reorganized Debtor, of any right pursuant to the Plan, including the provisions of this anti-waiver section. The waiver of any right under the Plan shall not act as a waiver of any other or subsequent right, power, or privilege.

14.04.   Notice. Any notice or communication required or permitted by the Plan shall be given, made, or sent as follows:

(a)   If to a Creditor, notice may be given as follows: (i) if the Creditor has not filed a proof of Claim, then to the address reflected in the Schedules, or (ii) if the Creditor has filed a proof of Claim, then to the address reflected in the proof of Claim.

(b)   If to the Reorganized Debtor, notice shall be sent as follows:

> J. Robert Forshey
> Emily S. Chou
> **Vartabedian Katz Hester & Haynes LLP**
> 301 Commerce Street, Ste. 2200
> Fort Worth, TX 76102
> bobby.forshey@vkhh.com
> emily.chou@vkhh.com

(c)   Any Creditor desiring to change its address for the purpose of notice may do so by giving notice to the Reorganized Debtor of its new address in accordance with the terms of this section.

(d)   Any notice given, made or sent as set forth above shall be effective upon being (i) deposited in the United States Mail, postage prepaid, addressed to the addressee at the address as set forth above; (ii) delivered by hand or messenger to the addressee at the address set forth above; (iii) telecopied to the addressee as set forth above, with a hard confirmation copy being immediately sent through the United States Mail; or (iv) delivered for transmission to an expedited or overnight delivery service such as FedEx.

14.05.  Compliance with All Applicable Laws. If notified by any governmental authority that it is in violation of any applicable law, rule, regulation, or order of such governmental authority relating to its business, the Reorganized Debtor shall comply with such law, rule, regulation, or order; *provided, however*, that nothing contained herein shall require such compliance if the legality or applicability of any such requirement is being contested in good faith in appropriate proceedings and, if appropriate, an adequate reserve has been set aside on the books of the Reorganized Debtor.

14.06.  Duties to Creditors; Exculpation. Neither the Debtor nor any agent, representative, accountant, financial advisor, attorney, shareholder, officer, Affiliate, member or employee of the Debtor, including but not limited to Estate Professionals (collectively, the "Exculpated Parties"), shall ever owe any duty to any Person (including any Creditor) other than the duties owed to the Debtor's bankruptcy Estate, for any act, omission, or event in connection with, or arising out of, or relating to, any of the following:  (a) the Chapter 11 Case, including all matters or actions in connection with or relating to the administration of the Estate, (b) the Plan, including the proposal, negotiation, confirmation and consummation of the Plan, or (c) any act or omission relating to the administration of the Plan after the Effective Date. All such Exculpated Parties shall be fully exculpated and released from any and all claims and causes of action by any Person, known or unknown, in connection with, or arising out of, or relating to, any of the following:  (x) the Chapter 11 Case, including all matters or actions in connection with or relating to the administration of the Estate, (y) the Plan, including the proposal, negotiation, confirmation and consummation of the Plan, or (z) any act or omission relating to the administration of the Plan after the Effective Date, except for claims and causes of action arising out of such Exculpated Party's gross negligence or willful misconduct.

14.07.  Binding Effect. The Plan shall be binding upon, and shall inure to the benefit of, the Reorganized Debtor, the holders of the Claims or Liens, and their respective successors-in-interest and assigns.

14.08.  Governing Law, Interpretation. Unless a rule of law or procedure supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) is applicable, the internal laws of the State of Texas shall govern the construction and implementation of the Plan and any Plan Documents without regard to conflicts of law. The Plan shall control any inconsistent term or provision of any other Plan Documents.

14.09.  Payment of Statutory Fees. All accrued U.S. Trustee Fees as of the Confirmation Date shall be paid by the Reorganized Debtor on or as soon as practicable after the Effective Date and thereafter shall be paid by the Reorganized Debtor as such statutory fees become due and payable.

14.10.  Filing of Additional Documents. On or before Substantial Consummation of the Plan, the Reorganized Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

14.11.  Computation of Time. Bankruptcy Rule 9006 shall apply to the calculation of all time periods pursuant to this Plan. If the final day for any Distribution, performance, act, or event under the Plan is not a Business Day, then the time for making or performing such Distribution, performance, act, or event shall be extended to the next Business Day. Any payment or Distribution required to be

---

made hereunder on a day other than a Business Day shall be due and payable on the next succeeding Business Day.

14.12.  Elections by the Reorganized Debtor. Any right of election or choice granted to the Reorganized Debtor under this Plan may be exercised, at the Reorganized Debtor's election, separately as to each Claim, Creditor, or Person.

14.13.  Release of Liens. Except as otherwise expressly provided in this Plan or the Confirmation Order, all Liens against any of the Assets transferred to and vested in the Reorganized Debtor shall be deemed to be released, terminated, and nullified without the necessity of any order by the Bankruptcy Court other than the Confirmation Order.

14.14.  Rates. The Plan does not provide for the change of any rate that is within the jurisdiction of any governmental regulatory commission after the occurrence of the Effective Date.

14.15.  Compliance with Tax Requirements. In connection with the Plan, the Reorganized Debtor shall comply with all withholding and reporting requirements imposed by federal, state, and local Taxing Authorities and all Distributions under the Plan shall be subject to such withholding and reporting requirements. Notwithstanding the above, each holder of an Allowed Claim or Interest that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding and other tax obligations, on account of such Distribution under the Plan.

14.16.  Notice of Occurrence of the Effective Date. Promptly after occurrence of the Effective Date, the Reorganized Debtor, as directed by the Bankruptcy Court, shall serve on all known parties-in-interest and holders of Claims and Interests, notice of the occurrence of the Effective Date.

14.17.  Notice of Entry of Confirmation Order. Promptly after entry of the Confirmation Order, the Reorganized Debtor, as directed by the Bankruptcy Court in the Confirmation Order, shall serve on all known parties-in-interest and holders of Claims and Interests, notice of entry of the Confirmation Order.

*[Remainder of page intentionally left blank]*

Dated:  April 27, 2026

Respectfully submitted,

VILLAGE HOMES, L.P.

By:  DH Management, Inc.
Its:  General Partner


By:  */s/ Michael Dike*_____
      Michael Dike, President


By: */s/ J. Robert Forshey*___
     J. Robert Forshey
     State Bar No. 07264200
     Emily S. Chou
     State Bar No. 24006997
     **Vartabedian Katz Hester & Haynes LLP**
     301 Commerce Street, Ste. 2200
     Fort Worth, Texas 76102
     Telephone: 817-214-4990
     Facsimile: 817-214-4988
     bobby.forshey@vkhh.com
     emily.chou@vkhh.com

**ATTORNEYS FOR DEBTOR AND
DEBTOR-IN-POSSESSION**

# EXHIBIT A

# <u>ESTATE CLAIMS AND DEFENSES</u>

The Estate Claims shall include the following:

1.     All Claims or causes of action by the Debtor against VilHom, including without limitation all claims and causes of action which are or could be asserted by the Debtor against the VilHom in either the VilHom Adversary or the State Court Lawsuit.  All such Claims against VilHom are hereby retained by the Debtor and the Estate.

2.     All Claims and Causes of Action against the holders of the Bush Claim or which may be asserted in the Bush Lawsuit.

3.     All Claims and Causes of Action against Huntington, including all such Claims and Causes of Action against Huntington relating to unauthorized wire transfers made form the Debtor's account.

4.     All Claims, Causes of Action and rights by the Debtor against L&S Mechanical, LLC ("<u>L&S</u>"), including all cross-claims by the Debtor against L&S in the Bush Lawsuit for indemnity, contribution, breach of contract, negligence, and attorneys' fees.

The Estate Defenses shall include the following:

1.     All Claims, offsets, counterclaims, defenses, and affirmative defenses which were asserted, or could be asserted by the Debtor in either VilHom Adversary or the State Court Lawsuit or in relation to the VilHom Claim.

