**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| In re: | CASE NO. 25-43782 |
|---|---|
| **VILLAGE HOMES, L.P**<br>**Debtor.** | **CHAPTER 11** |

**OBJECTION TO (I) FINAL APPROVAL OF DISCLOSURE STATEMENT AND (II) CONFIRMATION OF SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR DEBTOR VILLAGE HOMES, L.P.**

VilHom FW Holdings, LLC f/k/a Olerio Development, LLC ("Objecting Party"), a party in interest in the above-captioned Chapter 11 case, hereby submits this objection (the "Objection") to (i) final approval of the Disclosure Statement for Second Amended Chapter 11 Plan of Reorganization for Village Homes, L.P. [Docket No. 354] (the "Disclosure Statement") and (ii) confirmation of the Second Amended Chapter 11 Plan of Reorganization for Village Homes, L.P. [Docket No. 317] (the "Plan"). In support hereof, the Objecting Party states as follows:

## I.  PRELIMINARY STATEMENT

The Plan as proposed cannot be confirmed. Despite the Debtor's representations of solvency and projected cash flows totaling approximately $6.27 million through mid-2029, critical deficiencies remain that prevent this Court from finding that the Plan satisfies the confirmation requirements of 11 U.S.C. § 1129. The Disclosure Statement likewise fails to provide adequate information sufficient to enable a hypothetical reasonable investor to make an informed judgment about the Plan, as required by 11 U.S.C. § 1125.

## II.  JURISDICTION AND STANDING

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The Objecting Party has standing to object to confirmation of the Plan as a party in interest pursuant to 11 U.S.C. § 1128(b) and Federal Rule of Bankruptcy Procedure 3020(b).

## III. BACKGROUND

1.      Village Homes, L.P. (the "Debtor") is a Texas limited partnership engaged in the construction and sale of single-family homes in Tarrant and Parker Counties, Texas. The Debtor filed for Chapter 11 relief on October 1, 2025 (the "Petition Date").

2.      The Debtor's bankruptcy was precipitated in large part by a dispute with VilHom FW Holdings, LLC f/k/a Olerio Development, LLC ("VilHom") arising from a failed Real Estate Sales Contract (the "Olerio Contract") involving approximately 100 vacant lots.

3.      The Debtor has filed the Plan providing for reorganization through continued home sales, payment of secured lenders through lot sale proceeds, and payment of unsecured claims over five years.

4.      The Bankruptcy Court conditionally approved the Disclosure Statement by Order entered May 14, 2026 [ECF No. 348]. The Confirmation Hearing is scheduled for June 26, 2026. Ballots and objections are due June 12, 2026.

## IV. OBJECTIONS TO FINAL APPROVAL OF DISCLOSURE STATEMENT

### A.   The Disclosure Statement Fails to Provide Adequate Information Regarding Feasibility.

5.      Section 1125(a)(1) of the Bankruptcy Code requires a disclosure statement to contain "adequate information" — information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, as would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan.

6.      While the Plan Projections (Exhibit 2) project total net cash flow of approximately $6.27 million through June 2029, the Disclosure Statement provides no explanation of the key assumptions underlying these projections, including: (a) assumed home sale prices and absorption rates; (b) construction cost assumptions; (c) assumed interest rates on secured debt; and (d) working capital requirements.

7.      The projections show several months of negative cash flow (e.g., January 2027: ($27,733); January 2028: ($92,083); March 2028: ($23,716); May-June 2028: ($5,262) and ($77,804)), yet the Disclosure Statement provides no explanation of how the Debtor intends to fund operations during these deficit periods, or what reserves exist to cover such shortfalls.

8.      The Disclosure Statement does not disclose the interest rates currently applicable to the seven secured lenders, which are material to any assessment of the Debtor's ability to service its approximately $13.2 million in secured debt while simultaneously paying unsecured creditors.

### B.   The Disclosure Statement Fails to Adequately Disclose Risks Related to the VilHom Adversary Proceeding.

9.      The VilHom Claim has been estimated at $300,000 for confirmation purposes, but the Debtor's own footnote acknowledges that "The Debtor believes that this Claim will ultimately be fixed at $0.00 and at no more than $300,000." This statement is contradictory on its face. The Disclosure Statement provides no meaningful discussion of the legal theories at issue in the

VilHom Adversary, the likely timeline for resolution, or the financial impact if VilHom prevails on its claims for breach of contract or specific performance.