2.     All Claims, offsets, counterclaims, defenses, and affirmative defense which were or could be asserted by the Debtor in relation to the Bush Claim or in the Bush Lawsuit.

3.     All Claims, offsets, counterclaims, defenses, and affirmative defenses which the Debtor has against Huntington, including all such Claims and defenses relating to the payment by Huntington for the Debtor's account of unauthorized wire transfers.  This shall include all claims, objections, and offsets included in the Huntington Objection or which might be asserted based upon the acts and occurrences which are the subject matter of the Huntington Objection.

4.     All Claims, offsets, credits, counterclaims, defenses, and affirmative defenses relating to any Warranty Claim which may be asserted against the Reorganized Debtor from and after the Effective Date.

# EXHIBIT B
## LOAN MATURITY DATES

| VERITEX BANK | Loan # | Maturity Date | Payoff/Release Price | |
|---|---|---|---|---|
| 1146 Bailey Ranch | 300712367-48 | 2/4/2026 | $118,863.39 | |
| 613 Hummingbird Dr | 300712367-59 | 12/20/2025 | $90,303.96 | |
| 2152 Village Walk Place | 300712367-64 | 3/12/2026 | $354,335.00 | |
| 9609 Latour | 300722986 | 3/27/2026 | $848,080.00 | |
| 715 Blackbird | 300712367-66 | 10/1/2026 | $97,500.00 | |
| 719 Blackbird | 300712367-66 | 10/1/2026 | $97,500.00 | |
| 821 Mallard Dr | 300712367-61 | 1/23/2025 | $78,931.47 | |
| 221 Blackbird Dr | 300712367-53 | 1/24/2026 | $97,500.00 | |
| 404 Wingtail | 300712367-66 | 10/1/2026 | $97,500.00 | |
| 406 Wingtail | 300712367-66 | 10/1/2026 | $97,500.00 | |
| 2021 Grey Birch | 300712367-67 | 8/13/2027 | $69,750.00 | |
| 2236 Rolling Oaks | 300712367-67 | 8/13/2027 | $69,750.00 | |
| 2229 Heather Hills | 300712367-67 | 8/13/2027 | $69,750.00 | |
| | | | **$2,187,263.82** | |
| **GREAT PLAINS BANK** | **Loan #** | **Maturity Date** | **Payoff/Release Price** | |
| 6911 Clayton Nicholas - (LEASED) | 5484 | 12/3/2041 | $198,220.44 | good thru 01/30/26 |
| 3634 Tulsa Way (LEASED) | 5484 | 12/3/2041 | $212,549.63 | good thru 01/30/26 |
| 2125 Village Walk Place | 160 | 9/18/2026 | $41,734.38 | good thru 01/30/26 |
| 2127 Village Walk Place | 160 | 9/18/2026 | $41,734.38 | good thru 01/30/26 |
| 2129 Village Walk Place | 160 | 9/18/2026 | $41,734.38 | good thru 01/30/26 |
| | | | **$535,973.21** | |

| SIMMONS BANK | Loan # | Maturity Date | Payoff/Release Price |
|---|---|---|---|
| 405 Athenia | 69724789 | 2/19/2026 | $48,431.30 |
| 407 Athenia | 69724789 | 2/19/2026 | $48,431.30 |
| 406 Sunset-SF | 69724789 | 2/19/2026 | $48,431.30 |
| 424 Sunset-SF | 69739167 | 3/26/2026 | $76,933.95 |
| 14481 Overlook Park | 70001532 | 2/19/2026 | $80,782.82 |
| 14525 Walsh | 70040506 | 2/19/2026 | $107,091.93 |
| 14553 Walsh | 70041199 | 2/19/2026 | $90,000.00 |
| 2213 Heather Hills | 70053681 | 2/19/2026 | $119,414.43 |
| 2216 Rolling Oaks | 70053699 | 2/19/2026 | $119,177.18 |
| 2131 Village Walk Place | 70044201 | 2/19/2026 | $59,095.79 |
| 2133 Village Walk Place | 70044672 | 2/19/2026 | $59,055.57 |
| 2135 Village Walk Place | 70044656 | 2/19/2026 | $59,110.26 |
| | | | **$915,955.83** |

| VALLIANCE BANK | Loan # | Maturity Date | Payoff/Release Price |
|---|---|---|---|
| 2136 Village Walk Place - (LEASED) | 8147083 | 2/2/2026 | $296,234.68 |
| 132 Kingfisher | 8148040 | 4/28/2026 | $91,047.00 |
| 14404 Walsh | 8148363 | 6/3/2026 | $107,635.74 |
| 14408 Walsh | 8148373 | 6/3/2026 | $108,111.04 |
| 14425 Overlook Park | 8148350 | 6/3/2026 | $81,240.00 |
| 2101 Sandlin | 8150430 | 6/12/2026 | $82,799.63 |
| 2133 Sandlin | 8150430 | 6/12/2026 | $82,799.63 |
| 2137 Sandlin | 8150430 | 6/12/2026 | $82,799.63 |
| 14445 Walsh | 8150430 | 6/12/2026 | $82,799.63 |
| 2140 Village Walk Place | 8152963 | 7/14/2026 | $2,249.39 |
| 2142 Village Walk Place | 8152963 | 7/14/2026 | $2,249.39 |
| 2144 Village Walk Place | 8152963 | 7/14/2026 | $2,249.39 |
| 2146 Village Walk Place | 8152963 | 7/14/2026 | $2,249.39 |
| | | | **$1,024,464.52** |

| WORTHINGTON BANK | Loan # | Maturity Date | Payoff/Release Price | |
|---|---|---|---|---|
| Stonegate Dev Loan | 130073 | 7/28/2027 | $3,987,068.92 | |
| 6713 Lake Overlook - (LEASED) | 130054 | 2/13/2034 | $218,147.48 | Interest per day: $40.71 |

| | | | | |
|---|---|---|---|---|
| 3412 Vista Highlands | 130049 | 1/23/2034 | $240,903.21 | Interest per day: $53.36 |
| | | | | Release Price: 100% of all costs, which include closing costs |
| 2732 Hogan Hill Lane | 130070 | 9/10/2026 | $776,325.00 | Additionally estimated tax liability on each unit. |
| 2728 Hogan Hill Lane | 130070 | 9/10/2026 | $776,325.00 | Interest per day for total principal: $541.61 |
| 2724 Hogan Hill Lane | 130070 | 9/10/2026 | $616,395.70 | |
| 2720 Hogan Hill Lane | 130070 | 9/10/2026 | $616,395.70 | |
| | | | **$7,231,561.01** | |

| PLAINS CAPITAL BANK | Loan # | Maturity Date | Payoff/Release Price | |
|---|---|---|---|---|
| 211 Blackbird | 3392743-124 | 2/9/2026 | $99,741.29 | |
| 213 Blackbird | 3392743-125 | 2/9/2026 | $99,741.29 | |
| 14457 Walsh | 3392743-126 | 11/10/2025 | $105,162.96 | Moving to Worthington |
| 14453 Overlook Park | 3392743-127 | 11/10/2025 | $67,240.80 | Moving to Worthington |
| 2129 Sandlin | 3392743-127 | 11/10/2025 | $67,240.80 | Moving to Worthington |
| 14473 Overlook Park | 3392743-128 | 5/15/2026 | $76,725.00 | |
| 14501 Walsh | 3392743-128 | 5/15/2026 | $76,725.00 | |
| 2104 Heather Hills | 3392743-128 | 5/15/2026 | $76,725.00 | |
| 2108 Heather Hills | 3392743-128 | 5/15/2026 | $76,725.00 | |
| 2121 Sandlin | 3392743-128 | 5/15/2026 | $76,725.00 | |
| | | | **$822,752.14** | |

| TEXAS BANK | Loan # | Maturity Date | Payoff/Release Price | |
|---|---|---|---|---|
| 1017 Karis Blvd (LEASED) | 65801 | 10/3/2027 | $117,941.87 | |
| 434 Wingtail | 66738 | 4/30/2026 | $98,676.01 | |
| 717 Blackbird | 66776 | 1/31/2026 | $124,275.82 | |
| 316 Scissor Tail | 66987 | 1/31/2026 | $96,240.59 | |
| 340 Nursery Lane | 67781 | 12/11/2026 | $78,807.18 | |
| 342 Nursery Lane | 67782 | 12/11/2026 | $78,741.61 | |
| 344 Nursery Lane | 67783 | 12/11/2026 | $78,763.07 | |
| 346 Nursery Lane | 67784 | 12/11/2026 | $78,743.71 | |
| 8 Lots Nursery/Sunset | 4451 | 5/12/2026 | $1,292,819.33 | |
| 244 Sunset Lane | 66906 | 6/21/2026 | $120,000.00 | |
| | | | **$2,165,009.19** | |