10.     The Disclosure Statement does not disclose whether VilHom's lis pendens filings remain of record as of the date of the Disclosure Statement, or whether they have been released or expunged, which is material information for parties evaluating the Debtor's ability to sell the subject properties.

## C.   The Disclosure Statement Inadequately Addresses the Huntington Bank Dispute.

11.     The Disclosure Statement discloses that Huntington made "unauthorized wire transfers" from the Debtor's account totaling approximately $522,000, and that the Debtor has objected to Huntington's proofs of claim. However, the Disclosure Statement provides no discussion of: (a) the legal basis for the Debtor's objection and the likelihood of success; (b) the potential counterclaims the Debtor holds against Huntington; (c) the estimated timeline for resolution; or (d) the impact on the Debtor's liquidity if Huntington's claim is allowed in full.

## D.     The Disclosure Statement Fails to Disclose the Debtor's Estimated $810,000 in Reorganization Costs and Contains Unreconciled Internal Contradictions Bearing on Feasibility.

12.     The Liquidation Analysis attached to the Disclosure Statement actually served on creditors for solicitation purposes (Docket No. 320, as of November 30, 2025) shows the line item for "reorganization costs" as "(to be added)", with the resulting Net Equity figure left as a blank underline. A later-filed version of the Liquidation Analysis (Docket No. 354, Exhibit 6, as of March 31, 2026) discloses, for the first time, that the Debtor estimates these reorganization costs at approximately $810,000 — a figure material to any creditor's assessment of solvency, feasibility, and the best-interests-of-creditors test under § 1129(a)(7). Creditors who voted on the Plan based on the Disclosure Statement as served were not provided this information, in violation of the "adequate information" requirement of 11 U.S.C. § 1125(a)(1).

13.     The Disclosure Statement is internally contradictory regarding whether the Debtor remains an operating business. The Plan and Projections are premised on the Reorganized Debtor continuing its homebuilding operations and selling more than 100 remaining lots over a five-year period. Yet the Disclosure Statement's "Alternatives to Confirmation" section (Part IX.A) states that "the Debtor have sold substantially all of its assets and have ceased doing business." These two positions cannot both be true, and the Disclosure Statement does not reconcile them. Because the going-concern, continued-sales premise is central to the feasibility of the Projections, this unreconciled contradiction independently renders the Disclosure Statement's description of the Plan inadequate under § 1125.

14.     The Disclosure Statement and supporting cost-basis schedule (Exhibit 5) do not adequately disclose the construction costs necessary to realize the projected sale proceeds. Exhibit 5 shows numerous lots — including the Wild Grove and Hill Point tracts and additional Hogan Hill lots — carried at land cost only, with $0 in improvements, yet assigned proposed sale prices ranging from approximately $110,000 to $350,000 per lot. Realizing those sale prices requires the Debtor to actually construct homes on these lots, yet the Plan Projections (Exhibit 2) reflect only

loan payoffs and settlement costs against sale revenue, with no corresponding construction or cost-to-complete line item. The Disclosure Statement does not explain how, or from what source, the construction costs required to generate this revenue will be funded, leaving creditors unable to assess whether the projected revenues are realistically achievable.

## V.  OBJECTIONS TO CONFIRMATION OF THE PLAN

### A.  The Plan Fails the Feasibility Test Under 11 U.S.C. § 1129(a)(11).

15.     Section 1129(a)(11) requires the Court to find that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor." This standard requires more than speculative projections — the Debtor must demonstrate a reasonable probability that it can meet its obligations under the Plan.

16.     16.  The Plan requires the Debtor to simultaneously: (a) service approximately $13.2 million in secured debt through lot sale proceeds; (b) make monthly payments of $8,333.33 into the VilHom Escrow Account; (c) pay General Unsecured Claims of approximately $287,650 in 36 monthly installments; (d) pay ongoing administrative expenses including professional fees; and (e) pay U.S. Trustee fees.