# EXHIBIT C

# HUNTINGTON BANK COLLATERAL

| Property | Loan # | Release Price |
|---|---|---|
| 1146 Bailey Ranch | 30071236748 | $118,863.39 |
| 613 Hummingbird Dr. | 30071236759 | $90,303.96 |
| 715 Blackbird | 30071236766 | $97,500.00 |
| 719 Blackbird | 30071236767 | $97,500.00 |
| 2021 Grey Birch | 30071236767 | $69,750.00 |
| 2236 Rolling Oaks | 30071236767 | $69,750.00 |
| 2229 Heather Hills | 30071236767 | $69,750.00 |
| | **Total:** | **$613,417.35** |

The above release price is the principal amount of the loans and does not include interest.

# EXHIBIT 2

# PLAN PROJECTIONS

Case 25-43782-mxm11    Doc 354    Filed 05/19/26    Entered 05/19/26 16:59:46    Desc
Main Document    Page 74 of 91

**Exhibit "2"**

**Plan Proejctions**

| Category | Jul-26 | Aug-26 | Sep-26 | Oct-26 | Nov-26 | Dec-26 |
|---|---|---|---|---|---|---|
| **OPERATING INCOME** | 3 | 2 | 2 | 3 | 3 | 4 |
| Sales Revenue | $ 2,174,000 | $ 1,042,721 | $ 1,950,000 | $ 1,375,000 | $ 1,475,000 | $ 2,250,000 |
| **Total Operating Income** | $ 2,174,000 | $ 1,042,721 | $ 1,950,000 | $ 1,375,000 | $ 1,475,000 | $ 2,250,000 |
| | | | | | | |
| **COST OF CLOSING** | | | | | | |
| Loan Payoff | $ 1,516,351 | $ 596,235 | $ 1,197,550 | $ 699,201 | $ 673,922 | $ 1,413,634 |
| Settlement Costs | $ 135,236 | $ 38,649 | $ 128,361 | $ 51,035 | $ 49,524 | $ 96,754 |
| **Total Cost of Closing** | $ 1,651,586 | $ 634,884 | $ 1,325,911 | $ 750,236 | $ 723,445 | $ 1,510,387 |
| | | | | | | |
| **TOTAL NET PROCEEDS** | $ 522,414 | $ 407,837 | $ 624,089 | $ 624,764 | $ 751,555 | $ 739,613 |
| | | | | | | |
| **FINANCING EXPENSES** | | | | | | |
| Interest on all Lots | $ 165,951 | $ 166,367 | $ 163,667 | $ 152,358 | $ 151,858 | $ 151,358 |
| **Total Financing Expenses** | $ 165,951 | $ 166,367 | $ 163,667 | $ 152,358 | $ 151,858 | $ 151,358 |
| | | | | | | |
| **OPERATING INCOME & EXPENSES** | | | | | | |
| G&A Overhead | $ 19,450 | $ 19,450 | $ 19,450 | $ 19,450 | $ 19,450 | $ 19,450 |
| Sales & Marketing | $ 51,830 | $ 29,204 | $ 47,350 | $ 35,850 | $ 37,850 | $ 53,350 |
| Payroll & Benefits | $ 108,175 | $ 108,175 | $ 108,175 | $ 108,175 | $ 108,175 | $ 108,175 |
| Business Insurance | $ 5,685 | $ 5,685 | $ 5,685 | $ 5,685 | $ 5,685 | $ 5,685 |
| Professional Fees | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 |
| Warranty Expense | $ 6,250 | $ 6,250 | $ 6,250 | $ 6,250 | $ 6,250 | $ 6,250 |
| Rental Home Income | $ (13,300) | $ (10,350) | $ (5,000) | $ (1,600) | $ (1,600) | $ (1,600) |
| Rental Home Expense | $ 5,000 | $ 5,000 | $ 2,500 | $ - | $ - | $ - |
| Overhead Fee | $ (35,000) | $ (35,000) | $ (35,000) | $ (35,000) | $ (35,000) | $ (35,000) |
| Ad Valorem Taxes | $ - | $ - | $ - | $ - | $ 80,000 | $ - |
| **Total Operating Income & Expenses** | $ 163,090 | $ 143,414 | $ 164,410 | $ 153,810 | $ 235,810 | $ 171,310 |
| | | | | | | |
| **TOTAL EXPENSES** | $ 329,041 | $ 309,781 | $ 328,077 | $ 306,168 | $ 387,668 | $ 322,668 |
| | | | | | | |
| **TOTAL NET CASH FLOW** | $ 193,373 | $ 98,056 | $ 296,012 | $ 318,596 | $ 363,887 | $ 416,945 |

| Closings: | 2724 Hogan Hill | 2136 Village Walk | 3634 Tulsa Way | 6911 Clayton Nicholas | 406 Sunset | 2146 Village Walk |
|---|---|---|---|---|---|---|
| | 6713 Lake Overlook | 2129 Sandlin | 2720 Hogan Hill | 2140 Village Walk | 2144 Village Walk | 14404 Walsh |
| | 14408 Walsh | | | 2142 Village Walk | TG | TG |
| | | | | | | 717 Blackbird |

Case 25-43782-mxm11    Doc 354    Filed 05/19/26    Entered 05/19/26 16:59:46    Desc
Main Document    Page 75 of 91