17.     The projections contemplate selling the Debtor's entire inventory of approximately 117 lots over a period extending to mid-2029 — nearly four years. The real estate market, particularly for single-family homes in the Tarrant and Parker County area, is subject to significant volatility. The Plan contains no contingency provisions or alternative scenarios if home sales slow, interest rates rise, or construction costs increase.

18.     The projected total net cash flow of $6,277,782 over the Plan period, while positive in the aggregate, masks significant monthly variability. The months of negative or near-zero cash flow, combined with the obligation to make monthly debt service payments to seven secured lenders, raises serious concerns about whether the Debtor can meet its obligations as they come due.

19.     The Plan provides that secured lender debt matures on the second anniversary of the Effective Date. If all lots are not sold within two years, the Debtor will face balloon maturities on all secured debt simultaneously, which could necessitate liquidation or further reorganization — the precise outcome § 1129(a)(11) is designed to prevent.

20.     VilHom objects to the form of ballot approved by this Court on April 27, 2026, which references and hence restricts voting only to the First Plan (to be clear, not the Plan). VilHom has signed and submitted the bankruptcy court approved and mandated ballot and voted no with respect to the First Plan.  However, VilHom reserves its right to vote on the Second Plan, which is the subject of this filing, in the future.

### B.  The Plan Is Not Feasible Because It Fails to Fund the Debtor's Own Estimated $810,000 in Reorganization Costs (11 U.S.C. §§ 1129(a)(9)(A), (a)(11)).

21.     In its § 1129(a)(7) Liquidation Analysis (Exhibit 6, as of March 31, 2026, filed with the Disclosure Statement at Docket No. 354), the Debtor itself lists "Estimated reorganization Costs as of 04.01.2026" at approximately $810,000, and deducts that amount from assets in

computing net equity. These reorganization costs — principally the administrative and professional expense of this Chapter 11 case — are entitled to payment in full, in cash, on the Effective Date under 11 U.S.C. § 1129(a)(9)(A) unless the holder of the claim agrees to different treatment. The Debtor has not alleged, and the record does not establish, any such agreement.

22.     Despite the Debtor's own admission of this approximately $810,000 obligation, the Plan Projections (Exhibit 2) carry a "Professional Fees" line of only $15,000 to $15,450 per month — plainly an ordinary-course, go-forward figure. Nowhere in the 36-month Projections is there any disbursement corresponding to the approximately $810,000 of reorganization costs the Debtor's own Liquidation Analysis treats as a real, payable cost. The Liquidation Analysis and the Plan Projections are thus internally inconsistent: either the Projections are materially incomplete, or they silently assume these costs will be deferred — a result the record does not support and § 1129(a)(9)(A) does not permit absent agreement.

23.     The magnitude of this gap is dispositive of feasibility. According to the Debtor's own Exhibits 2 and 6, the Debtor had $911,010 in cash on hand as of March 31, 2026. Absorbing the Debtor's own approximately $810,000 reorganization-cost estimate would leave a cushion of approximately $101,010 — against a 36-month projection that already shows six negative cash-flow months, including a projected shortfall of approximately $(92,083) in January 2028 alone. A plan that cannot demonstrate funding for its own admitted administrative costs, and that operates with this thin a margin against documented negative-cash-flow months, does not satisfy the "reasonable probability of success" standard of § 1129(a)(11).

24.     This deficiency is compounded by a disclosure failure: the Liquidation Analysis actually served on creditors with the Disclosure Statement at the time of solicitation (Docket No. 320, as of November 30, 2025) left the reorganization-cost line blank — designated "(to be added)" — with the resulting Net Equity figure likewise left blank. The approximately $810,000 estimate appears only in the later-filed version of the Liquidation Analysis (Docket No. 354, Exhibit 6). Creditors were therefore asked to vote on the Plan without the single largest administrative figure in the Debtor's own solvency analysis, in further violation of the adequate-information requirement of 11 U.S.C. § 1125 discussed in Section IV above.

## C.   The Plan Fails the Best Interests of Creditors Test Under 11 U.S.C. § 1129(a)(7).

25.     Section 1129(a)(7) requires that each holder of an impaired claim either accept the Plan or receive under the Plan property of a value not less than what such holder would receive in a Chapter 7 liquidation.