## Exhibit "2"
### Plan Proejctions

| Category | Jan-27 | Feb-27 | Mar-27 | Apr-27 | May-27 | Jun-27 |
|---|---|---|---|---|---|---|
| **OPERATING INCOME** | 3 | 4 | 3 | 4 | 3 | 4 |
| Sales Revenue | $ 1,450,000 | $ 2,900,000 | $ 2,350,000 | $ 3,000,000 | $ 2,450,000 | $ 2,900,000 |
| **Total Operating Income** | $ 1,450,000 | $ 2,900,000 | $ 2,350,000 | $ 3,000,000 | $ 2,450,000 | $ 2,900,000 |
| | | | | | | |
| **COST OF CLOSING** | | | | | | |
| Loan Payoff | $ 1,070,000 | $ 2,110,000 | $ 1,735,000 | $ 2,220,000 | $ 1,790,000 | $ 2,110,000 |
| Settlement Costs | $ 49,923 | $ 165,656 | $ 125,364 | $ 173,892 | $ 131,938 | $ 157,919 |
| **Total Cost of Closing** | $ 1,119,923 | $ 2,275,656 | $ 1,860,364 | $ 2,393,892 | $ 1,921,938 | $ 2,267,919 |
| | | | | | | |
| **TOTAL NET PROCEEDS** | $ 330,077 | $ 624,344 | $ 489,636 | $ 606,108 | $ 528,062 | $ 632,082 |
| | | | | | | |
| **FINANCING EXPENSES** | | | | | | |
| Interest on all Lots | $ 133,500 | $ 126,236 | $ 120,894 | $ 116,509 | $ 113,343 | $ 110,931 |
| **Total Financing Expenses** | $ 133,500 | $ 126,236 | $ 120,894 | $ 116,509 | $ 113,343 | $ 110,931 |
| | | | | | | |
| **OPERATING INCOME & EXPENSES** | | | | | | |
| G&A Overhead | $ 19,450 | $ 19,450 | $ 19,450 | $ 20,034 | $ 20,034 | $ 20,034 |
| Sales & Marketing | $ 37,350 | $ 66,350 | $ 55,350 | $ 68,600 | $ 57,600 | $ 66,600 |
| Payroll & Benefits | $ 108,175 | $ 108,175 | $ 108,175 | $ 108,175 | $ 108,175 | $ 108,175 |
| Business Insurance | $ 5,685 | $ 5,685 | $ 5,685 | $ 5,856 | $ 5,856 | $ 5,856 |
| Professional Fees | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,450 | $ 15,450 | $ 15,450 |
| Warranty Expense | $ 6,250 | $ 6,250 | $ 6,250 | $ 6,438 | $ 6,438 | $ 6,438 |
| Rental Home Income | $ (1,600) | $ (1,600) | $ (1,600) | $ (1,600) | $ (1,600) | $ (1,600) |
| Rental Home Expense | $ - | $ - | $ - | $ - | $ - | $ - |
| Overhead Fee | $ (35,000) | $ (35,000) | $ (35,000) | $ (36,050) | $ (36,050) | $ (36,050) |
| Ad Valorem Taxes | $ 65,000 | $ - | $ - | $ - | $ - | $ 72,000 |
| **Total Operating Income & Expenses** | $ 220,310 | $ 184,310 | $ 173,310 | $ 186,902 | $ 175,902 | $ 256,902 |
| | | | | | | |
| **TOTAL EXPENSES** | $ 353,810 | $ 310,546 | $ 294,204 | $ 303,411 | $ 289,245 | $ 367,833 |
| | | | | | | |
| **TOTAL NET CASH FLOW** | $ (23,733) | $ 313,798 | $ 195,432 | $ 302,698 | $ 238,818 | $ 264,249 |
| | | | | | | |
| Closings: | TG | CP | CP | CP | CP | CP |
| | TG | WTH | TG | TG | WSF | WTH |
| | WTH | WTH | TG | TG | WTH | WTH |
| | | WSF | | WSF | | WSF |

# Exhibit "2"

## Plan Proejctions

| Category | Jul-27 | Aug-27 | Sep-27 | Oct-27 | Nov-27 | Dec-27 |
|---|---|---|---|---|---|---|
| **OPERATING INCOME** | 5 | 4 | 5 | 3 | 4 | 5 |
| Sales Revenue | $ 2,650,000 | $ 3,850,000 | $ 3,250,000 | $ 2,450,000 | $ 2,800,000 | $ 4,300,000 |
| **Total Operating Income** | $ 2,650,000 | $ 3,850,000 | $ 3,250,000 | $ 2,450,000 | $ 2,800,000 | $ 4,300,000 |
| | | | | | | |
| **COST OF CLOSING** | | | | | | |
| Loan Payoff | $ 1,930,000 | $ 2,830,000 | $ 2,375,000 | $ 1,790,000 | $ 2,055,000 | $ 3,150,000 |
| Settlement Costs | $ 106,418 | $ 223,855 | $ 150,308 | $ 134,648 | $ 151,757 | $ 238,069 |
| **Total Cost of Closing** | $ 2,036,418 | $ 3,053,855 | $ 2,525,308 | $ 1,924,648 | $ 2,206,757 | $ 3,388,069 |
| | | | | | | |
| **TOTAL NET PROCEEDS** | $ 613,582 | $ 796,145 | $ 724,692 | $ 525,352 | $ 593,243 | $ 911,931 |
| | | | | | | |
| **FINANCING EXPENSES** | | | | | | |
| Interest on all Lots | $ 106,682 | $ 104,682 | $ 102,655 | $ 101,142 | $ 100,142 | $ 98,642 |
| **Total Financing Expenses** | $ 106,682 | $ 104,682 | $ 102,655 | $ 101,142 | $ 100,142 | $ 98,642 |
| | | | | | | |
| **OPERATING INCOME & EXPENSES** | | | | | | |
| G&A Overhead | $ 20,034 | $ 20,034 | $ 20,034 | $ 20,034 | $ 20,034 | $ 20,034 |
| Sales & Marketing | $ 61,600 | $ 95,600 | $ 63,600 | $ 57,600 | $ 64,600 | $ 94,600 |
| Payroll & Benefits | $ 108,175 | $ 108,175 | $ 108,175 | $ 108,175 | $ 108,175 | $ 108,175 |
| Business Insurance | $ 5,856 | $ 5,856 | $ 5,856 | $ 5,856 | $ 5,856 | $ 5,856 |
| Professional Fees | $ 15,450 | $ 15,450 | $ 15,450 | $ 15,450 | $ 15,450 | $ 15,450 |
| Warranty Expense | $ 6,438 | $ 6,438 | $ 6,438 | $ 6,438 | $ 6,438 | $ 6,438 |
| Rental Home Income | $ (1,600) | $ (1,600) | $ (1,600) | $ (1,600) | $ (1,600) | $ (1,600) |
| Rental Home Expense | $ - | $ - | $ - | $ - | $ - | $ - |
| Overhead Fee | $ (36,050) | $ (36,050) | $ (36,050) | $ (36,050) | $ (36,050) | $ (36,050) |
| Ad Valorem Taxes | $ - | $ - | $ - | $ - | $ 80,000 | $ - |
| **Total Operating Income & Expenses** | $ 179,902 | $ 213,902 | $ 181,902 | $ 175,902 | $ 262,902 | $ 212,902 |
| | | | | | | |
| **TOTAL EXPENSES** | $ 286,584 | $ 318,584 | $ 284,557 | $ 277,044 | $ 363,044 | $ 311,544 |
| | | | | | | |
| **TOTAL NET CASH FLOW** | $ 326,998 | $ 477,562 | $ 440,135 | $ 248,308 | $ 230,200 | $ 600,388 |

| Closings: | | | | | | |
|---|---|---|---|---|---|---|
| | WSF | CP | CP | CP | CP | CP |
| | 242 Sunset | CP | TG | WTH | TG | CP |
| | 244 Sunset | TG | TG | WSF | TG | TG |
| | 316 Scissor Tail | WSF | WTH | | WTH | WTH |

Case 25-43782-mxm11    Doc 354    Filed 05/19/26    Entered 05/19/26 16:59:46    Desc
Main Document    Page 77 of 91