26.     The Liquidation Analysis (Exhibit 6) estimates net equity of $7,630,932, but this analysis is unreliable for the following reasons: (a) the inventory is valued at book value of $19,591,634, which may not reflect fair market value — particularly for lots that have been sitting on the market or are subject to construction cost overruns; (b) the analysis does not account for the costs of a Chapter 7 trustee's sale, which typically yield significantly lower prices than orderly sales by a chapter 11 debtor in possession; and (c) the analysis does not adequately account for the disputed VilHom and Huntington claims, which, if allowed in full, would reduce available proceeds for unsecured creditors.

27.     An independent valuation of the Debtor's real property assets has not been provided to creditors, making it impossible for impaired creditors to independently verify the Debtor's assertion that they will fare better under the Plan than in a Chapter 7 liquidation.

**D.   The Plan's Treatment of the VilHom Claim Is Improper.**

28.     The Plan proposes to discharge the VilHom Claim — including all claims for breach of contract, specific performance, and any damages arising from the Olerio Contract — while simultaneously litigating through the VilHom Adversary. The discharge provision in Plan § 12.01 purports to extinguish "all VilHom Adversary Claims, and all Claims, rights, or remedies which were or could be asserted by VilHom in the State Court Lawsuit," subject only to distribution rights under Class 4.

29.     The Plan effectively uses the confirmation process to pre-adjudicate contested claims and defenses that have not been fully litigated. To the extent VilHom or any other party has valid claims that exceed the $300,000 estimation, the Plan improperly caps recovery through the confirmation process in a manner inconsistent with 11 U.S.C. § 502.

30.     The Plan provides that VilHom's "sole right to any Distribution pursuant to this Plan shall be on account of any Allowed Class 4 Claim." However, the Final Allowed Amount of the VilHom Claim has not been determined and remains pending through the Adversary Proceeding. Conditioning all distributions on resolution of a contested adversary proceeding of unknown duration creates uncertainty incompatible with a confirmable plan.

**E.   The Plan's Escrow Mechanism for the Huntington Claim Is Inadequate.**

31.     The Plan proposes to place Huntington's release price proceeds into a segregated escrow account pending resolution of the Huntington Objection. However, the Plan does not provide: (a) a timeline for resolution of the Huntington Objection; (b) adequate protection to Huntington if the escrow funds become insufficient due to declining property values or carrying costs; or (c) a mechanism for Huntington to assert rights if the Reorganized Debtor fails to timely fund the Huntington Escrow Account.

32.     If Huntington's claim of approximately $613,417.35 is ultimately allowed, the 90-day cure period for any deficiency after escrow disbursement may be insufficient protection given the Debtor's demonstrated cash flow constraints.

**F.   The Plan Does Not Comply with 11 U.S.C. § 1129(a)(1) — Good Faith.**

33.     While the Debtor urges that the Plan is proposed in good faith, the Plan Injunction in § 12.03 is extraordinarily broad. It permanently enjoins all claimants from asserting any Claims against the Debtor or its assets "other than through the terms of the Plan," yet simultaneously withholds final distribution rights from contested claimants pending resolution of adversary proceedings that may take years to conclude. This creates an indefinite state of limbo inconsistent with the fresh start principle of Chapter 11 and may not satisfy the good faith requirement of § 1129(a)(3).

34.     Independent of the foregoing, Plan § 3.01(f) provides that professional fees incurred on or after the Effective Date "may be paid by the Reorganized Debtor without necessity of any application to, or order by, the Bankruptcy Court," and the same provision appears in the Disclosure Statement's means-of-implementation section. This eliminates judicial review of

professional fees under 11 U.S.C. § 330 at precisely the point in the case when the estate's exposure to professional fees is greatest.