**Exhibit "2"**

**Plan Proejctions**

| Category | Jan-28 | Feb-28 | Mar-28 | Apr-28 | May-28 | Jun-28 |
|---|---|---|---|---|---|---|
| **OPERATING INCOME** | 2 | 5 | 2 | 3 | 2 | 2 |
| Sales Revenue | $ 950,000 | $ 4,300,000 | $ 950,000 | $ 1,600,000 | $ 1,150,000 | $ 1,150,000 |
| **Total Operating Income** | $ 950,000 | $ 4,300,000 | $ 950,000 | $ 1,600,000 | $ 1,150,000 | $ 1,150,000 |
| | | | | | | |
| **COST OF CLOSING** | | | | | | |
| Loan Payoff | $ 695,000 | $ 3,150,000 | $ 695,000 | $ 1,180,000 | $ 860,000 | $ 860,000 |
| Settlement Costs | $ 43,582 | $ 253,371 | $ 42,714 | $ 68,400 | $ 57,261 | $ 57,261 |
| **Total Cost of Closing** | $ 738,582 | $ 3,403,371 | $ 737,714 | $ 1,248,400 | $ 917,261 | $ 917,261 |
| | | | | | | |
| **TOTAL NET PROCEEDS** | $ 211,418 | $ 896,629 | $ 212,286 | $ 351,600 | $ 232,739 | $ 232,739 |
| | | | | | | |
| **FINANCING EXPENSES** | | | | | | |
| Interest on all Lots | $ 92,600 | $ 91,100 | $ 90,100 | $ 89,100 | $ 88,100 | $ 88,642 |
| **Total Financing Expenses** | $ 92,600 | $ 91,100 | $ 90,100 | $ 89,100 | $ 88,100 | $ 88,642 |
| | | | | | | |
| **OPERATING INCOME & EXPENSES** | | | | | | |
| G&A Overhead | $ 20,034 | $ 20,034 | $ 20,034 | $ 20,034 | $ 20,034 | $ 20,034 |
| Sales & Marketing | $ 27,600 | $ 94,600 | $ 27,600 | $ 30,600 | $ 31,600 | $ 31,600 |
| Payroll & Benefits | $ 108,175 | $ 108,175 | $ 108,175 | $ 108,175 | $ 108,175 | $ 108,175 |
| Business Insurance | $ 5,856 | $ 5,856 | $ 5,856 | $ 5,856 | $ 5,856 | $ 5,856 |
| Professional Fees | $ 15,450 | $ 15,450 | $ 15,450 | $ 15,450 | $ 15,450 | $ 15,450 |
| Warranty Expense | $ 6,438 | $ 6,438 | $ 6,438 | $ 6,438 | $ 6,438 | $ 6,438 |
| Rental Home Income | $ (1,600) | $ (1,600) | $ (1,600) | $ (1,600) | $ (1,600) | $ (1,600) |
| Rental Home Expense | $ - | $ - | $ - | $ - | $ - | $ - |
| Overhead Fee | $ (36,050) | $ (36,050) | $ (36,050) | $ (36,050) | $ (36,050) | $ (36,050) |
| Ad Valorem Taxes | $ 65,000 | $ - | $ - | $ - | $ - | $ 72,000 |
| **Total Operating Income & Expenses** | $ 210,902 | $ 212,902 | $ 145,902 | $ 148,902 | $ 149,902 | $ 221,902 |
| | | | | | | |
| **TOTAL EXPENSES** | $ 303,502 | $ 304,002 | $ 236,002 | $ 238,002 | $ 238,002 | $ 310,544 |
| | | | | | | |
| **TOTAL NET CASH FLOW** | $ (92,083) | $ 592,627 | $ (23,716) | $ 113,599 | $ (5,262) | $ (77,804) |
| | | | | | | |
| Closings: | TG | CP | WTH | TG | TG | TG |
| | WTH | CP | TG | WTH | WSF | WSF |
| | | TG | | WSF | | |
| | | WTH | | | | |

**Exhibit "2"**

**Plan Proejctions**

| Category | Jul-28 | | Aug-28 | | Sep-28 | | Oct-28 | | Nov-28 | | Dec-28 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **OPERATING INCOME** | | 2 | | 2 | | 2 | | 2 | | 1 | | 2 |
| Sales Revenue | $ | 950,000 | $ | 1,150,000 | $ | 1,150,000 | $ | 950,000 | $ | 1,350,000 | $ | 1,150,000 |
| **Total Operating Income** | $ | 950,000 | $ | 1,150,000 | $ | 1,150,000 | $ | 950,000 | $ | 1,350,000 | $ | 1,150,000 |
| | | | | | | | | | | | | |
| **COST OF CLOSING** | | | | | | | | | | | | |
| Loan Payoff | $ | 695,000 | $ | 860,000 | $ | 860,000 | $ | 695,000 | $ | 985,000 | $ | 860,000 |
| Settlement Costs | $ | 22,481 | $ | 57,261 | $ | 57,261 | $ | 22,481 | $ | 92,486 | $ | 57,261 |
| **Total Cost of Closing** | $ | 717,481 | $ | 917,261 | $ | 917,261 | $ | 717,481 | $ | 1,077,486 | $ | 917,261 |
| | | | | | | | | | | | | |
| **TOTAL NET PROCEEDS** | $ | 232,519 | $ | 232,739 | $ | 232,739 | $ | 232,519 | $ | 272,514 | $ | 232,739 |
| | | | | | | | | | | | | |
| **FINANCING EXPENSES** | | | | | | | | | | | | |
| Interest on all Lots | $ | 75,100 | $ | 75,100 | $ | 75,100 | $ | 75,600 | $ | 75,600 | $ | 75,600 |
| **Total Financing Expenses** | $ | 75,100 | $ | 75,100 | $ | 75,100 | $ | 75,600 | $ | 75,600 | $ | 75,600 |
| | | | | | | | | | | | | |
| **OPERATING INCOME & EXPENSES** | | | | | | | | | | | | |
| G&A Overhead | $ | 20,034 | $ | 20,034 | $ | 20,034 | $ | 20,034 | $ | 20,034 | $ | 20,034 |
| Sales & Marketing | $ | 27,600 | $ | 31,600 | $ | 31,600 | $ | 27,600 | $ | 44,600 | $ | 31,600 |
| Payroll & Benefits | $ | 108,175 | $ | 108,175 | $ | 108,175 | $ | 108,175 | $ | 108,175 | $ | 108,175 |
| Business Insurance | $ | 5,856 | $ | 5,856 | $ | 5,856 | $ | 5,856 | $ | 5,856 | $ | 5,856 |
| Professional Fees | $ | 15,450 | $ | 15,450 | $ | 15,450 | $ | 15,450 | $ | 15,450 | $ | 15,450 |
| Warranty Expense | $ | 6,438 | $ | 6,438 | $ | 6,438 | $ | 6,438 | $ | 6,438 | $ | 6,438 |
| Rental Home Income | $ | (1,600) | $ | (1,600) | $ | (1,600) | $ | (1,600) | $ | (1,600) | $ | (1,600) |
| Rental Home Expense | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - |
| Overhead Fee | $ | (36,050) | $ | (36,050) | $ | (36,050) | $ | (36,050) | $ | (36,050) | $ | (36,050) |
| Ad Valorem Taxes | $ | - | $ | - | $ | - | $ | - | $ | 80,000 | $ | - |
| **Total Operating Income & Expenses** | $ | 145,902 | $ | 149,902 | $ | 149,902 | $ | 145,902 | $ | 242,902 | $ | 149,902 |
| | | | | | | | | | | | | |
| **TOTAL EXPENSES** | $ | 221,002 | $ | 225,002 | $ | 225,002 | $ | 221,502 | $ | 318,502 | $ | 225,502 |
| | | | | | | | | | | | | |
| **TOTAL NET CASH FLOW** | $ | 11,517 | $ | 7,738 | $ | 7,738 | $ | 11,017 | $ | (45,987) | $ | 7,238 |

| Closings: | TG | TG | TG | TG | CP | TG |
|---|---|---|---|---|---|---|
| | WTH | WSF | WSF | WTH | | WSF |

Case 25-43782-mxm11   Doc 354   Filed 05/19/26   Entered 05/19/26 16:59:46   Desc Main Document   Page 79 of 91