35.     This unsupervised-fee provision compounds the feasibility and good-faith concerns identified above. The VilHom Adversary Proceeding (Adv. No. 25-04130) remains pending, and the Final Allowed Amount of the VilHom Claim could materially exceed the $300,000 estimate used for confirmation purposes. The Huntington Objection, including the disputed approximately $522,000 in allegedly unauthorized wire transfers, will likewise require continued litigation, as will the pending Parker County lawsuit and ongoing claims-reconciliation work. Permitting the Reorganized Debtor to incur and pay an unbounded amount of litigation-related professional fees without court oversight — in a case whose feasibility already depends on a razor-thin cash cushion, as set forth in Paragraphs 20–23 above — is inconsistent with the reasonableness-of-fees requirements of 11 U.S.C. §§ 1129(a)(3) and (a)(4) and should not be confirmed as written.

## G.   The Plan Fails to Satisfy 11 U.S.C. § 1129(a)(8) and Cramdown Standards Are Not Met.

36.     If any Impaired Class votes to reject the Plan, the Debtor must satisfy the cramdown requirements of § 1129(b). The Plan provides in § 5.03 a blanket request for cramdown. However, the Debtor has not demonstrated that the Plan is "fair and equitable" with respect to any rejecting secured creditor class, nor has the Debtor established that the present value of payments to secured creditors equals the allowed amount of their secured claims as required under § 1129(b)(2)(A).

37.     With respect to Class 6 General Unsecured Claims, the Plan provides for payment over 36 months with interest at the federal judgment rate. Given the significant uncertainties in the Plan projections, the Debtor has not established that unsecured creditors will in fact receive the present value of their allowed claims as of the Effective Date.

## VI. RESERVATION OF RIGHTS

38.     The Objecting Party reserves the right to supplement or amend this Objection, to introduce evidence at the Confirmation Hearing, to join in objections filed by other parties in interest, and to raise additional arguments as may be warranted by discovery or other developments prior to the Confirmation Hearing.

## VII.   CONCLUSION

WHEREFORE, the Objecting Party respectfully requests that this Court: (i) sustain this Objection; (ii) deny final approval of the Disclosure Statement; (iii) deny confirmation of the Plan in its current form; (iv) require the Debtor to amend the Disclosure Statement to provide adequate information as required by 11 U.S.C. § 1125, including disclosure of the Debtor's approximately $810,000 reorganization-cost estimate and resulting net equity, reconciliation of the contradictory statements regarding whether the Debtor has ceased doing business, and disclosure of the construction costs necessary to realize the projected sale proceeds; (v) require the Debtor to address the feasibility and best interests deficiencies identified herein before confirmation is reconsidered, including, at a minimum, (a) establishment of a reserve or escrow funding the Debtor's approximately $810,000 reorganization-cost estimate, (b) revised Plan Projections that account for

such reorganization costs and for the construction costs necessary to generate the projected sale revenues, and (c) deletion or revision of Plan § 3.01(f) to retain this Court's review of post-Effective-Date professional fees under 11 U.S.C. § 330; and (vi) grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

**WOLF & HENDERSON, P.C.**

/s/ William L. Wolf_____

William L. Wolf
   State Bar No. 21854500
   bwolf@wolf-law.com
4309 Irving Avenue, Suite 200
Dallas, Texas 75219
214.750.1395 (T)
214.368.1395 (F)
ATTORNEYS FOR BUYER

## CERTIFICATE OF SERVICE

I hereby certify that I have served a true and correct copy of the foregoing document was served upon the parties via CM/ECF Electronic notice on June 12, 2026.

**DEBTOR and it's LITIGATION COUNSEL**

| | |
|---|---|
| Jeff Prostok | Bryan D. Bruner |
| State Bar No. 16352500 | State Bar No. 03252475 |
| Emily S. Chou | bbruner@brunerpc.com |
| State Bar No. 24006997 | Lynne B. Frank |
| Mary Taylor Stanberry | State Bar No. 24087215 |
| State Bar No. 24143781 | lfrank@brunerpc.com |
| Vartabedian Hester & Haynes LLP | BRUNER & BRUNER, P.C. |
| 301 Commerce Street, Suite 2200 | 3700 W. 7th Street |
| Fort Worth, Texas 76102 | Fort Worth, Texas 76107-2536 |
| Tel: (817) 214-4990 | Attorney for Plaintiff |
| Email: jeff.prostok@vhh.law | |
| emily.chou@vhh.law | |
| mary.stanberry@vhh.law | |

/s/ William L. Wolf_____
William L. Wolf