**Exhibit "2"**

**Plan Proejctions**

| Category | Jan-29 | Feb-29 | Mar-29 | Apr-29 | May-29 | Jun-29 |
|---|---|---|---|---|---|---|
| OPERATING INCOME | 2 | 2 | 2 | 2 | 1 | 2 |
| Sales Revenue | $ 2,000,000 | $ 1,150,000 | $ 1,300,000 | $ 1,850,000 | $ 1,350,000 | $ 1,850,000 |
| Total Operating Income | $ 2,000,000 | $ 1,150,000 | $ 1,300,000 | $ 1,850,000 | $ 1,350,000 | $ 1,850,000 |
| | | | | | | |
| COST OF CLOSING | | | | | | |
| Loan Payoff | $ 1,470,000 | $ 860,000 | $ 970,000 | $ 1,360,000 | $ 985,000 | $ 1,360,000 |
| Settlement Costs | $ 138,405 | $ 57,261 | $ 91,837 | $ 103,828 | $ 92,486 | $ 103,828 |
| Total Cost of Closing | $ 1,608,405 | $ 917,261 | $ 1,061,837 | $ 1,463,828 | $ 1,077,486 | $ 1,463,828 |
| | | | | | | |
| TOTAL NET PROCEEDS | $ 391,596 | $ 232,739 | $ 238,163 | $ 386,172 | $ 272,514 | $ 386,172 |
| | | | | | | |
| FINANCING EXPENSES | | | | | | |
| Interest on all Lots | $ 53,100 | $ 53,100 | $ 53,100 | $ 53,100 | $ 53,100 | $ 53,100 |
| Total Financing Expenses | $ 53,100 | $ 53,100 | $ 53,100 | $ 53,100 | $ 53,100 | $ 53,100 |
| | | | | | | |
| OPERATING INCOME & EXPENSES | | | | | | |
| G&A Overhead | $ 20,034 | $ 20,034 | $ 20,034 | $ 20,034 | $ 20,034 | $ 20,034 |
| Sales & Marketing | $ 48,600 | $ 31,600 | $ 34,600 | $ 45,600 | $ 62,600 | $ 45,600 |
| Payroll & Benefits | $ 108,175 | $ 108,175 | $ 108,175 | $ 108,175 | $ 108,175 | $ 108,175 |
| Business Insurance | $ 5,856 | $ 5,856 | $ 5,856 | $ 5,856 | $ 5,856 | $ 5,856 |
| Professional Fees | $ 15,450 | $ 15,450 | $ 15,450 | $ 15,450 | $ 15,450 | $ 15,450 |
| Warranty Expense | $ 6,438 | $ 6,438 | $ 6,438 | $ 6,438 | $ 6,438 | $ 6,438 |
| Rental Home Income | $ (1,600) | $ (1,600) | $ (1,600) | $ (1,600) | $ (1,600) | $ (1,600) |
| Rental Home Expense | $ - | $ - | $ - | $ - | $ - | $ - |
| Overhead Fee | $ (36,050) | $ (36,050) | $ (36,050) | $ (36,050) | $ (36,050) | $ (36,050) |
| Ad Valorem Taxes | $ 65,000 | $ - | $ - | $ - | $ - | $ 72,000 |
| Total Operating Income & Expenses | $ 231,902 | $ 149,902 | $ 152,902 | $ 163,902 | $ 180,902 | $ 235,902 |
| | | | | | | |
| TOTAL EXPENSES | $ 285,002 | $ 203,002 | $ 206,002 | $ 217,002 | $ 234,002 | $ 289,002 |
| | | | | | | |
| TOTAL NET CASH FLOW | $ 106,594 | $ 29,738 | $ 32,161 | $ 169,171 | $ 38,513 | $ 97,171 |
| | | | | | | |
| Closings: | WSF | TG | WSF | TG | CP | TG |
| | CP | WSF | WSF | CP | | CP |

**Village Homes' Cash Flow**

| Month | Year: 2026 |
|---|---|
| July | 193,373 |
| August | 98,056 |
| September | 296,012 |
| October | 318,596 |
| November | 363,887 |
| December | 416,945 |
| | |
| **Total:** | **$1,686,869** |

| Month | Year: 2027 |
|---|---|
| January | (27,733) |
| February | 313,798 |
| March | 195,432 |
| April | 302,698 |
| May | 238,818 |
| June | 264,249 |
| July | 326,998 |
| August | 477,562 |
| September | 440,135 |
| October | 248,308 |
| November | 230,200 |
| December | 600,388 |
| | |
| **Total:** | **$3,610,853** |

| Month | Year: 2028 |
|---|---|
| January | (92,083) |
| February | 592,627 |
| March | (23,716) |
| April | 113,599 |
| May | (5,262) |
| June | (77,804) |
| July | 11,517 |
| August | 7,738 |
| September | 7,738 |
| October | 11,017 |
| November | (45,987) |
| December | 7,328 |
| | |
| **Total:** | **$506,712** |

| Month | Year: 2029 |
|---|---|
| January | 106,594 |
| February | 29,738 |
| March | 32,161 |
| April | 169,171 |
| May | 38,513 |
| June | 97,171 |
| Total: | $473,348 |
| **Grant Total:** | **$6,277,782** |

**Cash on hand as of March 31, 2026 - $911,009.91**

# EXHIBIT 3

# CURRENT INVENTORY PLEDGED TO PREPETITION LENDERS AND RELEASE PRICE FOR EACH PROPERTY

# Exhibit 3
## Remaining Prepetition Secured Debt

| HUNTINGTON BANK | Payoff/Release Price |
|---|---|
| 1146 Bailey Ranch | $118,863.39 |
| 613 Hummingbird Dr | $90,303.96 |
| 715 Blackbird | $97,500.00 |
| 719 Blackbird | $97,500.00 |
| 2021 Grey Birch | $69,750.00 |
| 2236 Rolling Oaks | $69,750.00 |
| 2229 Heather Hills | $69,750.00 |
| | **$613,417.35** |
| **GREAT PLAINS BANK** | **Payoff/Release Price** |
| 6911 Clayton Nicholas - (LEASED) | $198,220.44 |
| 3634 Tulsa Way (LEASED) | $212,549.63 |
| 2125 Village Walk Place | $41,734.38 |
| 2127 Village Walk Place | $41,734.38 |
| 2129 Village Walk Place | $41,734.38 |
| | **$535,973.21** |
| **SIMMONS BANK** | **Payoff/Release Price** |
| 405 Athenia | $34,326.14 |
| 407 Athenia | $34,326.15 |
| 406 Sunset-SF | $91,162.27 |
| 424 Sunset-SF | $76,933.95 |
| 14481 Overlook Park | $80,782.82 |
| 14525 Walsh | $107,091.93 |
| 14553 Walsh | $90,000.00 |
| 2213 Heather Hills | $119,414.43 |
| 2216 Rolling Oaks | $119,177.18 |
| 2131 Village Walk Place | $59,095.79 |
| 2133 Village Walk Place | $59,055.57 |
| 2135 Village Walk Place | $59,110.26 |
| | **$930,476.49** |
| **VALLIANCE BANK** | **Payoff/Release Price** |
| 2136 Village Walk Place - (LEASED) | $296,234.68 |
| 14404 Walsh | $107,635.74 |
| 14408 Walsh | $234,340.23 |
| 14425 Overlook Park | $81,240.00 |
| 2101 Sandlin | $82,799.63 |
| 2133 Sandlin | $82,799.63 |
| 2137 Sandlin | $82,799.63 |
| 14445 Walsh | $82,799.63 |
| 2140 Village Walk Place | $124,992.31 |
| 2142 Village Walk Place | $124,992.31 |

| | |
|---|---|
| 2144 Village Walk Place | $2,249.39 |
| 2146 Village Walk Place | $2,249.39 |
| | **$1,305,132.55** |

| **WORTHINGTON BANK** | **Payoff/Release Price** | |
|---|---|---|
| Stonegate Dev Loan | $3,987,068.92 | 19 lots |
| 6713 Lake Overlook - (LEASED) | $218,147.48 | |
| 2732 Hogan Hill Lane | $939,912.50 | |
| 2724 Hogan Hill Lane | $961,250.00 | |
| 2720 Hogan Hill Lane | $961,250.00 | |
| 2129 Sandlin | $278,685.69 | |
| | **$7,346,314.59** | |

| **PLAINS CAPITAL BANK** | **Payoff/Release Price** |
|---|---|
| 14457 Walsh | $105,162.96 |
| 14453 Overlook Park | $67,240.80 |
| 14473 Overlook Park | $76,725.00 |
| 14501 Walsh | $76,725.00 |
| 2104 Heather Hills | $76,725.00 |
| 2108 Heather Hills | $76,725.00 |
| 2121 Sandlin | $76,725.00 |
| | **$556,028.76** |

| **TEXAS BANK** | **Payoff/Release Price** | |
|---|---|---|
| 717 Blackbird | $124,275.82 | |
| 316 Scissor Tail | $96,240.59 | |
| 340 Nursery Lane | $78,807.18 | |
| 342 Nursery Lane | $78,741.61 | |
| 344 Nursery Lane | $78,763.07 | |
| 346 Nursery Lane | $78,743.71 | |
| Trinity Grove Dev Loan | $1,292,819.33 | 28 lots |
| 244 Sunset Lane | $120,000.00 | |
| | **$1,948,391.31** | |

| **Total Debt** | **$13,235,734** |
|---|---|

# EXHIBIT 4

# PROPERTIES UNDER CONTRACT AS OF MAY 12, 2026

**Exhibit 4**

**Property Under Sale Contract (not yet closed)**

| Address | Judge Approved/Hearing Date | Est. Closing Date | Contract Price |
|---|---|---|---|
| 424 Sunset-SF | Judge Approved | 5/20/2026 | $ 185,000.00 |
| 2129 Sandlin | Judge Approved | 5/29/2026 | $ 642,721.00 |
| 2732 Hogan Hill Lane | Judge Approved | 6/3/2026 | $ 1,475,000.00 |
| 405 Athenia | Hearing Date 6/1/2026 | 6/15/2026 | $ 429,000.00 |
| 407 Athenia | Hearing Date 6/1/2026 | 6/12/2026 | $ 429,000.00 |
| 1146 Bailey Ranch | Hearing Date 6/1/2026 | Target 6/12/2026 | $ 624,000.00 |
| 3 POA Lots (613 Hummingbird, 715/719 Blackbird) | Hearing Date 6/1/2026 | 6/12/2026 | $ 500,000.00 |
| 6713 Lake Overlook | Sale Motion to be filed | 6/19/2026 | $ 285,000.00 |
| 5 Walsh Lots (2021 Grey Birch, 2213/2229 Heather Hills, 2216/2236 Rolling Oaks) | Sale Motion to be filed | 6/30/2026 | $ 700,000.00 |
| 14408 Walsh | Sale Motion to be filed | Target July 15 | $ 575,000.00 |
| 14404 Walsh | Sale Motion to be filed | August | $ 699,000.00 |
| 316 Scissor Tail | Judge Approved | October | $ 617,148.00 |
| 406 Sunset-SF | Judge Approved | October | $ 530,999.00 |

# EXHIBIT 5

# CURRENT INVENTORY (INCLUDING THOSE UNDER CONTRACT) SHOWING COST BASIS AND ESTIMATED SALE PRICE FOR EACH PROPERTY

**Exhibit 5**
**Inventory with Cost Basis and Estimated Sale Price**

| Address | Land Costs | Improvements | Total Cost Basis | Proposed Sales Price |
|---|---|---|---|---|
| 1146 Bailey Ranch | $ 119,135 | $ 367,935 | $ 487,070 | $ 624,000 |
| 613 Hummingbird Dr | $ 128,786 | $ 4,557 | $ 133,343 | $ 166,667 |
| 715 Blackbird | $ 129,992 | $ - | $ 129,992 | $ 166,667 |
| 719 Blackbird | $ 129,992 | $ - | $ 129,992 | $ 166,667 |
| 2021 Grey Birch | $ 120,414 | $ 12,727 | $ 133,141 | $ 140,000 |
| 2236 Rolling Oaks | $ 120,414 | $ 750 | $ 121,164 | $ 140,000 |
| 2229 Heather Hills | $ 120,414 | $ 750 | $ 121,164 | $ 140,000 |
| 6911 Clayton Nicholas - (LEASED) | $ 65,869 | $ 193,957 | $ 259,825 | $ 475,000 |
| 3634 Tulsa Way (LEASED) | $ 117,002 | $ 200,875 | $ 317,877 | $ 625,000 |
| 2125 Village Walk Place | $ 65,564 | $ 2,307 | $ 67,871 | $ 65,000 |
| 2127 Village Walk Place | $ 65,564 | $ 2,307 | $ 67,871 | $ 65,000 |
| 2129 Village Walk Place | $ 65,564 | $ 2,307 | $ 67,871 | $ 65,000 |
| 405 Athenia | $ 95,252 | $ 231,268 | $ 326,520 | $ 429,000 |
| 407 Athenia | $ 95,252 | $ 237,707 | $ 332,959 | $ 429,000 |
| 406 Sunset-SF | $ 118,281 | $ 40,031 | $ 158,311 | $ 530,999 |
| 424 Sunset-SF | $ 124,743 | $ 3,072 | $ 127,815 | $ 185,000 |
| 14481 Overlook Park | $ 114,612 | $ 1,835 | $ 116,447 | $ 140,000 |
| 14525 Walsh | $ 112,916 | $ 3,627 | $ 116,543 | $ 140,000 |
| 14553 Walsh | $ 110,738 | $ 1,187 | $ 111,925 | $ 140,000 |
| 2213 Heather Hills | $ 115,662 | $ 10,831 | $ 126,493 | $ 140,000 |
| 2216 Rolling Oaks | $ 114,411 | $ 10,649 | $ 125,060 | $ 140,000 |
| 2131 Village Walk Place | $ 64,135 | $ 825 | $ 64,960 | $ 65,000 |
| 2133 Village Walk Place | $ 64,135 | $ 825 | $ 64,960 | $ 65,000 |
| 2135 Village Walk Place | $ 64,135 | $ 825 | $ 64,960 | $ 65,000 |
| 2136 Village Walk Place - (LEASED) | $ 63,627 | $ 239,279 | $ 302,906 | $ 422,000 |
| 14404 Walsh | $ 113,996 | $ 181,173 | $ 295,169 | $ 699,000 |
| 14408 Walsh | $ 114,762 | $ 209,109 | $ 323,871 | $ 575,000 |
| 14425 Overlook Park | $ 114,806 | $ 6,926 | $ 121,732 | $ 140,000 |
| 2101 Sandlin | $ 112,123 | $ 1,944 | $ 114,067 | $ 140,000 |
| 2133 Sandlin | $ 112,623 | $ 1,944 | $ 114,567 | $ 140,000 |
| 2137 Sandlin | $ 112,623 | $ 1,944 | $ 114,567 | $ 140,000 |
| 14445 Walsh | $ 112,623 | $ 1,944 | $ 114,567 | $ 140,000 |
| 2140 Village Walk Place | $ 69,658 | $ 129,415 | $ 199,074 | $ 390,000 |
| 2142 Village Walk Place | $ 69,658 | $ 113,346 | $ 183,004 | $ 390,000 |
| 2144 Village Walk Place | $ 69,658 | $ 115,354 | $ 185,012 | $ 450,000 |
| 2146 Village Walk Place | $ 69,658 | $ 123,465 | $ 193,123 | $ 469,000 |
| 6713 Lake Overlook - (LEASED) | $ 60,890 | $ 190,089 | $ 250,979 | $ 285,500 |
| 2732 Hogan Hill Lane | $ 324,931 | $ 669,247 | $ 994,178 | $ 1,475,000 |
| 2724 Hogan Hill Lane | $ 324,874 | $ 631,781 | $ 956,655 | $ 1,425,000 |
| 2720 Hogan Hill Lane | $ 325,008 | $ 655,971 | $ 980,979 | $ 1,495,000 |
| 2129 Sandlin | $ 130,764 | $ 244,639 | $ 375,402 | $ 642,721 |
| 2708 Hogan Hill Lane | $ 315,000 | $ 10,371 | $ 325,371 | $ 350,000 |
| 2712 Hogan Hill Lane | $ 315,000 | $ 10,373 | $ 325,373 | $ 350,000 |
| 2716 Hogan Hill Lane | $ 315,000 | $ 10,351 | $ 325,351 | $ 350,000 |
| 14457 Walsh | $ 134,680 | $ 6,453 | $ 141,133 | $ 140,000 |
| 14453 Overlook Park | $ 109,791 | $ 6,139 | $ 115,930 | $ 140,000 |
| 14473 Overlook Park | $ 114,485 | $ 5,300 | $ 119,785 | $ 140,000 |
| 14501 Walsh | $ 134,119 | $ 5,350 | $ 139,469 | $ 140,000 |
| 2104 Heather Hills | $ 119,348 | $ 5,350 | $ 124,698 | $ 140,000 |
| 2108 Heather Hills | $ 128,928 | $ 10,050 | $ 138,978 | $ 140,000 |
| 2121 Sandlin | $ 124,539 | $ 5,350 | $ 129,889 | $ 140,000 |
| 717 Blackbird | $ 129,992 | $ 25,773 | $ 155,765 | $ 140,000 |
| 316 Scissor Tail | $ 142,658 | $ 33,813 | $ 176,471 | $ 617,148 |
| 340 Nursery Lane | $ 113,163 | $ 7,103 | $ 120,266 | $ 110,000 |
| 342 Nursery Lane | $ 113,163 | $ 7,098 | $ 120,261 | $ 110,000 |
| 344 Nursery Lane | $ 113,163 | $ 7,101 | $ 120,265 | $ 110,000 |
| 346 Nursery Lane | $ 113,163 | $ 7,102 | $ 120,265 | $ 110,000 |
| 244 Sunset | $ 215,779 | $ 13,448 | $ 229,227 | $ 220,000 |
| 2137 Village Walk Place | $ 66,580 | $ 150 | $ 66,730 | $ 65,000 |
| 2139 Village Walk Place | $ 66,580 | $ 150 | $ 66,730 | $ 65,000 |
| 2141 Village Walk Place | $ 66,580 | $ 150 | $ 66,730 | $ 65,000 |
| 2143 Village Walk Place | $ 71,028 | $ 18,544 | $ 89,572 | $ 65,000 |

**Exhibit 5**
**Inventory with Cost Basis and Estimated Sale Price**

| Address | Land Costs | Improvements | Total Cost Basis | Proposed Sales Price |
|---|---|---|---|---|
| 2145 Village Walk Place | $ 71,028 | $ 17,634 | $ 88,662 | $ 65,000 |
| 2147 Village Walk Place | $ 71,028 | $ 18,545 | $ 89,572 | $ 65,000 |
| 2149 Village Walk Place | $ 65,000 | $ - | $ 65,000 | $ 65,000 |
| 2151 Village Walk Place | $ 65,000 | $ - | $ 65,000 | $ 65,000 |
| 2153 Village Walk Place | $ 65,000 | $ - | $ 65,000 | $ 65,000 |
| 401 Sunset | $ 95,110 | $ - | $ 95,110 | $ 110,000 |
| 403 Sunset | $ 95,110 | $ - | $ 95,110 | $ 110,000 |
| 405 Sunset | $ 95,110 | $ - | $ 95,110 | $ 110,000 |
| 407 Sunset | $ 95,110 | $ - | $ 95,110 | $ 110,000 |
| 409 Sunset | $ 95,110 | $ - | $ 95,110 | $ 110,000 |
| 411 Sunset | $ 95,110 | $ - | $ 95,110 | $ 110,000 |
| 348 Nursery | $ 95,110 | $ - | $ 95,110 | $ 110,000 |
| 4924 Wild Grove | $ 95,110 | $ - | $ 95,110 | $ 110,000 |
| 4920 Wild Grove | $ 95,110 | $ - | $ 95,110 | $ 110,000 |
| 4916 Wild Grove | $ 95,110 | $ - | $ 95,110 | $ 110,000 |
| 4912 Wild Grove | $ 95,110 | $ - | $ 95,110 | $ 110,000 |
| 4908 Wild Grove | $ 95,110 | $ - | $ 95,110 | $ 110,000 |
| 4904 Wild Grove | $ 95,110 | $ - | $ 95,110 | $ 110,000 |
| 4900 Wild Grove | $ 95,110 | $ - | $ 95,110 | $ 110,000 |
| 4901 Wild Grove | $ 95,110 | $ - | $ 95,110 | $ 110,000 |
| 4905 Wild Grove | $ 95,110 | $ - | $ 95,110 | $ 110,000 |
| 4909 Wild Grove | $ 95,110 | $ - | $ 95,110 | $ 110,000 |
| 4913 Wild Grove | $ 95,110 | $ - | $ 95,110 | $ 110,000 |
| 4917 Wild Grove | $ 95,110 | $ - | $ 95,110 | $ 110,000 |
| 4921 Wild Grove | $ 95,110 | $ - | $ 95,110 | $ 110,000 |
| 4925 Wild Grove | $ 95,110 | $ - | $ 95,110 | $ 110,000 |
| 4929 Wild Grove | $ 95,110 | $ - | $ 95,110 | $ 110,000 |
| 4932 Wild Grove | $ 95,110 | $ - | $ 95,110 | $ 110,000 |
| 4940 Wild Grove | $ 95,110 | $ - | $ 95,110 | $ 110,000 |
| 2700 Hogan Hill | $ 315,000 | $ - | $ 315,000 | $ 350,000 |
| 2704 Hogan Hill | $ 315,000 | $ - | $ 315,000 | $ 350,000 |
| 2701 Hogan Hill | $ 315,000 | $ - | $ 315,000 | $ 350,000 |
| 2705 Hogan Hill | $ 315,000 | $ - | $ 315,000 | $ 350,000 |
| 2709 Hogan Hill | $ 315,000 | $ - | $ 315,000 | $ 350,000 |
| 2713 Hogan Hill | $ 315,000 | $ - | $ 315,000 | $ 350,000 |
| 2717 Hogan Hill | $ 315,000 | $ - | $ 315,000 | $ 350,000 |
| 2721 Hogan Hill | $ 315,000 | $ - | $ 315,000 | $ 350,000 |
| 2725 Hogan Hill | $ 315,000 | $ - | $ 315,000 | $ 350,000 |
| 2705 Hill Point | $ 315,000 | $ - | $ 315,000 | $ 350,000 |
| 2709 Hill Point | $ 315,000 | $ - | $ 315,000 | $ 350,000 |
| 2713 Hill Point | $ 315,000 | $ - | $ 315,000 | $ 350,000 |
| 2717 Hill Point | $ 315,000 | $ - | $ 315,000 | $ 350,000 |
| 2721 Hill Point | $ 315,000 | $ - | $ 315,000 | $ 350,000 |
| 2725 Hill Point | $ 315,000 | $ - | $ 315,000 | $ 350,000 |
| 2729 Hill Point | $ 315,000 | $ - | $ 315,000 | $ 350,000 |
| | **$ 15,427,699** | **$ 5,080,419** | **$ 20,508,118** | **$ 26,998,368** |

# EXHIBIT 6

# LIQUIDATION ANALYSIS

**Liquidation Analysis**

The Debtor presents the following liquidation analysis as of March 31, 2026, as required by

section 1129(a)(7).  The figures below are taken from the Debtor's *Monthly Operating Report* (MOR)

[Docket no.   ] for the period ending March 31, 2026:

**Assets**

| | |
|---|---|
| Cash | 911,010 |
| Inventory (book value) | 19,591,634 |
| Other assets | 1,461,593 |
| **Total:** | **21,964,237** |

**Debt**

| | |
|---|---|
| Pre-petition secured debt | 12,837,102 |
| Pre-petition unsecured debt | 587,650* |
| Post-petition debt | 98,553 |
| Estimated reorganization Costs as of 04.01.2026 | approximately 810,000 |
| **Net Equity:** | **7,630,932** |

The Debtor is believed to be solvent.  Consequently, all Allowed Claims are expected to be

paid in full through this bankruptcy case.

*Indicates an estimated $300,000 for the VilHom Claim.